## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| BADLANDS ENERGY, INC. | ) Case No. 17-17465-KHT |
| EIN: 98-0204105, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) |
| | ) |
| BADLANDS PRODUCTION COMPANY | ) Case No.  17-17467-KHT |
| EIN: 84-1461816, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) |
| | ) Case No.  17-17469-KHT |
| BADLANDS ENERGY-UTAH, LLC | ) Chapter 11 |
| EIN: 47-2023934, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) |
| | ) Case No.  17-17471-KHT |
| MYTON OILFIELD RENTALS, LLC | ) Chapter 11 |
| EIN: 20-1202389, | ) |
| | ) **Jointly Administered Under** |
| Debtor. | ) **Case No.  [pending]** |
| | ) |

---

**DEBTORS' MOTION FOR EXPEDITED ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

---

Badlands Energy, Inc., and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") respectfully submit this motion for the relief requested herein. In support of this motion, the Debtors incorporate and proffer the *Affidavit of Richard S. Langdon in Support of the Debtors' Motion Seeking Expedited*

*Entry of Order(s) and Notice of Impending Hearing Thereon* (the "<u>Langdon Affidavit</u>") as provided in L.B.R. 2081-1(a). In further support of this motion, the Debtors state the following:

<u>**Preliminary Statement**</u>[1]

1.     Debtors request that the Court approve a $350,000 secured loan credit facility on an interim basis and $1.5 million in the aggregate on a final basis (collectively, the "<u>DIP Loan</u>") provided by Garrison Loan Agency Services LLC ("<u>GLAS</u>") and certain of its affiliates comprising the Pre-Petition Lenders (collectively, the "<u>DIP Lenders</u>"). If this Motion is approved, the Debtors will use the proceeds of the DIP Loan to stabilize and fund the Debtors' operations for a period sufficient to consummate sales of substantially all of their assets.

2.     For the reasons set forth below and in the Langdon Affidavit, the Debtors firmly believe that the DIP Facility will maximize the value of their estates and is an exercise of their sound business judgment. Accordingly, the Debtors respectfully request that the Court enter the Interim DIP Order and the Final DIP Order.

<u>**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and L.B.R. 4001-3**</u>

3.     Debtors seek entry of an interim order, substantially in the form filed contemporaneously with this Motion (the "<u>Interim DIP Order</u>"), and a final order (the "<u>Final DIP Order</u>,"[2] and together with the Interim DIP Order, the "<u>DIP Orders</u>"): (i) authorizing the Debtors to obtain secured postpetition financing (the "<u>DIP Facility</u>") as set forth in the Terms and Conditions - Proposed Senior Secured, Superpriority Debtor-in-Possession Credit Facility, annexed as **Exhibit A** attached hereto (the "<u>DIP Financing Term Sheet</u>" and, together with all agreements, documents, and instruments executed and delivered in connection therewith, as

---

[1] Capitalized terms used but not defined in this section have the meanings ascribed to such terms in this Motion and its Exhibits, or in the Interim DIP Order, as applicable.

[2] The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Financing Documents") among Badlands Energy, Inc. ("Badlands"), Badlands Production Company ("BPC"), Badlands Energy-Utah, LLC ("Badlands-Utah"), Myton Oilfield Rentals, LLC ("Myton"), and any other subsidiary of any of the foregoing, and GLAS as administrative agent (in such capacity, the "DIP Agent"), and the DIP Lenders; (ii) granting liens and providing superpriority claims with respect to such postpetition financing; (iii) authorizing the Debtors to use cash collateral; (iv) approving the form of adequate protection to be provided to the Prepetition Lenders; (v) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (vi) granting related relief.

4.     The DIP Financing Term Sheet and the Interim DIP Order were extensively negotiated and contain the most favorable terms that the Debtors were able to obtain. Moreover, the Debtors have an urgent need for the DIP Facility. Approval of the DIP Facility will ensure the Debtors are able to maintain their operations, pursue the chapter 11 cases, and maximize the value of their estates for the benefit of all stakeholders.

5.     The chart below contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and L.B.R. 4001-3.[3]

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
| --- | --- |
| Borrowers Bankruptcy Rule 4001(c)(1)(B) | Badlands, BPC, Badlands-Utah, and Myton.<br><br>Exhibit A, p. 1. |
| Guarantors Bankruptcy Rule 4001(c)(1)(B) | Badlands Energy-California, LLC ("Badlands California") and any other subsidiary of the debtors or Badlands California.<br><br>Exhibit A, p. 1. |

_____

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| DIP Financing Lenders Bankruptcy Rule 4001(c)(1)(B) | GLAS and certain of its affiliates.<br><br>Exhibit A, p. 2; Exhibit C, preamble. |
| Term Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B), Local Rule 4001-3(a)(2)(F) | Petition Date ("PD") + 90 days, provided no earlier "Termination Date" has occurred. Terminate Date includes failure to obtain a Final DIP Order within 25 days after the PD, and closing of the Sales.<br><br>Exhibit A, pp. 3-4 "Termination Date," and p. 19 "Maturity Date." |
| Commitment Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-3(a)(2)(A) and (B) | Not to exceed $350,000 from entry of the Interim DIP Order through entry of the Final DIP Order; and not to exceed $1,500,000 (inclusive of the $350,000 authorized on an interim basis) from and after entry of the Final DIP Order. Commitment is reduced from time to time to the extent Cash Collateral on hand exceeds $250,000.<br><br>Exhibit A, p. 18 - "DIP Advance Amounts." |
| Conditions of Borrowing Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-3(a)(2)(C) | Budgets, court orders, adequate protection, cash management and Debtors' reaffirmation of obligations are satisfactory to Agent; no Event of Default; no material adverse change; Sale progress satisfactory to Agent; payment of fees.<br><br>Exhibit A, p. 9, 12-13. |
| Interest Rates Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-3(a)(2)(D) | Lesser of maximum amount legally allowable or LIBO + 21.5% absent default; Lesser of maximum amount legally allowable or LIBO + 23.5% during default.<br><br>Exhibit A, p. 4; Exhibit C, § 2.5. |
| Use of DIP Financing Facility and Cash Collateral Bankruptcy Rule 4001(b)(1)(B)(ii) Local Rule 4001-3(a)(2)(I) | Solely for the following lawful purposes (and to the extent identified in the Budget): (a) to fund post-petition operating expenses and working capital needs of the Debtors, (b) to pay interest, fees and expenses to DIP Agent in accordance with this DIP Term Sheet, the DIP Financing Documents, and/or the Pre-Petition Credit Agreement (whether or not such amounts are reflected in the Budget); (c) to fund fees and expenses incurred in connection with the Sales; (d) to pay permitted pre-petition claim payments and adequate protection payments approved by DIP Agent, if any; (e) to pay Professional Fees and expenses provided for in the Budget; and (f) to pay certain other costs and expenses of administration, as set forth in the Budget.<br><br>Exhibit A, pp. 5-6. |
| Entities with Interests in Cash Collateral Bankruptcy Rule 4001(b)(1)(B)(i) | Pre-Petition Lenders<br><br>Exhibit C. |

4

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Fees<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3(a)(2)(E) | Fees and other charges payable in the amounts and at the times separately set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.<br><br>The Debtors also agree to pay Agent a DIP Commitment Fee of 1% of the Maximum DIP Advance Amount, which Commitment Fee shall be fully earned upon entry of the Interim Order, and payable on the Maturity Date.<br><br>The Debtors also agree to pay the costs and expenses of Agent as set forth in the Section titled "Fees and Expenses" in the DIP Term Sheet.<br><br>Exhibit A, pp. 3 and 8.<br>Order, pp. 13-14, ¶ 6. |
| Budget<br>Bankruptcy Rule 4001 (c)(1)(B)<br>Local Rule 4001-3(a)(2)(K) | All borrowings under the DIP Facility shall be limited by the Budget and borrowing Availability.<br><br>"**Budget**" means the budget of the Debtors relative to the operations of the Debtors in the Chapter 11 Cases for any fiscal period, as delivered to Agent in form and substance satisfactory to Agent in its sole discretion. A Budget for the first 8 weeks of the Chapter 11 Case (the "**Interim Budget**") must be approved by Agent and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Borrowers to Agent at least 7 business days before, and shall be approved by Agent at least 2 business days before, any hearing related to final approval of the DIP Facility and must be attached to the Final Order.<br><br>Exhibit A, pp. 2-3 and 16; Exhibit B.<br>Order, pp. 11-12, ¶ 3. |
| Reporting Information<br>Bankruptcy Rule 4001(c)(1)(B) | On or before the third (3rd) business day of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to Agent an Approved Budget Variance Report.<br><br>"**Approved Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis); (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each line item set forth in the Budget for such period; and (iii) provides an explanation for all variances between budgeted amounts and actual amounts. Each Approved Budget Variance Report will be certified as true and correct by the Debtors' chief financial officer or chief executive officer.<br><br>Exhibit A, pp. 3 and 16.<br>Order, p. 23, ¶ 19. |

DOCS-#5923417-v3

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Variance Covenant Bankruptcy Rule 4001(c)(1)(B) | Subject to the Budget Variances (as defined below): (i) the Debtors' Budget line items for actual cash receipts and cash disbursements from operations (excluding Professional Fees), shall each be adhered to, by line item, on a weekly period basis and a cumulative basis for the Budget period then ending as described below; and (ii) the disbursements for Professional Fees for the Debtors and Committee (if any) (which shall be reported in a manner so that Professional Fees for each retained Professional shall be reflected on its own line item) shall be adhered to, by line item, on a cumulative basis for that portion of the Budget period then ending, as described below.  Any professional fees payable to Agent's counsel shall not be limited by the Budget.<br><br>Actual cash receipt and cash disbursement activity (which shall not include any Professional Fees) shall be tested on a line item basis and each such line item may not vary unfavorably from the applicable Budget more than ten percent (10%) for each week during any Budget period or five percent (5%) on a cumulative basis for that portion of the Budget period then ended (collectively, the "**Budget Variances**").<br><br>Exhibit A, pp. 2-3. |
| Sale Milestones Bankruptcy Rule 4001(c)(1)(B) | PD – Sale Motions filed.<br>PD + 21 days – Sale Procedures approved by Court.<br>PD + 35 days – All bids received.<br>PD + 40 days – Auction conducted.<br>PD + 45 days – Sales approved by Court.<br>Sale Order + 10 days – Closing.<br><br>Exhibit A, pp. 11-12, subject to extension at Agent's consent or to accommodate Court's schedule. |
| Liens and Priorities Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Facility shall be secured by first priority, perfected senior and priming liens (subject and junior only to: (i) the Carve-Out and (ii) any valid, enforceable, properly perfected and unavoidable prepetition liens to the extent such liens are senior (after giving effect to any subordination agreement) to the liens of the Pre-Petition Agent and Pre-Petition Lenders (collectively, the "**DIP Liens**"):  in each Debtors' now owned or hereafter acquired right, title, or interest in any property, and all proceeds thereof (collectively, the "**DIP Collateral**"); provided, however, the DIP Collateral shall not include any Avoidance Actions or the proceeds thereof.<br><br>Subject to the Carve-Out, amounts owed by any of the Debtors to DIP Agent and DIP Lenders pursuant to the DIP Facility shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code. The foregoing superpriority claim in favor of Agent shall not be payable from any claims or causes of action arising under any Avoidance Actions.<br><br>Exhibit A, pp. 6-7.<br>Order, p. 13, ¶ 5; pp. 14-15, ¶¶ 7-8. |

DOCS-#5923417-v3

| Bankruptcy Code/ Local Rule | Summary of Material Terms |
|---|---|
| Carve Out Bankruptcy Rule 4001(c)(1)(B) | (i) unpaid post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930; and

(ii) unpaid post-petition fees and expenses of professionals of the Debtors and/or any Committee, but only to the extent that to the extent such fees and expenses satisfy all of the following:  (a) were incurred before the Termination Event, (b) are within the amounts set forth in the Budget approved by DIP Agent for such Professionals through the date of the Termination Event, (c) are subsequently allowed by the Bankruptcy Court, and (d) were not otherwise paid from retainers or any professional expense escrow account established by the Debtors; and

provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall the Carve-Out for each Professional exceed the amounts for post-petition fees set forth for such Professional in the Budget as of any applicable date of determination.

Exhibit A, pp. 17-18.
Order, pp. 18-20, ¶¶ 13-14. |
| 506(c) Waiver Bankruptcy Rule 4001(c)(1)(B)(x) Local Rule 4001-3(a)(1)(A) | Subject to entry of the Final Order and show of "cause":

(i) the Debtors shall waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code Section 506(c) or 105(a) or under any other applicable law; and

Exhibit A, p. 8.
Order, pp. 20-21, ¶ 15. |
| Section 552(b) Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-3(a)(1)(A) | Subject to entry of the Final Order and show of "cause":

(i) Agent, DIP Lender, Pre-Petition Agent, and Pre-Petition Lenders shall not be subject to the "equities of the case" exception of Bankruptcy Code Section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Facility.

Exhibit A, p. 8.
Order, pp. 20-21, ¶ 15. |
| Stipulations to Prepetition Liens and Claims Bankruptcy Rule 4001(c)(1)(B)(iii) Local Rule 4001-3(a)(1)(A)

Challenge Period Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-3(a)(1)(A) | The Debtors shall stipulate and agree that (i) the Debtors have outstanding obligations to the Pre-Petition Agent and Pre-Petition Lenders in an amount not less than $33,401,224.84, which are secured by liens on substantially all of the Debtors' asset and which are not subject to any defenses or offsets of any kind; (ii) Pre-Petition Agent's liens and security interests securing the Pre-Petition Credit Facility are valid, perfected and have first priority, and such liens and security interests encumber all assets of the Debtors, and (iii) the Debtors possess no claims, offsets or any other type of causes of action against the Pre-Petition Agent or any Pre-Petition Lender.  The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Committee, unless and to the extent (i) an adversary proceeding is filed prior to the expiration of seventy five (75) days after the Petition Date (the "**Review Period**") against the Pre-Petition Agent or Pre-Petition Lender challenging such party's liens and security interests or otherwise asserting estate claims against |

7

| Bankruptcy Code/<br>Local Rule | Summary of Material Terms |
|---|---|
| | such party, and (ii) a final, non-appealable judgment is entered against the Pre-Petition Agent or such Pre-Petition Lender in such adversary proceeding.<br><br>Exhibit A, p. 7.<br>Order, pp. 4-5, ¶ F; pp. 12-13, ¶ 4; pp. 24-27, ¶¶ 25-29. |
| Adequate Protection Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | The Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114, subject to allowed claims paid under the Carve-Out and super-priority administrative claims of Agent and DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected replacement liens and security interests in all of the DIP Collateral, subject only to the DIP Liens and the Carve-Out, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral.<br><br>Exhibit A, p.8.<br>Order, pp. 16-17, ¶ 10, |
| Events of Default Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-3(a)(2)(G) | • Current Management ceasing to be employed by the Debtors or incurring a material change in job duties.<br><br>• Any of the Chapter 11 Cases shall be converted to a case under Chapter 7 or be dismissed or the filing of a motion requesting such relief that the Debtors fail to timely oppose.<br><br>• Filing or support of a proposed plan of reorganization that does not provide for the indefeasible payment in full, in cash on the effective date of the plan of the Debtors' obligations outstanding under the DIP Facility.<br><br>• Appointment of a trustee for any of the Debtors, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.<br><br>• Appointment of an examiner with enlarged powers for any of the Debtors, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.<br><br>• Entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.<br><br>• Any Debtor shall request approval of any post-petition financing, other than the DIP Facility, which would not immediately repay all DIP Facility obligations in full.<br><br>• Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.<br><br>• Entry of an order granting liens, security interests, or claims that are senior or pari passu to the liens, security interests, or claims granted in favor of Agent or DIP Lender under the DIP Financing Documents.<br><br>• Any party in interest (including the Debtors) shall assert that any of the DIP Liens or DIP Facility obligations is invalid, or any DIP Liens granted to or DIP Facility obligations owed to Agent or DIP Lender shall be determined to be invalid. |

| Bankruptcy Code/<br>Local Rule | Summary of Material Terms |
|---|---|
| | • Any payment on, or application for authority to pay, any pre-petition claim without the prior written consent of Agent.<br>• At any time, Investment Banker ceases to be involved in the sale process or the sale process is halted.<br>• A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.<br>• Failure to make all payments under the DIP Facility when due.<br>• Failure to pay any post-petition material indebtedness.<br>• Breach of any term or covenant of the DIP Facility or in any DIP Financing Document.<br>• Any representation or warranty by any Debtor is incorrect in any material respect.<br>• Plan exclusivity shall have been terminated or any Debtor shall have agreed to any such termination.<br>• Either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect.<br>• Any action in order to restrict or prohibit Agent, the Pre-Petition Agent, the Pre-Petition Lender, or any DIP Lender from submitting a "credit bid" for any assets of the Debtors.<br>• Any Debtor shall take (or directly or indirectly support any other Person in taking) any action inconsistent with the disbursement of the 363 Sale Proceeds to the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lender contemporaneously with the closing of the 363 Sale.<br>• The failure to disburse the 363 Sale proceeds to Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of the 363 Sale.<br>• Any matters that give rise to the Termination Date.<br><br>Exhibit A, pp. 13-15. |
| Remedies in the Event of Default<br>Local Rule 4001-3(a)(2)(H) | Cease advances; terminate Debtors' use of DIP Collateral, including Cash Collateral; terminate DIP Facility; demand immediate repayment; any other remedy under applicable law.<br><br>Exhibit A, pp. 12-13.<br>Order, pp. 22-23, ¶¶ 17-18. |

## **Jurisdiction and Venue**

6.     This Court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and D.C. Colo. LCivR 84.1(a) of the United States District Court for the District of Colorado. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Debtors confirm their consent, insofar as the Court's General Procedural Order Number 2016-01 applies,

to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b), 2081-1, 4001-3, and 9013-1.

## Relief Requested

9.      Debtors request that the Court, on an interim basis pending entry of the Final DIP Order:

   a.   authorize them to obtain the DIP Financing consisting of up to $350,000 of secured financing on an interim basis and $1.5 million in aggregate on a final basis subject to and pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Financing Term Sheet;

   b.   authorize them to execute and deliver the DIP Financing Term Sheet and the other DIP Financing Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

   c.   authorize them to grant the DIP Lenders (a) superpriority administrative claims and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, except for the Carve Out and (b) pursuant to sections 364(d)(i), (c)(2) and (c)(3) of the Bankruptcy Code, perfected first priority claims, priming liens, and security interests in the DIP Collateral,[4] subject only to the properly perfected, enforceable, non-avoidable prepetition liens senior to the Pre-Petition Agent (if any) and the Carve Out.

   d.   authorize the Debtors to (a) use Cash Collateral (as defined in the Interim DIP Order) to the extent required herein, and (b) provide adequate protection, solely to the extent provided herein, to the Pre-Petition Agent and Pre-Petition Lenders under: (i) that certain Amended and Restated Credit Agreement, dated as of August 19, 2014, (the "Pre-Petition Credit Agreement," attached as Exhibit C) by and among the Debtors, as

---

[4] The DIP Collateral does not include any Avoidance Actions or proceeds thereof.  Exhibit A, p.7.

borrowers, the Guarantors party thereto, GLAS, as administrative agent (the "Pre-Petition Agent," and together with the DIP Agent, collectively, the "Agent"), and the lenders from time to time party thereto (in such capacity, the "Pre-Petition Lenders") on account of the Debtors' use of Cash Collateral and any other Pre-Petition Collateral;

e.      authorize the Agent to exercise remedies under the DIP Financing Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Financing Term Sheet);

f.      subject to entry of the Final DIP Order and a show of "cause," waive the Debtors' right to surcharge against the DIP Collateral or the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code; and

g.      schedule the Final Hearing for a date that is before the 25th day after the Petition Date to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Financing Term Sheet on a final basis and approval of notice procedures with respect thereto.

### **Background**

10.     On August 11, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these cases, and no committees have been appointed or designated.

11.     As set forth in the Langdon Affidavit, Debtors are an onshore oil and gas exploration and production company with headquarters in Denver, Colorado, and operations located primarily in Utah's Uinta Basin.

12.     Badlands is the 100% member of its subsidiary debtor affiliates, BPC, Badlands-Utah, and Myton. Badlands-Utah is a 40% working interest owner and operator of Debtor's South

Altamont Project. BPC is an approximate 35% working interest owner and operator of Debtor's Riverbend Project. Myton owns miscellaneous oil and gas operating assets utilized by the Debtors.

13.     Driven by current market conditions, the Debtors liquidity constraints have prevented them from increasing their oil and gas production and proved productive reserves. Continuation of the Debtors' business without new capital would diminish the value of their assets. Accordingly, a sale or sales of substantially all of the Debtors' assets to the highest or best bidder(s) is in the best interests of their estates and creditors.

14.     As noted above, Debtors are parties to the Pre-Petition Credit Agreement with the Agent. As of August 9, 2017, the outstanding amounts due under the Pre-Petition Credit Agreement total no less than $33,401,224.84.

15.     Obligations under the Pre-Petition Credit Agreement are secured in part by one or more Amended and Restated Security Agreements, dated on or about August 19, 2014 (each such agreement, a "Security Agreement" and collectively the "Security Agreements").  Under the Security Agreements, the Debtors granted the Pre-Petition Agent and Pre-Petition Lenders a first priority security interest in all of the Debtors' current and after acquired assets, including their equipment, accounts, chattel paper, general intangibles, documents, instruments, inventory, investment property, and all other collateral and cash collateral (the "Pre-Petition Collateral").

16.     Pursuant to UCC Financing Statements and assignments for the Pre-Petition Agent and/or Pre-Petition Lenders filed in Delaware and Nevada, Lenders have a perfected lien interest in the Pre-Petition Collateral. In addition to the UCC Financing Statements, the Pre-Petition Agent and/or Pre-Petition Lenders perfected their liens on the Pre-Petition Collateral through one or more mortgages, deeds of trust, and/or other documents recorded in Uinta County, Utah, Carbon County, Utah and Duchesne County, Utah.

DOCS-#5923417-v3

17.     All of the Debtors' cash and the revenues, receivables, proceeds, products, and profits of the Collateral constitute cash collateral within the meaning of Bankruptcy Code § 363(a) the ("Cash Collateral"). No other party claims an interest in the Cash Collateral to the knowledge of the Debtors.

18.     On August 7, 2017, Debtor BPC entered into a "stalking-horse" Purchase and Sale Agreement for a sale of substantially all of its assets with Wapiti Newco, L.L.C. (the "Riverbend PSA"). Badlands-Utah and Myton intend to auction and sell their assets pursuant to 11 U.S.C. § 363 in sale transactions separate from the Riverbend PSA transaction (together with the Rivberbend PSA transaction, the "Sales").

19.     As reflected in the Langdon Affidavit, BPC will be filing a motion seeking approval of the Riverbend PSA and sale procedures on an expedited basis in its chapter 11 case, and Badlands-Utah and Myton will seek authority to auction and sell their assets on a parallel track in their cases (the "Sale Motions"). The deadline for the Sales to be approved is 45 days after the Petition Date. Exhibit A, p. 11, Milestones, ¶ (e).

20.     In order to continue to operate in chapter 11 until the Sales occur, Debtors must be able to, among other things, use their remaining cash in the ordinary course of these chapter 11 cases. Without access to financing and Cash Collateral, Debtors will be unable to achieve their goals in connection with these chapter 11 cases, including closing the Sales.

21.     The Pre-Petition Agent and Pre-Petition Lenders possess validly perfected, first priority liens against the Pre-Petition Collateral. Pursuant to Debtors' obligations under Bankruptcy Code § 363(c) and (e), Debtors have requested that the Agent consent to the use of Agent and Pre-Petition Lender's collateral, including the Cash Collateral, as contemplated by Bankruptcy Code § 363(c)(2)(A).

13

22.     Pre-Petition Lenders and the Agent have indicated their willingness to allow the Debtors to use the Pre-Petition Collateral and Cash Collateral in which they hold a perfected security interest, but only on the specific terms and conditions set forth in the DIP Financing Documents.

23.     A copy of the Interim Budget approved by the Lenders is attached as **Exhibit B**.

**Debtors Have an Immediate Need for Cash.**

24.     Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest. As of the Petition Date, the Debtors' total cash balance is approximately $1.8 million, which is insufficient to operate their properties and pay their debts as they come due. Without prompt postpetition financing and access to Cash Collateral, the Debtors will be unable to pay wages to their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

**Alternative Sources of Financing Are Not Readily Available.**

25.     Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. However, the Debtors do not have a variety of sources of financing readily available. The Agent and Pre-Petition Lenders assert that all of the Debtors' existing producing reserves are encumbered under their existing capital structure, which, along with the Debtors' long-term liquidity needs, projected cash losses, and the current state of the oil and gas commodity markets and its impact on cash flows and asset values, restricts the availability of, and options for, postpetition financing. As a result, Debtors do not believe third-party debtor-in-possession financing is reasonably obtainable, if at all.

26.     Prior to the Petition Date, the Debtors' management and advisors initiated discussions with the Pre-Petition Lenders regarding a potential chapter 11 process as well as a variety of out-of-court restructuring options. During this process, the Agent and Pre-Petition Lenders made it clear that they would not consent to a "priming" DIP financing provided by a third party.

27.     Additionally, Debtors could not provide strong enough evidence of a sufficient equity cushion to allow for debtor in possession financing that would prime existing lenders' liens over their objections. For the same reasons regarding the likelihood of providing sufficient evidence of an equity cushion, few if any lenders would be willing to provide debtor in possession financing junior to the Debtors' existing lenders. These indicators did not portend the arrangement of a feasible third-party financing option.

28.     With any third-party proposal, Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees. In contrast, the proposed DIP Facility offered by the DIP Lenders allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

### Basis for Relief

I.     **Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Financing Documents.**

    A.     **Entry into the DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

29.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Financing Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.

15

Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

30.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

31.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

32.     Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of alternatives. Specifically, and in the face of insufficient cash on hand, Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and

16

chapter 11 activities. Further, while Debtors' vendors historically have allowed them to purchase goods on credit, their ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that Debtors are not a credit risk.

33.     Debtors negotiated the DIP Financing Term Sheet and other DIP Financing Documents with the DIP Lenders in good faith, at arms'-length, and with the assistance of their respective advisors, and Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize the Debtors' entry into the DIP Financing Documents, as it is a reasonable exercise of Debtors' business judgment.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

34.     Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Financing Documents pursuant to section 364(c) of the Bankruptcy Code; specifically, Debtors propose to provide to the DIP Lenders perfected first priority claims, priming liens, and security interests in the DIP Collateral and Pre-Petition Collateral.

35.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

17

      b.      the credit transaction is necessary to preserve the assets of the estate; and

      c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

36.     As described above and as set forth in the Langdon Affidavit, the Debtors are in need of an immediate capital infusion, yet current market conditions are challenging and the Debtors' existing producing reserves are fully encumbered under their existing capital structure. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the  Agent and Pre-Petition Lenders. Without post-petition financing, Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, or cover the projected costs of these chapter 11 cases.

37.     Absent the DIP Facility, which will allow Debtors to meet their working capital needs during these chapter 11 cases and consummate the proposed Sales, the value of their estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, they believe that the terms of the DIP Facility, as set forth in the DIP Financing Term Sheet, are fair, reasonable, and adequate, all as more fully set forth below. For all these reasons, Debtors submit that they have met the standard for obtaining post-petition financing.

38.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described

above, Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

39.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Says. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, Debtors may incur "priming" liens under the DIP Facility if either (a) the Pre-Petition Lenders have consented or (b) Pre-Petition Lenders' interests in collateral are adequately protected.

40.     Here, the Pre-Petition Lenders have consented to the DIP Facility. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

41.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *In re Stanley Hotel, Inc.*, 15 B.R. 660,

663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

42.     As noted above, Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by their existing capital structure. The Agent and Pre-Petition Lenders assert that all of the Debtors' existing producing reserves are encumbered under their existing capital structure. Thus, Debtors have determined that the DIP Facility provides the best opportunity available under the circumstances to fund these chapter 11 cases. In addition to evidence to be introduced at the hearing on the Interim DIP Order if necessary, Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.     Debtors Should Be Authorized to Use the Cash Collateral.

43.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Agent and Pre-Petition Lenders consent to Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

44.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See* 3 Collier on Bankruptcy ¶ 361.03 at 361-10 (16th ed. 2017).

45.     As described above, and as set forth in the Interim DIP Order, Debtors propose to provide the Agent and Pre-Petition Lenders with a variety of adequate protection to protect against

20

the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

      a.      Valid and automatically perfected first priority replacement liens and security interests in and upon the Pre-Petition Collateral and the DIP Collateral;

      b.      superpriority administrative claims and all of the other benefits and protections allowed under section 507(b) of the Bankruptcy Code, junior only in right to any superpriority administrative claims granted to the DIP Agent and the DIP Lenders on account of the DIP Facility and the Carve Out.

46.     Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Agent and Pre-Petition Lenders from any diminution in value to the Cash Collateral. In light of the foregoing, Debtors further submit, and the Agent and Pre-Petition Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Agent and Pre-Petition Lenders are appropriate.[5] Thus, Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases.

## III.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

47.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted,

---

[5] Pursuant to the DIP Orders, the Agent and Pre-Petition Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

48.     As explained herein, and in the Langdon Affidavit, the DIP Financing Documents are the result of: (a) Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arms'-length, good-faith negotiations between Debtors and the DIP Agent and DIP Lenders. The terms and conditions of the DIP Financing Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

49.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.     Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final DIP Order to

continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. *See* Langdon Affidavit ¶ 22.

## **Request for Final Hearing**

51.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

52.    To implement the foregoing successfully, Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that they have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

53.    Debtors will provide notice of this motion as required by L.B.R. 2081-1(a)(4) and (b). In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

Dated: August 14, 2017.

**LINDQUIST & VENNUM** LLP

By:  ___/s/Theodore J. Hartl_____
Theodore J. Hartl, #32409
Harold G. Morris, Jr., #8409
600 17th Street, Suite 1800 South
Denver, CO, 80202-5441
Telephone: (303) 573-5900
Facsimile: (303) 573-1956
Email:  thartl@lindquist.com
Email:  hmorris@lindquist.com

*Proposed Counsel for the Debtors*