IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>BADLANDS PRODUCTION COMPANY<br>EIN: 84-1461816,<br><br>    Debtor. | )<br>)<br>) Case No. 17-17467-KHT<br>) Chapter 11<br>)<br>) |

**MOTION FOR ENTRY OF AN ORDER
(A) APPROVING THE PURCHASE AND SALE AGREEMENT
BETWEEN BADLANDS PRODUCTION COMPANY AND THE SUCCESSFUL
AUCTION BIDDER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY
ALL OF ITS PROPERTY PURSUANT THERETO, FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS, AND (D) GRANTING RELATED RELIEF**

Badlands Production Company, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), respectfully states the following in support of this motion:

## I. Jurisdiction and Venue

1. This Court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and D.C. COLO. LCivR 84.1(a) of the United States District Court for the District of Colorado. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Court's Local Bankruptcy Rules, Forms and Appendix (the "Local Rules").

## II. Background

4.     On August 11, 2017 (the "Petition Date"), Debtor and its affiliates Badlands Energy, Inc., Badlands Energy-Utah, LLC, and Myton Oilfield Rentals, LLC (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Debtors have filed a motion requesting procedural consolidation and joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in the Debtors' cases, and no committees have been appointed or designated.

5.     As set forth in the Affidavit of Richard S. Langdon in Support of the Debtors' Motion Seeking Expedited Entry of Order(s) and Notice of Impending Hearing Thereon, Debtors are an onshore oil and gas exploration and production company with headquarters in Denver, Colorado, and operations located primarily in Utah's Uinta Basin.

6.     Badlands Energy, Inc., is the 100% member of its subsidiary debtor affiliates. Debtor is an approximate 35% working interest owner and operator of Debtors' Riverbend Project.

7.     Driven by current market conditions, the Debtors' liquidity constraints have prevented them from increasing their oil and gas production and proved productive reserves. Continuation of the Debtors' business without new capital would diminish the value of their assets. Accordingly, a sale or sales of substantially all of the Debtors' assets to the highest or best bidder(s) is in the best interests of their estates and creditors.

8.     Earlier this year, the Debtors retained Parkman Whaling, LLC ("PW") as investment bankers in connection with restructuring, and a potential sale, merger, or other disposition of all or a portion of the Debtors and their assets. The Debtors and PW canvassed

interested parties, solicited bids, and assisted interested buyers in completing initial due diligence toward a sale.

9. The Debtors' marketing efforts have borne fruit. Specifically, the Debtor, Badlands Production Company, and Wapiti Newco, L.L.C. (the "Stalking Horse Bidder"), have entered into a Purchase and Sale Agreement, dated as of August 7, 2017 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtor's assets for a Base Purchase Price of $5 million and the assumption of specified liabilities and obligations of the Debtor (the "Purchase Price"). The Stalking Horse Purchase Agreement, less its voluminous exhibits, is attached as **Exhibit A**.

10. The Debtor now seeks authority to market-test the transactions contemplated by the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid") to ensure that it obtains the highest or otherwise best offer or combination of offers for its assets. Pursuant to the Debtors' pending Motion for Expedited Entry of Interim and Final Orders Debtors' Motion For Expedited Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing the Debtors to Use Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing Motion"), the Debtors are required to expeditiously move toward a number of sale milestones. The sale milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed by October 5, 2017.

11. As set forth in further detail below, the sale, the Stalking Horse Purchase Agreement, the proposed bid procedures (the "Bid Procedures"), and the related relief requested in this Motion are in the best interests of the Debtor's estate, its stakeholders, and all other parties in interest. Accordingly, the Debtor respectfully requests that the Court grant this Motion.

12. Contemporaneously with this Motion the Debtor has filed its Motion for Entry of an Order (A) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially all of Its Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief (the "Bid Procedures Motion").

13. This Motion and the Bid Procedures Motion are intended to govern the expedited sale process for the Property required by the DIP Financing and the Stalking Horse Purchase Agreement to ensure an orderly market-based result.

### III. Relief Requested

14. The Debtor seeks entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as **Exhibit B** (the "Sale Order"):

    (a) authorizing and approving the Sale of the Property to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid;

    (b) authorizing and approving the Sale free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

    (c) authorizing the assumption and assignment of the Assumed Contracts; and

    (d) granting any related relief.

15. The Debtor reserves the right to file and serve before the Sale Hearing any supplemental pleading or declaration that it deems appropriate or necessary in its reasonable

business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of its request for entry of the Sale Order.

## IV. Notice

16. The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"); (b) the administrative agent under the Debtor's prepetition credit facility; (c) all creditors on the Debtor's list of creditors with the 20 largest unsecured claims; (d) the United States Attorney's Office for the District of Utah; (e) the Internal Revenue Service; (f) the Environmental Protection Agency; (g) the office of the Attorney General for the State of Utah; (h) counsel to the Stalking Horse Bidder; (i) the United States Bureau of Land Management; (j) the Utah Department of Environmental Quality; (k) all parties identified as secured creditors in Debtor's Schedule D filed as required by Section 521(a)(1)(A) of the Bankruptcy Code; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given at this time.

## V. The Proposed Sale

**A. The Proposed Stalking Horse Purchase Agreement and Contemplated Section 363 Sale.**

17. The Debtor entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the Property. The Debtor believes a prompt Sale of the Property represents the best alternative available for all stakeholders in its chapter 11 case. Moreover, it is critical for the Debtor to execute on the proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement and DIP Financing Motion. Under the DIP Financing Motion and its Proposed Interim Order ("DIP Order"), a sale transaction is to be consummated by October 5, 2017;

5

otherwise, the Debtor will trigger an event of default under the DIP Order and the Stalking Horse Purchase Agreement.

18. The Debtor respectfully requests that the Court approve the following general timeline:

- *Contract Cure Objection Deadline*: 5:00 p.m. (prevailing Mountain Time) ten calendar days from service of the Assumption and Assignment Notice (as defined herein), as the deadline to object to the Cure Amounts listed in the Assumption and Assignment Notice;

- *Bid Deadline*: 11:59 p.m. (prevailing Mountain Time), on or before September 15, 2017, as the deadline by which bids for the Property (as well as the deposit and all other documentation required under the Bid Procedures for Qualified Bidders (as defined in the Bid Procedures)) must be actually received (the "Bid Deadline");

- *Auction*: September 20, 2017 at 10:00 a.m. (prevailing Mountain Time), as the date and time the Auction, if needed, will be held at the offices of Lindquist & Vennum LLP, located at 600 17th Street, Suite 1800 South, Denver, Colorado 80202;

- *Sale Objection Deadline*: 12:00 noon (prevailing Mountain Time), September 22, 2017, as the deadline to object to the Sale;

- *Sale Hearing*: on or before September 25, 2017, at 10:00 a.m. (prevailing Mountain Time), or otherwise as the Court's calendar permits, as the date and time for the Sale Hearing;

- *Closing*: on or before October 5, 2017.

19. The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing its estate. To further ensure that the Debtor's proposed Auction and Sale process maximizes value to the benefit of the Debtor's estate, the Debtor will use the time following entry of the Bid Procedures Order to actively market the Property in an attempt to solicit higher or otherwise better bids.

B.  **Material Terms of the Stalking Horse Purchase Agreement.**

20. The following chart summarizes key terms and conditions of the Stalking Horse Purchase Agreement:[1]

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| Stalking Horse Purchase Agreement Parties (Recitals) | Seller: Badlands Production Company<br><br>Purchaser: Wapiti Newco, L.L.C. |
| Purchase Price (Sections 4, 8(i), 13 and 18) | Purchase Price: $5 million cash and the assumption of Buyer's Assumed Obligations.<br><br>Deposit: $500,000 cash.<br><br>Adjustment Items: Title defects, casualty losses, preferential purchase rights exercised, suspended funds required to be held, cure amounts paid by Buyer in excess of those scheduled by Seller. |
| Stalking Horse Bid Protections (Section 14(a)) | Breakup Fee: A breakup fee of $200,000 (the "Breakup Fee"), payable in the event of a sale to a higher and better bidder.<br><br>Expense Reimbursement: Up to $100,000, payable in the event of a sale to a higher and better bidder (the "Expense Reimbursement"). |
| Property (Section 1) | Substantially all assets of the Debtor. |
| Assumed Liabilities (Section 20(a)) | Except to the extent discharged by the Sale Order and the conveyance of Seller's assets to Buyer thereunder Free and Clear (except for Permitted Encumbrances and Buyer's Assumed Obligations), upon and after Closing, Buyer will assume, perform, pay, and perform all obligations, liabilities and duties with respect to ownership and (if applicable) operation of the Property, arising on or after the Effective Date, and all obligations arising under the Assumed Contracts (excluding Seller's obligations to pay Cure Costs) and those obligations expressly assumed or required to be performed by Buyer under this Agreement (collectively, the "Buyer's Assumed Obligations"). |

---

[1] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern in all respects. Capitalized terms used in the following summary have the meanings ascribed to them in the Stalking Horse Purchase Agreement. All references to schedules or sections in the following summary refer to schedules or sections of the Stalking Horse Purchase Agreement.

| | |
|---|---|
| Assumed Contracts (Section 2(a)) | Executory Contracts listed on **Schedule 2.1(a)** of the Stalking Horse Purchase Agreement that are selected by Buyer prior to the 10th business day preceding the Auction. |
| Excluded Assets | The Excluded Assets defined in Exhibit A of the Stalking Horse Purchase Agreement, including Avoidance Actions, Field Office and related inventory. |
| Excluded Liabilities | All obligations of Seller that are not Assumed Liabilities. |
| Representations and Warranties (Sections 5 and 6) | Customary representations and warranties by the Debtor and the Stalking Horse Bidder. |
| Closing and Other Deadlines (Section 15) | October 5, 2017, Closing deadline. |
| Requested Findings as to Successor Liability (Exhibit A) | See "Free and Clear" definition. |
| Relief from Bankruptcy Rules 6004(h) and 6006(d) | To maximize the value received for the Assets, the Debtor is seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing. The Debtor, therefore, has requested a waiver of the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d). |

**E.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

21.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

8

22. Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### 1. A Sound Business Purpose Exists for the Sale.

23. As set forth above, the Debtor has a sound business justification for selling the Property. ***First***, the Debtor believes the Sale will maximize its going-concern value by allowing a party to bid on assets that would have substantially less value on a stand-alone basis. Moreover, because the Stalking Horse Purchase Agreement contemplates the assumption of certain of the Debtor's estate's Assumed Contracts and environmental obligations, it will result in payment in full for a number of the Debtor's estate's creditors.

24. ***Second***, the sale of the Property will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Property. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtor's reasonable business judgment, the highest or otherwise best offer for the Property and will provide a greater recovery for its estate than any known or practicably available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require

an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

25. Thus, the Debtor submits that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Property and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Property through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of business judgment. The Debtor will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Property is a proper exercise of the Debtor's business judgment and is rightly authorized.

### 2. Adequate and Reasonable Notice of the Sale Will Be Provided.

26. As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Assumed Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order after notice and a hearing before it is served on parties in interest.

### 3. The Sale and Purchase Price Reflects a Fair Value Transaction.

27. It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require

10

an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

28. Moreover, as noted above, even as the Debtor moves forward with the Sale, it will continue to market the Property with the assistance of its investment advisor, Parkman Whaling LLC, and solicit other offers consistent with the Bid Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtor with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Purchase Agreement's purchase price will, conclusively, be fair value.

### 4. The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."

29. The Debtor requests that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Property.

30. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

31. Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

11

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

32. The Debtor submits that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[2] ***First***, as set forth in more detail above, the consideration to be received by the Debtor pursuant to the Stalking Horse Purchase Agreement is substantial, fair, and reasonable. ***Second***, the parties entered into the Stalking Horse Purchase Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties

---

[2] The Debtor believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtor will not choose as the Successful Bidder or Backup Bidder (as defined in the Bid Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. ***Finally***, the Stalking Horse Bidder's offer was evaluated and approved by the Debtor in consultation with its advisors, and any other bids that the Debtor ultimately determines to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtor believes that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Purchase Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 5.  The Sale Should be Approved "Free and Clear" Under Section 363(f).

33. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

34. Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtor's sale of the Property free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be Assumed Liabilities under the applicable Purchase Agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

35. The Debtor submits that any interest that will not be an Assumed Liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority to convey the Property to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**F.     The Assumption and Assignment of the Assumed Contracts Should Be Approved.**

### 1.     The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment.

36. To facilitate and effectuate the sale of the Property, the Debtor seeks authority to assign or transfer the Assumed Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

37. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943)

14

(applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

38. Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment: *First*, the Assumed Contracts are necessary to operate the Property and, as such, they are essential to inducing the best offer for the Property. *Second*, it is unlikely that any purchaser would want to acquire the Property unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Stalking Horse Purchase Agreement provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the Sale. *Finally*, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

39. Accordingly, the Debtor submits that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of its business judgment.

15

### 2. Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

40. Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

41. The Debtor submits that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Purchase Agreement requires that the Stalking Horse Bidder cure all defaults associated with, or that are required to properly assume, the Assumed Contracts. *See* Stalking Horse Purchase Agreement §2(a). Because the Bid Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### 3. Non-Debtor Parties Will Be Adequately Assured of Future Performance.

42. Similarly, the Debtor submits that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19

B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

43. The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied. As required by the Bid Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assumed Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtor to reject or assume and assign the Assumed Contracts as set forth in the Stalking Horse Purchase Agreement.

**G. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

44. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

45. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.11 at p. 6004-22 (16th rev. ed. 2017). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

46. To maximize the value received for the Property, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

18

Dated: August 14, 2017.

**LINDQUIST & VENNUM LLP**

By:     /s/Theodore J. Hartl
        Theodore J. Hartl, #32409
        Harold G. Morris, Jr., #8409
600 17th Street, Suite 1800 South
Denver, CO, 80202-5441
Telephone: (303) 573-5900
Facsimile: (303) 573-1956
Email: thartl@lindquist.com
Email: hmorris@lindquist.com

*Proposed Counsel for Badlands Energy, Inc., Badlands Production Company, Badlands Energy-Utah, LLC, and Myton Oilfield Services, LLC*