# EXHIBIT A

PURCHASE AND SALE AGREEMENT

Dated as of August 7, 2017

between

Badlands Production Company

as "Seller"

and

Wapiti Newco, L.L.C.

as "Buyer"

## Table of Contents

| | | Page |
|---|---|---|
| 1. | Purchased Property | 2 |
| 2. | Assumption and Rejection of Contracts | 2 |
| 3. | Exclusions from Property | 4 |
| 4. | Purchase Price and Performance Deposit | 4 |
| 5. | Representations of Seller | 5 |
| 6. | Representations of Buyer | 7 |
| 7. | Due Diligence Review | 9 |
| 8. | Title Review | 10 |
| 9. | Operations Pending Closing | 17 |
| 10. | Conditions to Obligations of Both Parties | 18 |
| 11. | Conditions of Closing by Seller | 18 |
| 12. | Conditions of Closing by Buyer | 18 |
| 13. | Purchase Price Adjustments | 19 |
| 14. | Bankruptcy Matters | 21 |
| 15. | Closing | 22 |
| 16. | Transactions at Closing | 22 |
| 17. | Post-Closing Adjustments; Delivery of Records | 23 |
| 18. | Taxes and Suspended Funds | 24 |
| 19. | Proceeds and Expenses | 25 |
| 20. | Assumption of Obligations and Indemnities of Buyer | 26 |
| 21. | DISCLAIMERS AND WAIVERS | 27 |
| 22. | Confidentiality | 29 |
| 23. | Further Assurances | 29 |
| 24. | Termination | 29 |
| 25. | Effect of Termination | 31 |
| 26. | Use of Seller Names | 32 |
| 27. | Continuation of Operatorship | 32 |
| 28. | Recording Documents Notices | 32 |
| 29. | Entire Agreement | 33 |
| 30. | Counterparts | 33 |

31.   Time of Essence ............................................................................................ 33
32.   Announcements; Disclosures ........................................................................ 33
33.   Waiver ........................................................................................................... 33
34.   Governing Law .............................................................................................. 34
35.   Venue and Jurisdiction .................................................................................. 34
36.   Legal Fees ..................................................................................................... 35
37.   Interpretation of Agreement .......................................................................... 35
38.   Agreement for the Parties' Benefit Only ...................................................... 35
39.   Severability ................................................................................................... 35
40.   Assignment and Binding Effect .................................................................... 35
41.   Bonds ............................................................................................................ 36
42.   Exclusive Remedy ......................................................................................... 36
43.   Survival of Representations and Warranties .................................................. 37
44.   Employee Matters .......................................................................................... 37

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated August 7, 2017 (the "Execution Date"), is between Badlands Production Company, a Delaware corporation ("Badlands" or "Seller"), with offices at 7979 E. Tufts Avenue, Suite 1150, Denver, CO 80237, and Wapiti Newco, L.L.C., a Delaware limited liability company ("Buyer"), with offices at 800 Gessner, Suite 1100, Houston, Texas 77024.

### Recitals:

A.     Seller intends to become debtors and debtors in possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") as a result of filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on or before August 11, 2017 in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"), where Seller's bankruptcy case is to be administered (the "Bankruptcy Case").

B.     Buyer desires to purchase Seller's interests in the Property (as defined herein) Free and Clear (as defined herein) (except for Permitted Encumbrances (as defined herein) and Buyer's Assumed Obligations (as defined herein)) and Seller desires to sell its interests in the Property to Buyer, all subject to and according to the terms and conditions set forth below (such purchase and sale, the "Sale Transaction").

C.     Subject to the terms of this Agreement and the Bid Procedure Order, Buyer and Seller (each, a "Party" and, collectively, the "Parties") intend that the Buyer's acquisition of the Property would be accomplished through the sale, transfer and assignment of the Property by Seller to Buyer, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, in each instance Free and Clear other than Permitted Encumbrances and Buyer's Assumed Obligations to the extent provided for in the Sale Order.

D.     Seller intends, pursuant to the terms of the final form of the Bid Procedures Order approved by the Bankruptcy Court, to conduct a Sale Process to sell all of the Property and Assumed Obligations, all as more specifically provided for herein, and the sale of the Property shall be subject to Buyer's offer being the highest or otherwise best offer as determined in accordance with the Bid Procedures Order at the conclusion of the Sale Process.

E.     The Parties acknowledge and agree that the terms of this Agreement are the result of arm's length negotiations.

F.     Capitalized terms used in this Agreement, and in the schedules and exhibits attached hereto, shall have the meanings given to such terms in Exhibit A, Definitions.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

**Agreements:**

NOW, THEREFORE, in consideration of the above recitals and of the covenants and agreements herein contained, Seller and Buyer agree as follows:

1.    **Purchased Property.** Subject to and upon the terms and conditions herein set forth, Seller shall, at Closing (in accordance with this Agreement and subject to the approval of the Bankruptcy Court) (the "Effective Date") sell, transfer, assign, convey, and deliver to Buyer, and Buyer shall purchase, receive, pay for, and accept all of Seller's right and title to, and interest in, and all privileges and obligations appurtenant to, the following described property rights, interests, privileges and obligations (such property rights, interest, privileges and obligations, SAVE and EXCEPT the Excluded Assets described in Section 3, are hereafter referred to collectively as the "Property") Free and Clear (except for Permitted Encumbrances and Buyer's Assumed Obligations):

    (a)   Oil and Gas Interests; and

    (b)   the Assumed Contracts, including all rights, obligations and interests in all such Assumed Contracts and applicable to the other rights, titles and interests included in this definition of the term "Property."

2.    **Assumption and Rejection of Contracts.**

    (a)   Schedule 2(a) sets forth a list (the "Executory Contract List") of all Executory Contracts to which the Seller is a party or by which Seller or any of the Property are bound, including all Material Contracts. Schedule 2(a) includes a cure schedule that identifies, for each Contract on the Executory Contract List, the estimated Cure Costs (and if no Cure Costs is estimated to be applicable with respect to any particular Executory Contract, the amount of such Cure Costs has been designated for such Executory Contract as "$0.00") that must be paid in order for Seller to assume, and to assign to Buyer, each Contract listed thereon pursuant to this Agreement (the "Contract and Cure Schedule"). From the date the Contract and Cure Schedule is provided through (and including) the Closing, promptly following any material changes to the information set forth on such schedule (including any new Executory Contracts to which Seller becomes a party and any change in the total amount of the Cure Costs of any such Executory Contract), Seller shall provide Buyer with a schedule that updates and corrects the Contract and Cure Schedule. Subject to the entry of the Bid Procedures Order, Seller shall serve a cure notice that includes the Contract and Cure Schedule on the counterparties to each Contract listed on the Executory Contract List. Any counterparty to a Contract included on the Executory Contract List shall have the time period prescribed by the Bid Procedures Order, or any other applicable Bankruptcy Court Order, to file with the Bankruptcy Court and serve on Buyer and Seller an objection to the Cure Costs listed on the Contract and Cure Schedule and to the adequate assurance of future performance by Buyer. At any time prior to the tenth (10th) Business Day immediately preceding the Auction, Buyer may designate in writing any Contract listed on the Executory Contract List or any other Contract to which Seller is a party or by which Seller or the Property are bound, as a Contract to be assumed by Seller and assigned to

Buyer pursuant to this Agreement (collectively the "Assumed Contracts"). In addition, any Contract deleted from the Executory Contract List by Buyer, by such date, shall be deemed to no longer be an Assumed Contract. Notwithstanding the foregoing, to the extent that any objection is filed by a counterparty to an Executory Contract within ten (10) Business Days prior to the Auction, Buyer may designate any such Executory Contract as an Assumed Contract or Excluded Contract up to one (1) Business Day prior to the Auction. All Contracts to which Seller is a party or by which Seller or any of its assets or properties are bound that are not designated as Assumed Contracts or listed on the Executory Contract List shall be deemed to be "Excluded Contracts". Seller shall be responsible for the verification of all Cure Costs for each Executory Contract and shall establish the proper Cure Costs, if any, for each Executory Contract at the hearing to consider the Sale Order. Buyer shall be obligated to pay all Cure Costs in the amounts determined by the Bankruptcy Court in the Sale Order; provided that Buyer shall receive a closing credit for the amount that the total amount of all Cure Costs as established by the Bankruptcy Court for Assumed Contracts (except those Assumed Contracts to which Wapiti Oil & Gas II, L.L.C. is a counterparty) exceed the total amount of the Cure Costs for Assumed Contracts (except those Assumed Contracts to which Wapiti Oil & Gas II, L.L.C. is a counterparty) as set forth on Schedule 2(a). Buyer shall not be required to make any payment for Cure Costs for, or otherwise have any liabilities with respect to, any Contract that is not an Assumed Contract. For the avoidance of doubt the contracts with the following parties shall not be Assumed Contracts: Monarch Natural Gas, LLC; Chipeta Processing, LLC; Questar Pipeline Company; or any of those parties' Affiliates, successors or assigns. With respect to each Assumed Contract, Buyer shall assume all obligations regarding the demonstration of adequate assurance of future performance required with respect to the Assumed Contracts under Section 365 of the Bankruptcy Code. For the avoidance of doubt, any exclusions of Assumed Contracts after the Execution Date will not result in any adjustment to the Purchase Price.  Buyer will receive a closing credit for the Cure Costs, if any, for any Previously Omitted Contracts (defined below).

    (b)    Previously Omitted Contracts.

    (i)    If, prior to Closing, and while the Bankruptcy Case is pending, it is discovered that a Contract should have been listed on the Executory Contract List but was not listed on the Executory Contract List (any such Contract, a "Previously Omitted Contract"), Seller shall, as promptly as reasonably practicable, following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof and in any event prior to dismissal of the Bankruptcy Case), (A) notify Buyer of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract, and (B) if required by Buyer, file a motion with the Bankruptcy Court on appropriate notice to the counterparties to such Previously Omitted Contract seeking entry of an order (the "Omitted Contract Order") fixing the Cure Costs and approving the assumption by Buyer and assignment to Buyer of such Previously Omitted Contract in accordance with this Section 2(b); provided, that no Previously Omitted Contract shall be assumed and assigned unless such Previously Omitted

Contract shall be designated by Buyer as an "Assumed Contract" in accordance with this Section 2(b)(i).

(ii)     Within five (5) Business Days of its receipt of the notice provided in Section 2(b)(i)(A), Buyer shall deliver written notice to Seller, designating such Previously Omitted Contract as an Assumed Contract or an Excluded Contract, as Buyer may determine in its sole discretion. For purposes of the application of this Section 2, each Previously Omitted Contract so designated as an Assumed Contract shall be an Assumed Contract, and each Previously Omitted Contract so designated as an Excluded Contract shall be an Excluded Contract. Each Previously Omitted Contract shall then be treated in accordance with the provisions of this Section 2 with respect to Assumed Contracts and Excluded Contracts.

3.    **Exclusions from Property.** The Property to be conveyed and assigned under this Agreement does not include the following, which are reserved by Seller:

(a)    The Excluded Assets;

(b)    All of Seller's Contracts that are not Assumed Contracts; and

(c)    Except for any Claims and Actions included in the Property, any and all Claims and Actions, including any Actions arising under Chapter 5 of the Bankruptcy Code.

4.    **Purchase Price and Performance Deposit.**

(a)    <u>Base Purchase Price</u>. Subject to Section 4(b) below, the aggregate consideration for the Property (the "<u>Base Purchase Price</u>" will be:

(i)    Five Million Dollars ($5,000,000.00) for all of the Property, (the "<u>Cash Consideration</u>"); and

(ii)    the assumption of the Buyer's Assumed Obligations (defined below).

The Base Purchase Price shall be adjusted as provided herein and as adjusted is referred to herein as the "<u>Purchase Price</u>."

(b)    <u>Deposit</u>. Upon execution of this Agreement, Buyer shall deliver to Seller in escrow in a form satisfactory to Buyer a performance deposit of ten percent (10%) of the Cash Consideration component of the Base Purchase Price (the "<u>Performance Deposit</u>") to assure Buyer's performance of its obligations hereunder. No interest shall be paid (or deemed earned) on the Performance Deposit. At Closing, the Performance Deposit shall be a Buyer's credit against the payment of the Purchase Price. If this Agreement is terminated without a Closing, then the distribution of the Performance Deposit shall be governed by the provisions of Section 25.

(c)    Allocation.  Seller and Buyer agree that the Base Purchase Price shall be allocated among the Property as set forth on Exhibit F for the purpose of (i) establishing a basis for certain Taxes and (ii) giving notices of value to the owners of any preferential rights to purchase the Oil and Gas Interests (for each such Property, its "Allocated Value").

5.    **Representations of Seller**.  As of the date hereof, Seller represents and warrants to Buyer as follows:

(a)    Qualification.  Badlands is a corporation validly existing and in good standing under the laws of the State of Delaware and is duly qualified to own its properties and the Property owned by it and to carry on its business as now being conducted.

(b)    Authority.  Upon approval by the Bankruptcy Court to enter into this Agreement pursuant to the Sale Order, Seller has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

(c)    Validity of Obligation.  This Agreement and all other transaction documents Seller is to execute and deliver on or before the Closing Date (i) have been duly or shall have been executed by its authorized representatives; (ii) constitute its valid and legally binding obligations; and (iii) are enforceable against it in accordance with their respective terms, in each case subject to entry of the Sale Order.

(d)    No Violation of Contractual Restrictions.  Except filings with, notices to, consents or approvals of Governmental Authorities customarily obtained subsequent to a sale or transfer and assuming the receipt of all consents or approvals applicable to the transactions contemplated hereunder, including those in Schedule 5(d) (the "Scheduled Consents"), this Agreement, and the execution and delivery hereof by Seller, subject to the entry of the Sale Order, do not and the consummation of the transactions contemplated hereby will not (i) conflict with or result in a breach of the governance agreements or bylaws of Seller or any other governing documents of Seller, (ii) violate, conflict with, or constitute a default under, or result in the creation or imposition of any Lien upon any property or assets of Seller under any mortgage, deed of trust, indenture, or agreement to which it is a party or by which the Property is bound, which violation, conflict, or default might adversely affect the ability of Seller to perform its obligations under this Agreement, or (iii) violate any statute or law or any judgment, decree, order, writ, injunction, regulation, or rule of any court or Governmental Authority, which violation might adversely affect the ability of Seller to perform its obligations under this Agreement.

(e)    No Restraining Litigation. There is no Action by any Person pending or, to Seller's Knowledge, threatened against it before any Governmental Authority that seeks damages in connection with, or seeks to restrain, enjoin, impair or prohibit the consummation of all or part of the transaction contemplated in this Agreement.

(f)    Contracts.  Solely as of the Execution Date, the list of Contracts set forth in Exhibit J, as such Exhibit exists on the Execution Date, includes the following Contracts included in the Property: (i) all farmout, farmin, development and other similar agreements with remaining drilling or assignment obligations on the part of Seller or any other party, (ii) all Contracts that would obligate Buyer to drill additional wells or conduct other material development operations after the Closing, (iii) all Contracts that provide for an area of mutual interest, (iv) all Contracts that contain a non-compete agreement that would restrict, limit or prohibit the manner in which, or the locations in which, Buyer may conduct its business, (v) all Contracts involving the transportation or processing of production that would not be cancelable by Buyer after Closing upon notice of 60 days or less without liability for further payment other than nominal penalty (including those providing for volumetric or monetary commitments or indemnification therefor or for dedication of future production), (vi) all Contracts providing for any call upon, option to purchase or similar rights with respect to the Property or to the production therefrom or the processing thereof, and (vii) all Contracts that provide for the supply or transportation of water associated with or used in production from the Leases, the Wells or the Units (herein collectively the "Material Contracts").

(g)    No Brokers' Fees.  Seller has incurred no liability, contingent, or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Buyer would be liable.

(h)    Tax Matters.  Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended and in any regulations promulgated thereunder (the "Code").  All material Tax returns required to be filed by Seller on or before the Closing Date with respect to Taxes payable in respect of the Property have been, or will be, timely filed with the appropriate governmental authority and, except as set forth on Schedule 5(h), all Taxes shown on such returns have been or will be paid. Except as set forth on Schedule 5(h), none of the Property is subject to a tax partnership agreement or arrangement for federal income tax purposes.

(i)    Actions.  Except as set forth on Schedule 5(i), to Seller's Knowledge, there are no claims, actions, suits, or proceedings (including condemnation or similar proceedings) filed or threatened against the Property or any portion thereof that would have a Material Adverse Effect on the value or operation of the Property, taken as a whole.

(j)    Production Matters.  Except as set forth on Schedule 5(j), to Seller's Knowledge, none of the Oil and Gas Interests are encumbered by take-or-pay arrangements with purchasers of oil or gas whereby Seller is obligated (i) to deliver production without receiving payment therefor or (ii) to repay monies received for production paid for but not taken.

(k)    No Violation of Laws.  To Seller's Knowledge, Seller has not violated any laws, statutes, regulations, or orders applicable (excluding Environmental Laws, which have been handled exclusively in Section 5(n)) to any of the Property or the operation

thereof which violation (i) would have a Material Adverse Effect on the value or operation of the affected Property or (ii) has not been remedied.

(l)     Consents.    Assuming entry of the Sale Order, except as set forth on Schedule 5(l), no material Consent is required to be obtained by Seller in connection with the transfer of the Property to Buyer, the execution, delivery or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby or thereby, other than any consent the failure of which to obtain would not have a Material Adverse Effect. Except for Permitted Encumbrances or as set forth on Schedule 5(l)(A), there are no valid and enforceable preferential purchase rights, rights of first refusal or similar rights to which Seller is a party or to which the Properties are subject that are applicable to the transactions contemplated hereby.

(m)     Definition of Seller's Knowledge.    In those instances where Seller's representations are made on the basis of "Seller's Knowledge," such representations are made on the basis of the actual knowledge of any of Seller's officers and any knowledge such officer should have had as an officer of Seller, and any actual knowledge of David Burnett (consultant to Seller). For purposes of this Agreement, "knowledge such officer should have had as an officer of Seller" shall mean knowledge that would have been gained by an officer through the reasonable performance of his/her duties.

(n)     Certain Environmental Matters.    Seller has not received prior to the Execution Date any communication from: (a) any Governmental Authority alleging the violation of or liability under any Environmental Law with respect to the Property or requesting, with respect to the Property, information with respect to an investigation pursuant to any Environmental Law; or (b) any landowner or surface owner of any tract upon which any of the Property is located alleging material violation of or material liability under any Environmental Law, in each case, which has not been fully remediated in accordance with applicable Environmental Laws (to the extent remediation was required, if at all). To Seller's Knowledge, Seller is not in violation of any Environmental Law.

6.     **Representations of Buyer**.    As of the date hereof, Buyer represents and warrants to Seller as follows:

(a)     Qualifications.    Buyer is a limited liability company validly existing and in good standing under the laws of the State of Delaware and is duly qualified to own its properties and assets and to carry on its business as now being conducted.

(b)     Authority.    Buyer has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, subject to entry of the Sale Order.

(c)     Validity of Obligation.    This Agreement and all other transaction documents Buyer is to execute and deliver on or before the Closing Date (i) have been duly or shall have been executed by its authorized representatives; (ii) constitute its valid

and legally binding obligations; and (iii) are enforceable against it in accordance with their respective terms, in each case subject to entry of the Sale Order.

(d) <u>No Violation</u>. Buyer's execution, delivery and performance of this Agreement do not conflict with or violate any Contract or instrument to which it is a party or by which it is bound.

(e) <u>No Brokers' Fees</u>. Buyer has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Seller would be liable.

(f) <u>No Restraining Litigation</u>. To Buyer's Knowledge, there is no Action by any Person pending or threatened, against Buyer before any Governmental Authority that seeks substantial damages in connection with, or seeks to restrain, enjoin, materially impair or prohibit the consummation of all or part of the transaction contemplated in this Agreement.

(g) <u>No Projections.</u> Buyer acknowledges that neither Seller nor any of its Affiliates have made any warranty, express or implied, as to the performance, utility or prospects, financial or otherwise, or the profitability of the Property for Buyer, or with respect to any forecasts, projections or business plans prepared by or on behalf of Seller and delivered to Buyer in connection with Buyer's review of the Property and the negotiation and the execution of this Agreement.

(h) <u>Permits.</u> Buyer or its designated operator is now or at Closing will be, and thereafter will continue to be, qualified to own and, as applicable, operate any federal, state or tribal oil, gas and mineral leases, and any oil, gas and mineral leases for all states in which the Oil and Gas Interests are located, including meeting all bonding requirements. Consummating the transaction contemplated in this Agreement will not cause Buyer to be disqualified or to exceed any acreage limitation imposed by applicable Law.

(i) <u>Sufficient Funds</u>. Buyer has, and will have on the Closing Date and thereafter, sufficient cash to enable it to make payment in immediately available funds of the Purchase Price and any other amounts to be paid by it hereunder. The letter from Buyer's lender or financing entity attached hereto as <u>Schedule 6(i)</u> is true and correct as of the Execution Date and shall be true and correct as of the Closing Date.

(j) <u>Knowledgeable Investor</u>. Buyer is an experienced and knowledgeable investor in the oil and gas business and is sophisticated in the evaluation, purchase, ownership, and operation of oil and gas properties and related facilities. Buyer is not acquiring the Property in connection with a distribution or resale thereof in violation of federal or state securities laws and the rules and regulations thereunder.

(k) <u>No Reliance</u>. Prior to executing this Agreement, Buyer has been afforded an opportunity to (i) examine the Property and such documents, instruments, and other materials as it has requested to be provided to it by Seller, (ii) discuss with representatives of Seller such documents, instruments, and other materials and the nature,

condition, and operation of the Property, and (iii) investigate the condition, including the surface and subsurface condition, of the Property. In entering into this Agreement, Buyer (x) has relied solely on the express representations and covenants of Seller in this Agreement, its independent investigation of, and judgment with respect to, the Property, and the advice of its own legal, tax, economic, environmental, engineering, geological, and geophysical advisors, and not on any comments or statements of Seller or its Affiliates, or any representatives or agents of, or consultants or advisors engaged by, Seller or its Affiliates and (y) has satisfied itself, or shall satisfy itself through its own due diligence, of the environmental and physical condition and contractual arrangements of the Property.

(l)    Governmental Approval.  To Buyer's Knowledge, no fact or circumstance exists which would preclude or inhibit approval of Seller's assignment(s) of that portion of the Property which constitutes state or federal oil, gas and mineral leases to Buyer, by any Governmental Authority having jurisdiction, including meeting existing or increased state and federal bonding or supplemental security requirements of such authority.

(m)    Definition of Buyer's Knowledge.   In those instances where Buyer's representations are made on the basis of "Buyer's Knowledge," such representations are made by Buyer on the basis of the actual knowledge, without any duty of inquiry, of Bart Agee.

7.    **Due Diligence Review.**

(a)    Records.  Prior to Closing, Seller has made available, and will make available, to Buyer, and Buyer's authorized representatives, for examination as Buyer may reasonably request, electronic copies of all Lease files, land files, right-of-way files, well files, product purchase and sale, gathering, and processing contracts, division order files, abstracts, drilling and division order title opinions, engineering and geological data, reports, maps, logs, and well records contained in Seller's files relating to the Property, other than (i) any geophysical data, (ii) any information subject to third party confidentiality agreements for which a consent or waiver cannot be secured by Seller after reasonable efforts, (iii) any information subject to an attorney/client, work product, or similar privilege, (iv) any proprietary evaluations or projections of Seller related to the Property, and (v) other information related solely to the Excluded Assets (collectively, the "Records").

(b)    Inspections.   Seller shall permit Buyer and Buyer's authorized representatives to consult with Seller's employees during reasonable business hours and to conduct, at Buyer's sole risk and expense, non-invasive site inspections and inventories of the Property that are Seller-Operated; provided, however, that Buyer shall provide Seller with not less than two (2) Business Days' written notice prior to Buyer's entry to the Property, and that Seller shall have the right to send a designated representative to accompany Buyer for the duration of such access. The scope of the work comprising such inspections shall be limited to conducting a review of the compliance status of the Property with respect to Environmental Laws and a Phase I review and otherwise as may be agreed upon by Buyer and Seller prior to

commencement. During such inspections, Buyer shall have the right to evaluate the Property to determine the condition of the Property, but Buyer shall have no right to, and shall not, conduct any soil testing, groundwater testing, or other invasive or destructive testing of the Property or take samples from the Property, without Seller's prior written consent. To the extent Buyer desires similar access to Seller's non-operated Property, Seller shall assist Buyer in obtaining such access. Buyer shall not contact the operator of any non-operated Oil and Gas Interests directly. If Buyer or any of its representatives accesses any of the Property or Seller's offices, **BUYER AGREES TO PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE SELLER PARTIES FROM AND AGAINST ANY AND ALL CLAIMS OCCURRING ON OR ARISING OUT OF ACCESS TO THE PROPERTY, THE SELLER'S OFFICES, OR THE FIELD OFFICE, AS THE CASE MAY BE, BY BUYER AND ITS REPRESENTATIVES EVEN IF SUCH CLAIMS ARE CAUSED BY THE SOLE, JOINT, AND/OR CONCURRENT NEGLIGENCE (BUT NOT THE GROSS NEGLIGENCE) OR STRICT LIABILITY OR OTHER FAULT OF THE SELLER PARTIES. BUYER'S INDEMNIFICATION OBLIGATION HEREUNDER DOES NOT APPLY TO ANY CLAIMS ARISING FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.** Buyer agrees to comply fully with all rules, regulations, and instructions issued by Seller regarding Buyer's actions while upon, entering, or leaving the Property and Seller's offices.

(c)     The Parties acknowledge and agree that after the Closing, Seller, its respective Affiliates, successors to Seller and its respective Affiliates (including, without limitation, any liquidating trustee or chapter 7 trustee subsequently appointed to administer Seller's bankruptcy estate or any assets that comprised such bankruptcy estate), Prepetition Lenders and designated agents and representatives thereof (each such party, an "Access Party" and collectively, the "Access Parties"), may need access to information or documents or other business records in the control or possession of Buyer or its Affiliates (whether such records are physical or electronic, including, without limitation, any records stored on any computer systems or similar information systems acquired by Buyer pursuant to this Agreement for one or more purposes, including without limitation: (i) preparing or filing Tax Returns; (ii) selling, using, monetizing or otherwise disposing of any Excluded Assets; and (iii) pursuing any Avoidance Actions or other claims or causes of action of any of Seller or its bankruptcy estate (other than claims or causes of action against Buyer). For one year following closing, Buyer shall reasonably cooperate in connection with, and, during normal business hours, make available for inspection and copying by such Access Parties or their successors or representatives, upon prior written request and at Seller's sole cost and expense, such information, documents, business records and other analogous information included in the Assets, as reasonably requested by such Access Parties, subject to such Access Parties executing a confidentiality agreement requested by Buyer.

**8.     Title Review.**

(a)     Defensible Title. The term "Defensible Title" means such title of Seller to the Properties immediately prior to the Effective Date that, subject to and except for Permitted Encumbrances:

(i)      in the case of any Lease or any Well (limited to currently producing intervals in such Well), entitles Seller to receive a Net Revenue Interest with respect to the Lease throughout the productive life of each Lease or Well of not less than the Net Revenue Interest shown in Exhibit B or Exhibit C, as applicable, with respect to the Lease for such Lease or Well, except (A) as otherwise specifically set forth in such Exhibit, (B) for decreases in connection with those operations from and after the Execution Date in which Seller may be a non-consenting co-owner, (C) for decreases resulting from the establishment or amendment of Units occurring in the ordinary course of business from and after the Execution Date, and (E) for decreases required under controlling agreements or applicable Law to allow other Working Interest owners to make up past underproduction or pipelines to make up past underdeliveries;

(ii)      in the case of any Well (limited to currently producing intervals in such Well), obligates Seller to bear a Working Interest throughout the productive life of such Well not greater than the Working Interest for such currently producing intervals shown in Exhibit C for such Well, without increase, except (A) as otherwise specifically set forth in such Exhibit, (B) for increases to the extent that they are accompanied by at least a proportionate increase in Seller's Net Revenue Interest with respect to the currently producing intervals for such Well and (C) for increases resulting from contribution requirements with respect to defaults or non-consent elections by co-owners under the applicable joint operating agreements; and

(iii)      is Free and Clear.

(b)      Title Defects.  The term "Title Defect" means any Lien, obligation, defect, or other matter that causes Seller not to have Defensible Title to its Property, provided, however, that Permitted Encumbrances and the following shall not be considered Title Defects:

(i)      defects in the chain of title consisting of the failure to recite marital status in a document;

(ii)      defects arising out of lack of survey or lack of metes and bounds description;

(iii)      defects asserting a change in Working Interest or Net Revenue Interest based on a change in drilling and spacing units, tract allocation or other changes in pool or unit participation occurring after the Effective Date by a Person other than such Seller;

(iv)      defects arising out of lack of evidence of corporate or other entity authorization;

(v)      defects that have been cured by applicable Laws of limitations, prescription, laches or otherwise;

(vi)     defects arising as a result of non-consent interests or farmed-in interests in any Well not being held of record by Seller;

(vii)    defects or irregularities resulting from or related to probate proceedings or lack thereof;

(viii)   defects arising from prior oil and gas leases relating to the lands relating to the Property that are terminated, expired or invalid but not surrendered of record;

(ix)     any defect that affects only which Person has the right to receive royalty payments (rather than the amount of such royalty) and that does not affect the validity of the underlying Lease; and

(x)      defects based on references to lack of information (unless such information (A) is not reflected in the records of the applicable county and (B) is not in the Records made available to Buyer).

(c)      <u>Title Benefit</u>.  The term "<u>Title Benefit</u>" means any right, circumstance or condition that operates to increase the Net Revenue Interest of Seller with respect to the currently producing intervals in any Well above that shown in Exhibit C, with respect to the currently producing intervals for such Well.

(d)      <u>Notice of Defective Interests</u>.  On or before the Defect Notice Date, Buyer shall notify Seller in writing of any matters that, in Buyer's reasonable opinion, constitute a Title Defect (such notice, a "<u>Notice of Defective Interests</u>").  To be effective, each Notice of Defective Interests shall be in writing, be received by Seller prior to or on the Defect Notice Date and contain the following: (1) a description of the alleged Title Defect, (2) a description of each Property affected by the alleged Title Defect (each such Property, a "<u>Title Defect Property</u>"), (3) the Allocated Value of each Title Defect Property, (4) supporting documents reasonably necessary for Seller (as well as any title attorney or examiner hired by Seller) to verify the existence of the alleged Title Defect, and (5) the amount which Buyer reasonably believes to be the Title Defect Amount as provided for in Section 8(f), and the computations and information upon which Buyer's beliefs are based. To give Seller an opportunity to commence reviewing and curing Title Defects, prior to the Defect Notice Date, Buyer agrees to use commercially reasonable efforts to give Seller weekly notices of all Title Defects discovered by Buyer during the preceding week; provided that any such notice may be preliminary in nature and supplemented prior to the Defect Notice Date.  Any matters that may otherwise constitute a Title Defect, but of which Seller has not been notified by Buyer in a Notice of Defective Interests delivered in accordance with this Section 8(d) prior to the Defect Notice Date, shall be deemed to have been waived by Buyer for all purposes.

(e)      Notice of Title Benefits.  On or before the Defect Notice Date, Seller shall advise Buyer in writing of any matters that, in Seller's reasonable opinion, constitute a Title Benefit (each such notice, a "Title Benefit Notice").  Each Title Benefit Notice shall be in writing and contain the following: (1) a clear description of the Title Benefit, (2) a

description of each Property affected by the Title Benefit (each such Property, a "Title Benefit Property"), (3) the Allocated Value of each Title Benefit Property, (4) supporting documents reasonably necessary for Buyer (as well as any title attorney or examiner hired by Buyer) to verify the existence of the Title Benefit, and (5) the amount which Seller reasonably believes to be the Title Benefit Amount for each Title Benefit Property and the computations and information upon which Seller's belief is based. Seller shall be deemed to have waived all Title Benefits of which it has not given notice on or before the Defect Notice Date.

(f)     Title Defect Amount. Subject to the provisions of Section 8(e), the "Title Defect Amount" means the amount by which the Allocated Value of a Title Defect Property affected by a Title Defect is reduced as a result of the existence of such Title Defect, which amount shall be determined in accordance with the following methodology, terms and conditions:

(i)     if Buyer and Seller agree in writing on the Title Defect Amount, that amount shall be the Title Defect Amount;

(ii)     if the Title Defect is a Lien that is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount of the payment necessary to remove such Title Defect from the Title Defect Property;

(iii)     in the event that the Title Defect for any Lease or Well is the actual failure of the Seller to own the represented Net Revenue Interest with respect to the Lease or Well set forth on Exhibit B or Exhibit C, as applicable, then the Title Defect Amount shall be equal to the Allocated Value of the Title Defect Property multiplied by a fraction, (A) the numerator of which is the difference between (i) the actual Net Revenue Interest with respect to the Title Defect Property, and (ii) the Net Revenue Interest with respect to such Title Defect Property as set forth on Exhibit B or Exhibit C, as applicable, and (B) the denominator of which is the Net Revenue Interest with respect to such Title Defect Property as set forth on Exhibit B or Exhibit C, as applicable; and

(iv)     if the Title Defect represents an obligation, encumbrance, burden or charge upon or other defect in title to the Title Defect Property of a type not described in subsections (i), (ii), or (iii) above, the Title Defect Amount shall be determined by taking into account the following factors:  (A) any potential discrepancy between (i) the Net Revenue Interest with respect to the Lease or Working Interest with respect to the currently producing intervals for such Title Defect Property and (ii) the Net Revenue Interest with respect to the Lease or Working Interest with respect to the currently producing intervals as stated on Exhibit B or Exhibit C, as applicable; (B) the Allocated Value of the Title Defect Property; (C) the portion of the Title Defect Property affected by the Title Defect; (D) the legal effect of the Title Defect; (E) the values placed upon the Title Defect by Buyer and Seller; (F) the likelihood that the Title Defect will prevent or impair the timely receipt of production revenues attributable to the Title Defect Property;

and (G) such other reasonable factors as are necessary to "make a proper evaluation.

Notwithstanding anything to the contrary in this Section 8, the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any Title Defect Property shall not exceed the Allocated Value of the Title Defect Property and if a Title Defect is reasonably susceptible to being cured, the Title Defect Amount attributable to such Title Defect shall not exceed the cost and expense to cure such Title Defect.

(g)    Title Deductibles.    Notwithstanding anything to the contrary in this Agreement, in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller in connection with the transactions contemplated hereby for any Title Defect affecting a Title Defect Property unless (1) the Title Defect Amount attributable to each individual Title Defect exceeds $50,000 ("Individual Title Threshold") and (2) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller in connection with the transactions contemplated hereby for any Title Defect Amount attributable to a Title Defect affecting a Title Defect Property that exceeds the Individual Title Threshold unless (A) the sum of (i) the aggregate Title Defect Amounts of all such Title Defects exceeding the Individual Title Threshold, excluding any Title Defects cured by Seller, minus (ii) all Title Benefit Amounts, exceeds (B) the Aggregate Defect Deductible, after which point Buyer shall be entitled to adjustments to the Purchase Price or other remedies only with respect to the incremental amount of all such Title Defect Amounts, in the aggregate, with no reduction for Individual Title Thresholds, in excess of such Aggregate Defect Deductible..

(h)    Title Benefit Amount.    The "Title Benefit Amount" means the amount by which the Allocated Value of a Title Benefit Property affected by a Title Benefit is increased as a result of the existence of such Title Benefit. Each Title Benefit Amount shall be determined in accordance with the same methodology, terms and conditions for determining each Title Defect Amount. With respect to any Title Benefit reported under Section 8(e), provided that the Title Benefit Amount with respect thereto is in excess of the Individual Title Threshold, the Title Benefit Amount attributable to such Title Benefit shall be used to reduce the amount of the aggregate Title Defect Amounts attributable to Title Defects properly and timely raised by Buyer after taking into account the Individual Title Threshold. If the Parties cannot reach an agreement on alleged Title Benefits or Title Benefit Amounts by the scheduled Closing, then (1) the average of Seller's and Buyer's good faith estimate of such disputed Title Benefit Amount shall be used in calculating the reduction to the Title Defect Amounts pursuant to this Section 8(h) to the extent applicable, and (2) the provisions of Section 8(l) shall apply. For the avoidance of doubt, Seller shall not be entitled to any remedy with respect to any claimed Title Benefit if the applicable Title Benefit Amount with respect thereto is not in excess of the Individual Title Threshold.

(i)    Title Adjustment Amount.    The amount by which the Purchase Price is to be adjusted in accordance with this Section 8 for Title Defect Amounts (after, for the avoidance of doubt, taking into account the Aggregate Defect Deductible) shall be referred to as the "Title Adjustment Amount".

(j)     <u>Seller's Right to Cure</u>.  Continuing until five (5) Business Days after the Defect Notice Date (such period of time, the "<u>Cure Period</u>"), Seller shall have the right, but not the obligation, to attempt, at its sole cost, to cure or remove any Title Defects timely asserted by Buyer pursuant to Section 8(d).  If Seller believes that it has cured any applicable Title Defect, Seller shall deliver written notice thereof to Buyer, together with supporting documents available to Seller and reasonably necessary for Buyer (as well as any title attorney or examiner hired by Buyer) to verify the cure of such Title Defect. Buyer shall, at or prior to two (2) Business Days after the end of the Cure Period, advise Seller in writing whether it agrees or (pursuant to a Title Dispute Notice, as described in Section 8(l)), or Disputes that any such Title Defect has been so cured; provided that Buyer's failure to timely respond to Seller's notice of cure shall be deemed Buyer's agreement that such Title Defect has been cured and Buyer's waiver of its Claim with respect to such Title Defect.  If Buyer timely notifies Seller of a Dispute as to Seller's attempted cure of any Title Defect, then (subject to Section 8(h)), the provisions of Section 8(l) shall apply to such Title Defect.

(k)     <u>Remedies for Title Defects</u>.  Subject to Seller's and Buyer's continuing right to Dispute the existence of a Title Defect and/or the Title Defect Amount asserted with respect thereto and subject to Section 8(g), in the event that any Title Defect timely asserted by Buyer in accordance with Section 8(d) is not waived in writing by Buyer or cured by Seller prior to the end of the Cure Period, then Seller shall reduce the Purchase Price by the Title Defect Amount applicable to such Title Defect and the Closing Statement and Final Closing Statement shall reflect such reduction.

As to any Title Defect timely asserted by Buyer in accordance with Section 8(d) which remains uncured by Seller prior to the end of the Cure Period and for which a corresponding Title Defect Amount is included in the Title Adjustment Amount at Closing (including, for the avoidance of doubt, any Title Defect which Seller has chosen to dispute pursuant to Section 8(l)), Seller also shall retain the right, but not the obligation, to attempt to cure each such Title Defect after Closing at Seller's sole cost and expense; provided that Seller shall furnish notice to Buyer of Seller's belief that they have cured any such Title Defect (together with supporting documents available to Seller and reasonably necessary for Buyer, as well as any title attorney or examiner hired by it, to verify the cure of any such Title Defect), by no later 15 days prior to the Final Closing Statement Due Date.  If Buyer disagrees that the Title Defect has been cured, it shall so advise Seller in writing within five Business Days after receipt of Seller's notice as provided above, following which the provisions of Section 8(l) will apply to resolve such Dispute, and the Closing Statement Due Date shall be extended as to the disputed Property only to the extent necessary to complete the Dispute resolution procedure as provided for in Section 8(l). Should Buyer (A) fail to respond to Seller's notice of cure in such five Business Day period, then Buyer shall be deemed to have (i) agreed that the Title Defect has been cured and (ii) waived its Claim with respect to such Title Defect, or (B) agree that the Title Defect has been cured, and then, in each case, the Title Defect Amount attributable thereto and included in the Title Adjustment Amount used to adjust the Purchase Price at Closing shall be credited to Seller in the Final Closing Statement.

(l)     <u>Title Dispute Resolution</u>.  If prior to the Closing or, with respect to the adequacy of Seller's Title Defect curative actions after Closing, after the Closing, the Parties are unable to resolve any Title Disputed Matter, then either Party shall have the right, upon the delivery of written notice to the other Party within the time periods set forth in this Agreement (each, a "<u>Title Dispute Notice</u>"), to Dispute such Title Disputed Matter and to invoke the Dispute resolution provisions below in this Section 8(i) in order to resolve any such Dispute.  As used herein, the term "<u>Title Disputed Matter</u>" means a Dispute regarding any of the following: (w) the existence and scope of a Title Defect or Title Benefit; (x) any Title Defect Amount or Title Benefit Amount, as the case may be; (y) the Title Adjustment Amount, if any; and (z) the adequacy of Seller's Title Defect curative actions.  As to any Dispute regarding the adequacy of Seller's Title Defect curative actions after Closing as provided for in Section 8(k), the Final Closing Statement Due Date for the Title Defect Property involved shall be extended to the extent necessary to complete the Dispute resolution procedure as provided for below in this Section 8(l). Any Title Dispute Notice must be delivered on or before the second Business Day after the Cure Period except with respect to Disputes relating to any of Seller's Title Defect curative actions conducted post-Closing.  Any Title Dispute Notice relating to any of Seller's Title Defect curative actions conducted post-Closing must be delivered within five (5) Business Days following Buyer's receipt of notice from Seller that it has cured the applicable Title Defect.  In no event will Closing be delayed on account of any Title Disputed Matter and, if the Title Defect Property affected thereby is transferred to Buyer at Closing, the average of the Parties' respective good faith estimates of the Title Defect Amounts attributable to such Title Defect Property shall be used in the calculation and determination of the Title Adjustment Amount to be used at Closing.

(i)     The Parties shall attempt to resolve all Title Disputed Matters through good faith negotiations for a period of five (5) Business Days after the delivery of a Title Dispute Notice by either Party.  Following such negotiation period, if the Title Disputed Matter at issue remains in Dispute, such Title Disputed Matter shall be resolved pursuant to this Section 8(l) and the Parties shall mutually appoint an independent expert having the qualifications specified below (the "<u>Title Defect Expert</u>").  If the Parties are unable to mutually agree upon the Title Defect Expert, then the Parties shall, within five (5) Business Days after the expiration of such foregoing negotiation period, request that the Bankruptcy Court appoint the Title Defect Expert.  The Title Defect Expert shall be a licensed title attorney having a minimum of ten years' experience with regard to the types of title defects affecting the Properties involved in the Title Disputed Matter, shall be without any conflicts of interest as to the Parties, and shall not have been employed by or undertaken more than $50,000 of work, in the aggregate, for either Party or its Affiliates within the five year period preceding the submission of the Dispute.  For the avoidance of doubt, the Title Defect Expert will function as an expert in accordance with the procedures set forth in this Section 8(i), and not as an arbitrator.

(ii)     Within ten (10) Business Days following the appointment of the Title Defect Expert, Seller shall provide the Title Defect Expert with a copy of this Agreement, and each Party shall provide, both to the Title Defect Expert and

each other, a summary of its position with regard to each such outstanding Title Disputed Matter in a written document of five pages or less per Title Disputed Matter. The Parties shall instruct the Title Defect Expert that, within 30 days after receiving the Parties' respective submissions, the Title Defect Expert shall render a written decision. In rendering its decision, the Title Defect Expert shall not award (1) a higher Title Defect Amount than the lower of (A) the Allocated Value of the applicable Property or (B) the amount claimed by Buyer in its summary, or (2) a higher Title Benefit Amount than the amount claimed by Seller in its summary, (3) a lower Title Benefit Amount than the amount claimed by Buyer in its summary or (4) a lower Title Defect Amount than that amount claimed by Seller in its summary, as applicable. The Title Defect Expert shall determine the specific disputed Title Defect, Title Benefit, Title Defect Amount, Title Benefit Amount, or the adequacy of Seller's Title Defect curative actions, as the case may be, submitted by either Party and may not award damages, interest or penalties to either Party with respect to any other matter. Any decision rendered by the Title Defect Expert pursuant hereto shall be final, conclusive, and binding on Seller and Buyer, and will be enforceable against each Party in any court having jurisdiction hereof, but is not reviewable by, or appealable to, any court except in the event of fraud. The Parties shall each bear one-half of the costs of the Title Defect Expert and of any associated dispute resolution process and proceedings.

(iii)   If the Title Defect Expert determines that a Title Defect did not exist or that a Title Defect existed but was cured by Seller, then any Title Defect Amount attributable thereto that was included in the Title Adjustment Amount used at Closing, if any, shall be credited to Seller in the Final Closing Statement.

(iv)   If the Title Defect Expert determines that a Title Defect exists, but that the Title Defect Amount attributable thereto is a lesser amount than any Title Defect Amount with respect thereto that was included in the Title Adjustment Amount used at Closing, if any, then the difference thereof shall be credited to Seller in the Final Closing Statement.

(v)   If the Title Defect Expert determines that a Title Defect exists, such Title Defect has not been cured by Seller and the Title Defect Amount attributable thereto is a greater amount than any Title Defect Amount with respect thereto that was included in the Title Adjustment Amount used at Closing, if any, then the difference thereof shall be credited to Buyer in the Final Closing Statement.

(vi)   Any such adjustments to the amount of the Purchase Price will be reflected in the Final Closing Statement as applicable.

9.   **Operations Pending Closing**.   Seller shall operate the Seller-Operated Oil and Gas Interests using the same standard of care imposed on the party defined as the "Operator" under the applicable joint operating agreements until Closing, or such later time as any applicable joint operating agreement may require, when such operation shall be turned over to, and become the responsibility of, Buyer. During the period from the Execution Date through

and including the completion of the Closing, Seller shall (i) consult with Buyer with respect to all AFE's over Fifty Thousand Dollars ($50,000) net to the interests of Seller which is received by Seller with respect to any Oil and Gas Interest, and consult with Buyer with respect to all material decisions to be made with respect to the Property, including the incurring of costs for discretionary expenditures for operations in excess of Fifty Thousand Dollars ($50,000) net to the interest of Seller for which AFE's are not prepared, except as to the operations described in Schedule 9, which Seller may conduct without consulting with Buyer, (ii) operate the Seller-Operated Property after the filing of Seller's petition in bankruptcy in accordance with the terms and conditions of all applicable contracts, laws, and regulations, including making all post-filing bankruptcy payments when due of any payments required and performing the Contracts in accordance with their terms, and (iii) not transfer, sell, hypothecate, encumber, abandon, or otherwise dispose of any material portion of the Oil and Gas Interests (other than the sale of Hydrocarbons in the ordinary course of business or as required in connection with the exercise of third parties of preferential rights to purchase any of the Oil and Gas Interests) without the written consent of Buyer.

10.    **Conditions to Obligations of Both Parties.**  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    Neither the Bankruptcy Court nor any other Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order, decree or ruling or taken any other action which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    Except for such consents and approvals of transfer of the Leases, Units, Permits, Easements and Surface Rights as are customarily obtained from Governmental Authorities subsequent to a sale or transfer, the Parties shall have received all consents, authorizations, orders and approvals from Governmental Authorities that are required in connection with the consummation of the transactions contemplated by this Agreement, in each case, in form and substance reasonably satisfactory to the Buyer and the Seller, and no such consent, authorization, order and approval shall have been revoked.

11.    **Conditions of Closing by Seller**.  The obligation of Seller to consummate the transaction contemplated hereunder is subject to the satisfaction of the following conditions:

(a)    the representations and warranties of Buyer contained in Section 6 are true and correct in all material respects on and as of the Closing Date, and all covenants and agreements hereunder to be performed by Buyer at or prior to the Closing have been performed and satisfied in all material respects;

(b)    adjustments to the Base Purchase Price under Sections 8 and 13(b) shall not have exceeded ten percent (10%) of the Base Purchase Price;

(c)     unless waived by Buyer and Seller in each such Party's sole discretion, the Sale Order shall have become a Final Order;

(d)     as of the Closing Date, no Action is pending or threatened before any Governmental Authority or any court seeking to restrain, prohibit, or declare illegal, or seeking substantial damages in connection with, the transaction that is the subject of this Agreement; and

(e)     as of the Closing Date, Buyer shall have obtained and filed with applicable Governmental Authority in the name of Buyer, replacements for Seller's and or its Affiliates, bonds, letters of credit and guarantees relating to the Property posted by Seller or its Affiliates with such Governmental Authority.

**12.     Conditions of Closing by Buyer**.  The obligation of Buyer to consummate the transaction contemplated hereunder is subject to the satisfaction of the following conditions:

(a)     the representations and warranties of Seller contained in Section 5 are true and correct on and as of the Closing Date, except where the failure of such matter to be true and accurate, if any, would not have a Material Adverse Effect and all covenants and agreements hereunder to be performed by Seller at or prior to the Closing have been performed and satisfied in all material respects;

(b)     as of the Closing Date, no Action is pending or threatened before any Governmental Authority seeking to restrain, prohibit, or declare illegal, or seeking substantial damages in connection with, the transaction that is the subject of this Agreement;

(c)     unless waived by Buyer and Seller in each such Party's sole discretion, the Sale Order shall have become a Final Order; and

(d)     for any Property subject to Preferential Purchase Rights, those rights have been waived by the holders of the Preferential Purchase Rights, or exercised, and if exercised, the Purchase Price has been adjusted pursuant to Section 13(e).

**13.     Purchase Price Adjustments.**

(a)     _Notice of Casualty Losses and Government Takings_.  If, prior to the Closing Date, all or part of the Property is damaged or destroyed by fire, flood, storm, or other accident ("Casualty Loss"), or is taken in condemnation or under the right of eminent domain, or if proceedings for such purposes shall be pending or threatened ("Government Taking"), Seller must promptly notify Buyer in writing of the nature and extent of the Casualty Loss or Government Taking and Seller's estimate of the cost required to repair or replace that portion of the Property affected by the Casualty Loss or value of the Property taken by the Government Taking.  Notwithstanding the foregoing, no individual matter described above shall be deemed to be or constitute a Casualty Loss or a Government Taking unless the estimate of the cost required to repair or replace that portion of the Property affected by the Casualty Loss or value of the Property taken by

the Government Taking for such matter exceeds Fifty Thousand Dollars ($50,000), net to Seller's interest in the affected portion of the Property.

    (b)    <u>Remedies for Casualty Losses and Government Takings</u>.  With respect to each Casualty Loss to or Government Taking of the Property, Seller and Buyer will have the following rights and remedies:

    (i)    If the agreed cost to repair or replace the portion of the Property affected by the Casualty Loss or the agreed value of the Property taken in any Government Taking is less than One Hundred Thousand Dollars ($100,000), the Purchase Price will be adjusted by the agreed cost of the Casualty Loss or the agreed value of the Property taken by the Government Taking, and the Parties will proceed with Closing.

    (ii)    If the agreed cost to repair or replace the portion of the Property affected by the Casualty Loss or the agreed value of the Property taken in any Government Taking equals or exceeds One Hundred Thousand Dollars ($100,000), the Parties will proceed with Closing and Seller shall elect by written notice to Buyer prior to Closing either (A) to adjust the Purchase Price by the agreed cost of the Casualty Loss or the agreed value of the Property taken in any Government Taking, or (B) to cause the portion of the Property affected by the Casualty Loss to be repaired or replaced, at Seller's cost, as promptly as reasonably practicable (which work may extend after the Closing Date).  In the event that any Property is repaired or replaced by Seller under clause (B) and the repaired or replaced Property is newer than the Property that was damaged, destroyed or taken, or otherwise represents an upgrade from the Property that was damaged, destroyed or taken, Buyer shall bear the portion of the cost of repair or replacement attributable to the reduction in age or increase in quality.

    (c)    <u>Insurance Proceeds and Settlement Payments</u>.  In each case under subparts (i) and (ii) of Section 13(b), Seller will be entitled to (i) all insurance proceeds with respect to any such Casualty Loss, (ii) all sums paid to Seller or Buyer by third parties by reason of any such Casualty Loss, and (iii) all compensation paid to Seller or Buyer with respect to any such Government Taking.

    (d)    <u>Change in Condition</u>.  If Closing occurs, Buyer will assume all risk of loss with respect to, and any change of condition of the Property, including production of Hydrocarbons through normal depletion, the watering-out, casing collapse or sand infiltration of any well, the depreciation of personal property through ordinary wear and tear, and changes arising from operations conducted by Seller pursuant to Section 9.  None of the events or conditions set forth in this Section 13(d) will be considered a Casualty Loss with respect to the Property, nor will they be cause for any other reduction in the Base Purchase Price, or give rise to any right to terminate this Agreement.

    (e)    <u>Preferential Purchase Rights.</u>  Seller shall promptly give notices to third parties holding any Preferential Purchase Right known to Seller or identified to Seller by Buyer prior to Closing.  Seller shall use all reasonable efforts, but without obligation to

incur any unreasonable cost or expense, to obtain waivers of, or to comply with, any such Preferential Purchase Right prior to Closing. If a Preferential Purchase Right is exercised prior to Closing, the Base Purchase Price shall be reduced by the amount allocated to the affected Oil and Gas Interests in Exhibit F, and Seller shall convey the affected Oil and Gas Interests to the holder of such right and be entitled to all amounts paid by such holder. If, as of the Closing, there is a Preferential Purchase Right for which the time to exercise has not expired and the third-party holder thereof has neither exercised nor waived its right, then the affected Oil and Gas Interest shall be conveyed to Buyer at Closing without adjustment to the Base Purchase Price, and if such Preferential Purchase Right is exercised after Closing, Buyer shall convey the affected Oil and Gas Interests to the holder of such right and be entitled to all amounts paid by such holder.

(f)     Consents.    Seller shall promptly give notices to all third parties holding any Scheduled Consents or any other consent known to Seller or identified to Seller by Buyer prior to Closing which could reasonably render the transfer of Property to Buyer void or voidable. Seller shall use all reasonable efforts, but without obligation to incur any unreasonable cost or expense, to obtain any such consents. Upon Seller's request, Buyer will provide such information regarding Buyer and its operations and financial condition as Seller reasonably believes to be necessary or appropriate to obtain any such consents. Any such consent waived by Buyer shall be deemed a Permitted Encumbrance. Unless waived by Buyer, if Seller fails to receive prior to Closing any consent (other than consents of Governmental Authorities customarily obtained subsequent to a sale or transfer) containing terms that expressly provide that an assignment without consent will terminate the Lease or render the assignment void or voidable (each a "Hard Consent"), then A) the Parties shall proceed with the Closing with respect to all of the Properties (including the portions of the Properties affected by Hard Consents), and (B) Buyer shall INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS from all Claims arising out of or resulting from such unobtained Hard Consents.

14.    **Bankruptcy Matters.**

(a)     Break-Up Fee.    Subject to approval of the Bankruptcy Court, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation hereof, and to compensate Buyer for serving as a stalking-horse bidder and providing value to Seller's bankruptcy estate, in accordance with and subject to the conditions and findings set forth in the Bid Procedures Order, Buyer shall be entitled to a termination fee equal to four percent (4%) of the Base Purchase Price (such amount, the "Break-Up Fee") and the reimbursement of the actual amount of Buyer's transaction expenses up to an aggregate amount of $100,000 (the "Reimbursement"). The Break-Up Fee and the Reimbursement shall be payable by Seller upon the conditions set forth in Section 25.

(b)     Court Approval.    The Parties acknowledge and agree that the transactions contemplated herein between Seller and Buyer with respect to the Assets are subject to the Bankruptcy Court entering the Bid Procedures Order and the Sale Order in form and substance acceptable in all respects to the Parties.

(c)    Certain Bankruptcy Undertakings.  Seller (subject to Section 14(d) below, the Bankruptcy Code, any Bankruptcy Court Orders and any other restrictions on Seller by virtue of them being debtors in bankruptcy) and Buyer each agree to use commercially reasonable efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm, or obtain the Bankruptcy Court approval of the Bid Procedures Order, and, subject to Buyer's offer being the highest or otherwise best offer as determined in accordance with the Bid Procedures Order at the conclusion of the Sale Process, approval of the Sale Order, the sale of the Property, the assumption and/or assignment of the Assigned Contracts, or any other agreement contemplated hereby and the consummation of the transactions contemplated hereby. In furtherance of the foregoing but subject to any changes imposed by the Bankruptcy Court, the Parties hereby agree as follows:

(i)    No later than August 11, 2017, Seller will file the Bankruptcy Case with the Bankruptcy Court.

(ii)    Seller shall file the Bid Procedures Motion no later than August 11, 2017.

(iii)    At least five (5) Business Days, prior to the filing by Seller of the motion seeking entry of the Bid Procedures Order and the Sale Order, Seller will (i) provide a copy thereof to Buyer and its counsel and (ii) provide Buyer and its counsel a reasonable opportunity to review and comment on such document, and any amendment or supplement thereto. Such motion shall, in all material respects, be consistent with the terms of this Agreement.

(iv)    Seller shall have obtained a final bankruptcy court order approving the Bid Procedures Motion by no later than September 1, 2017.

(v)    Seller shall have obtained a Final Order approving the Sale Order approving this transaction not later than September 25, 2017.

(d)    Notwithstanding anything to the contrary set forth in this Agreement, this Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids with respect to an Alternative Transaction. Nothing contained herein shall be construed to prohibit Seller and its Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of any such Alternative Transaction, subject to the terms and conditions of the Bid Procedures Order, including the Break-Up Fee and the Reimbursement. Seller and Buyer further acknowledge that, to obtain Bankruptcy Court approval of the transactions contemplated herein, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if required under the Bid Procedures Order, conducting an auction (the "Auction").

(e)      Except as required by the Bankruptcy Code, Bankruptcy Court, and/or the Bid Procedures Order or as a response to an objection to the Bid Procedures Order and the Sale Order, Buyer will not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement or the consummation of the transactions contemplated hereby that is inconsistent with performing and carrying out the provisions of this Agreement in accordance with the terms and subject to the conditions herein. Nothing in this Agreement shall prohibit Buyer from contacts with any creditors of the Debtors or representatives of any committee of unsecured creditors or the United States Trustee or responding to inquiries about the Buyer or appearing in Court in connection with the hearings on the Bid Procedures Order or the Sale Order.

(f)      <u>Certain Sale Order Matters</u>.  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including providing such assurances as the Bankruptcy Court may require as a condition to making a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing the required assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.

**15.      Closing**.  Subject to the satisfaction or waiver of the conditions to Closing set forth in Sections 10 and 11 above, the Closing shall be held on or before fifteen (15) Business Days after the Sale Order has been entered by the Bankruptcy Court at the offices of Lindquist & Vennum LLP, 600 17th Street, Suite 1800 South, Denver, CO 80202 or at such other time and place as Seller and Buyer may mutually agree in writing (the "<u>Closing</u>" or "<u>Closing Date</u>").

**16.      Transactions at Closing**.  The following actions shall occur at Closing:

(a)      Seller shall execute, acknowledge, and deliver to Buyer the instrument of conveyance in the form as set forth in <u>Exhibit G</u> conveying the Property;

(b)      Seller and Buyer shall execute and deliver a preliminary Closing Statement that shall set forth the Base Purchase Price, each adjustment to Base Purchase Price under this Agreement, and the calculation of such adjustments used to determine such amount under this Agreement, and the final Purchase Price, in the form as set forth in <u>Exhibit H</u>;

(c)      Seller and Buyer shall execute, acknowledge, and deliver mutually agreeable transfer orders or letters-in-lieu prepared by the Buyer, directing all purchasers of production to make future payments of proceeds attributable to production from the Property to Buyer;

(d)      Seller shall deliver to Buyer a "<u>non-foreign person</u>" affidavit that complies with Section 1445 of the Code in the form as set forth in <u>Exhibit I</u>;

(e)     Buyer shall deliver to Seller a certificate stating that the representations and warranties of Buyer contained in Section 6 are true and correct, in all material respects, as of the Closing Date, and that Buyer has performed, in all material aspects, all covenants and agreements to be performed by Buyer hereunder at or prior to Closing;

(f)     Seller shall deliver to Buyer a certificate stating that the representations and warranties of Seller contained in Section 5 are true and correct, in all material respects, as of the Closing Date, and that Seller have performed, in all material aspects, all covenants and agreements to be performed by Seller hereunder at or prior to Closing;

(g)     Buyer shall deliver to Seller a complete copy of Buyer's environmental assessment of the Property, including, but not limited to, reports, data, valuation, assessments, and conclusions;

(h)     Seller shall deliver to the Buyer a certified copy of the Sale Order, together with a docket sheet for the Bankruptcy Case as of the Closing Date.

(i)     Seller shall deliver to Buyer possession of the Property, subject to any applicable operating agreements or other related agreements affecting the Property; and

(j)     Buyer shall deliver to Seller cash by wire transfer in the amount of the Purchase Price, less the Deposit to an account designated in writing by Seller.

17.    **Post-Closing Adjustments; Delivery of Records.**

(a)     Final Closing Statement.  As soon as practicable after the Closing, but in no event later than 120 days after Closing except as may be otherwise expressly provided herein, (the "Final Closing Statement Due Date"), Buyer will cause to be prepared and delivered to Seller, in accordance with GAAP and customary industry accounting practices, a settlement statement setting forth each adjustment to the Purchase Price in accordance with Sections 8, 13 and 19 and showing the calculation of such adjustments and the resulting final purchase price (the "Final Purchase Price" and such statement, the "Final Closing Statement").  Within thirty (30) days after its receipt of the Final Closing Statement, Seller shall deliver to Buyer a written report containing any changes that Seller proposes to make to the Final Closing Statement.  Seller's failure to deliver to Buyer a written report detailing proposed changes to the Final Closing Statement by such date shall be deemed to be an acceptance by Seller of the Final Closing Statement delivered by Buyer.  The Parties shall endeavor to agree in writing with respect to the changes proposed by Seller, if any, by no later than thirty (30) days after Seller's receipt of Buyer's proposed Final Closing Statement.  Should the Parties fail to agree on the Final Closing Statement and Final Purchase Price by such date, either Party may invoke the Dispute resolution procedures provided for in Section 35.  The date upon which such agreement is reached or upon which the Final Purchase Price is determined pursuant to Section 35 shall be herein called the "Final Closing Date".  If such agreed or determined Final Purchase Price is more than the Purchase Price paid pursuant to Section 16(h), Buyer shall pay to Seller the amount of such difference by wire transfer in immediately available funds no later than five Business Days after the Final Closing Date.  If such

agreed or determined Final Purchase Price is less than the Purchase Price paid pursuant to Section 16(h), Seller shall pay the amount of such difference to Buyer by wire transfer in immediately available funds no later than five Business Days after the Final Closing Date.

(b)      Delivery of Records.  No later than ten (10) Business Days after Closing, Seller shall deliver to Buyer the Records (and Seller shall retain copies of the Records).

**18.      Taxes and Suspended Funds.**

(a)      Taxes.  All Taxes, other than Transfer Taxes, and similar obligations with respect to the tax period in which the Effective Date occurs (the "current tax period") shall be apportioned between Seller and Buyer as of the Effective Date based on an estimate of the immediately preceding tax period assessment and prorating such Taxes on a per diem basis, and the Purchase Price shall be reduced at Closing by the amount of such estimated Taxes owed by Seller for that portion of the current tax period prior to the Effective Date. Buyer shall be liable and shall indemnify Seller for all Taxes attributable to Property, other than Transfer Taxes, for the portion of the current tax period after the Effective Date as well as any and all tax periods beginning on or after the Effective Date.

(b)      Transfer Taxes. It is the reasonable anticipation of the Parties that the transactions to occur pursuant to this Agreement, including the transfer of the Property, shall not give rise to any transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees arising out of or in connection with the transactions effected pursuant to this Agreement (the "Transfer Taxes"), but to the extent there are any Transfer Taxes attributable to the consummation of the transactions under this Agreement, such Transfer Taxes shall be paid by the Buyer. Any Transfer Tax inclusive of any penalty and interest, assessed at a future date against the Parties with respect to the transactions covered herein shall be paid by the Buyer, or if paid by the Seller shall be promptly reimbursed by the Buyer. Seller and Buyer shall reasonably cooperate to mitigate, reduce or eliminate any Taxes referred to in this Section 18(b), and to use reasonable efforts to obtain any certificate or other documents from any Governmental Authority as may be possible to mitigate, reduce or eliminate any such Transfer Taxes. For the avoidance of doubt, "Transfer Taxes" shall not include any federal, state and local income and gain Taxes resulting from the transactions hereunder.

(c)      Suspense Accounts. At Closing, the Purchase Price shall be decreased by an amount equal to all funds required to be held in suspense by Seller related to proceeds of production, whether or not actually held in a separate account by Seller, and any rebates of severance taxes and attributable to the interests of third parties in the Leases or lands pooled or unitized therewith, including funds suspended awaiting minimum disbursement requirements, funds suspended under division orders, and funds suspended for title and other defects (the "Suspended Funds") and the Parties shall cause such amounts to be reflected on the Final Closing Statement. After Closing, Buyer shall assume all liability related to the amount of the Suspended Funds, administer all such accounts and assume all payment obligations to the proper parties with respect to the

Suspended Funds in accordance with the terms of the Leases and all applicable laws, rules, and regulations.

**19.**   **Proceeds and Expenses.**

(a)   Proceeds Prior to Effective Date.  All proceeds, including proceeds held in suspense or escrow and proceeds received after the Effective Date for oil produced and held in storage on the Leases but not sold on or after the Effective Date, attributable to the Property and accruing to the period prior to the Effective Date (including outstanding accounts receivable attributable to the period prior to the Effective Date) shall belong to Seller.

(b)   Proceeds On and After Effective Date.  All proceeds attributable to the Property and accruing to the period on and after the Effective Date shall belong to Buyer. If Seller has received proceeds belonging to Buyer after the Effective Date, Seller will account to Buyer in writing for such proceeds at the same price Seller received for the production in accordance with its existing product purchase and sale contracts.  In addition, there is excepted, reserved, and excluded from the Property any and all rights and claims for reimbursement, recovery, or recoupment by any lawful means of payments for any royalties, overriding royalties, or other payments from production arising from or attributable to the Property prior to the Effective Date that were tendered by Seller (or any of its affiliated or subsidiary companies) to and accepted by any lessor, mineral owner, or other party (collectively, "Royalty Owners") that are in excess of the amount of royalties, overriding royalties, or other payments from production, if any, actually due or owing to such Royalty Owners prior to the Effective Date.  If Buyer becomes aware of any such payments, Buyer shall promptly notify Seller and shall cooperate with Seller in Seller's efforts in respect of such payments.

(c)   Expenses.  Solely with regard to calculating the Closing Statement and the Final Closing Statement, and not otherwise, (i) Seller shall be entitled to be reimbursed by Buyer for any costs and expenses paid by Seller with respect to the Property for any period after the Effective Date and attributable to the ownership or operation of the Property on or after the Effective Date, and (ii) Buyer shall be entitled to be reimbursed by Seller for any costs and expenses paid by Buyer with respect to the Property for any period prior to the Effective Date and attributable to the ownership or operation of the Property prior to the Effective Date.

(d)   Overhead Expenses.  With regard to the Property which is jointly owned and operated by Seller, Seller (i) shall retain overhead charges and rates received by Seller or its Affiliates in their capacity as "Operator" under the applicable operating agreement or COPAS accounting procedure attributable to any jointly owned Leases through the end of the month in which Closing and/or transfer of operations occurs, whichever is later and (ii) shall be entitled to receive, with respect to periods between the Effective Date and Closing, an overhead charge relating to such Property under the applicable operating agreements that would be chargeable, as Operator, if owned by a non-operating, third-party working interest owner. Seller shall retain (i) and (ii) assuming

the Seller has made all post bankruptcy filings to respective parties for Property jointly owned and operated by Seller.

20. **Assumption of Obligations and Indemnities of Buyer.**

(a)   Assumption by Buyer. Except to the extent discharged by the Sale Order and the conveyance of Seller's assets to Buyer thereunder Free and Clear (except for Permitted Encumbrances and Buyer's Assumed Obligations), upon and after Closing, Buyer will assume, perform, pay, and perform all obligations, liabilities and duties with respect to ownership and (if applicable) operation of the Property, arising on or after the Effective Date, and all obligations arising under the Assumed Contracts (excluding Seller's obligations to pay Cure Costs) and those obligations expressly assumed or required to be performed by Buyer under this Agreement (collectively, the "Buyer's Assumed Obligations"). Without limiting the generality of the foregoing and except to the extent discharged by the Sale Order and conveyance of Seller's assets to Buyer thereunder Free and Clear (except for Buyer's Assumed Obligations), Buyer's Assumed Obligations shall also specifically include the following obligations arising after the Effective Date: (i) to pay and deliver royalties, overriding royalties, non-participating royalties, and other burdens on production, (ii) any obligations in connection with or arising out of balancing of overproduction or underproduction from the Property, (iii) to take all actions and perform all obligations necessary to comply with all laws and governmental regulations with respect to the Property, including the lawful plugging and abandonment of oil and gas wells and the restoration of the surface of the land, or any governmental request or other requirement to abandon any pipeline or facility or take any clean-up, remedial, or other action with respect to the Property,  (iv) to dismantle or decommission and remove any personal property used with respect to the Property and other property of whatever kind related to or associated with operations and activities conducted by whomever on the Property, (v) to perform all obligations applicable to or imposed on the lessee, owner or operator under the Leases and any applicable contracts, or as required by any law, and (vi) to perform all obligations related to administration and payment of the Suspended Funds. Without limitation of the foregoing or Buyer's rights under this Agreement, Buyer shall not assume any obligations and liabilities or alleged or threatened liabilities and obligations of Seller for any violation of Environmental Laws with respect to the Property which are related to occurrences prior to the Effective Date.

(b)   Buyer's Indemnity. From and after Closing, subject to the provisions of this Agreement, Buyer shall, to the fullest extent permitted by law, **PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS** Seller and its Affiliates, and the managers, directors, officers, employees, agents, and representatives of each of them (collectively, the "Seller Parties") from and against any and all Claims attributable to or arising out of the following:  (i) the use, ownership, or operation of the Property, relating to periods of time after the Effective Date, (ii) Buyer's assumption of any obligation or liability contained in this Section 20, (iii) the breach by Buyer of any of its representations in Section 6, and (iv) the breach by Buyer of any of its agreements and covenants in this Agreement.

(c)    Compliance with Express Negligence Rule. THE INDEMNIFICATION, WAIVER, RELEASE, AND ASSUMPTION PROVISIONS OF BUYER IN THIS AGREEMENT, INCLUDING THOSE IN THIS SECTION 20 AND SECTION 21 BELOW, **SHALL BE APPLICABLE WHETHER OR NOT THE CLAIMS IN QUESTION AROSE SOLELY OR IN PART FROM THE ACTIVE, PASSIVE, COMPARATIVE, CONTRIBUTORY, CONCURRENT, SOLE OR JOINT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANY OF THE SELLER PARTIES OR ANY OTHER PERSON; EXCEPT FOR CLAIMS ARISING FROM SELLER PARTIES' GROSS NEGLIGENT ACT OR WILLFUL MISCONDUCT.**

21.    **DISCLAIMERS AND WAIVERS.**

(a)    Title Waiver. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE PROPERTY SHALL BE CONVEYED AND TRANSFERRED WITHOUT ANY REPRESENTATION, WARRANTY, OR COVENANT OF TITLE OF ANY KIND OR NATURE, EITHER EXPRESS, IMPLIED, OR STATUTORY.

(b)    No Reliance. Buyer has reviewed and has access to all contracts, documents, records, and information which it has desired to review in connection with its decision to enter into this Agreement, and to consummate the transactions contemplated hereby. Buyer has not relied upon any representation, warranty, statement, advice, document, projection, or other information of any type provided by Seller, or its Affiliates, or any of their representatives, except for those expressly set forth in this Agreement. In deciding to enter into this Agreement, and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own knowledge, investigation, and analysis (and that of its representatives and advisers) and not on any disclosure or representation made by, or any duty to disclose on the part of, Seller or its Affiliates, or any of their representatives or advisers, other than the representations and warranties of Seller expressly set forth in this Agreement.

(c)    Limited Duties. Any and all duties and obligations which either Party may have to the other Party with respect to or in connection with the Property, this Agreement, or the transactions contemplated hereby are limited to those in this Agreement. The Parties do not intend (i) that the duties or obligations of either Party, or the rights of either Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever or (ii) that any equitable or legal principle or any implied obligation of good faith or fair dealing or any other matter requires either Party to incur, suffer, or perform any act, condition, or obligation contrary to the terms of this Agreement and that it would be unfair, and that they do not intend, to increase any of the obligations of any Party under this Agreement on the basis of any implied obligation or otherwise.

(d)    Defects. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE PROPERTY IS BEING CONVEYED AND ASSIGNED TO AND ACCEPTED BY BUYER IN ITS "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION,

WARRANTY, OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MARKETABILITY, QUALITY, CONDITION, CONFORMITY TO SAMPLES, MERCHANTABILITY, AND/OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED BY SELLER AND WAIVED BY BUYER.  BUYER RECOGNIZES THAT THE PROPERTY HAS BEEN USED FOR OIL AND GAS DRILLING, PRODUCTION, GATHERING, PIPELINE, TRANSPORTATION, STORAGE, AND RELATED OPERATIONS.  PHYSICAL CHANGES IN THE PROPERTY AND IN THE LANDS BURDENED THEREBY MAY HAVE OCCURRED AS A RESULT OF SUCH USES. THE PROPERTY ALSO MAY INCLUDE BURIED PIPELINES AND OTHER EQUIPMENT, THE LOCATIONS OF WHICH MAY NOT BE KNOWN BY SELLER OR READILY APPARENT BY A PHYSICAL INSPECTION OF THE PROPERTY.   IT IS UNDERSTOOD AND AGREED THAT BUYER SHALL HAVE INSPECTED PRIOR TO CLOSING (OR SHALL BE DEEMED TO HAVE WAIVED ITS RIGHT TO INSPECT) THE LEASES, EQUIPMENT, PIPELINES, AND THE ASSOCIATED PREMISES AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, AND THAT BUYER SHALL ACCEPT ALL OF THE SAME IN THEIR "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, INCLUDING, BUT NOT LIMITED TO, THE PRESENCE OF NATURALLY OCCURRING RADIOACTIVE MATERIAL AND MAN-MADE MATERIAL FIBERS.

(e)   Records Disclaimer.   Seller makes no representation, covenant, or warranty, express, implied, or statutory, as to the accuracy or completeness of any data or records delivered to Buyer with respect to the Property, or concerning the quality or quantity of Hydrocarbon reserves, if any, attributable to the Property, or the ability of the Property to produce Hydrocarbons, or the product prices which Buyer is or will be entitled to receive from the sale of any such Hydrocarbons.

(f)   Environmental Waiver and Release.  From and after Closing, Buyer does hereby agree, warrant, and covenant to release, acquit, and forever discharge Seller and all Seller Parties from any and all Claims, including all claims, demands, and causes of action for contribution and indemnity under statute or common law, which could be asserted now or in the future relating to or arising out of environmental matters or liabilities and related to the Property, including any and all Claims attributable to or arising out of a violation of any Environmental Law.  From and after Closing, Buyer warrants, agrees, and covenants not to sue or institute arbitration against Seller or any Seller Parties upon any claim, demand, or cause of action for indemnity and contribution that have been asserted or could be asserted for any such environmental matters or liabilities.

(g)   Consequential Damages Waiver.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY EXEMPLARY, PUNITIVE, SPECIAL, INDIRECT, CONSEQUENTIAL, REMOTE, OR SPECULATIVE DAMAGES

ARISING OUT OF OR RELATING TO, IN ANY MANNER, THIS AGREEMENT, THE TRANSACTION CONTEMPLATED HEREUNDER, OR THE PROPERTY, EVEN IF SUCH DAMAGES ARE CAUSED BY THE SOLE, JOINT, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF THE PARTY WHOSE LIABILITY IS BEING WAIVED HEREBY; PROVIDED, HOWEVER, THAT THIS WAIVER SHALL NOT APPLY WITH REGARD TO CLAIMS BY THIRD PARTIES FOR WHICH ONE PARTY HAS AGREED TO INDEMNIFY THE OTHER UNDER THE TERMS OF THIS AGREEMENT.

22.   **Confidentiality**.  All Records, and all other confidential data provided to Buyer, whether before or after the date of this Agreement shall be subject to the Confidentiality Agreement; which Confidentiality Agreement shall terminate at Closing.

23.   **Further Assurances**.  Incidental and subsequent to Closing, each of the Parties shall execute, acknowledge, and deliver to the other Party such further instruments, and take such other actions, as may be reasonably necessary to carry out the provisions of this Agreement.

24.   **Termination.**  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in Sections 24 and 25. In the case of any such termination, the terminating Party shall give proper written notice to the other Party specifying the provision pursuant to which the Agreement is being terminated and with such termination being effective upon delivery of such notice (or written consent signed by Buyer and Seller) or as otherwise expressly provided in the case of Sections 24(c)(iv) and 24(d)(iv):

(a)   by the mutual consent of Buyer and Seller as evidenced in a writing signed by each of Buyer and Seller;

(b)   pursuant to written notice, by Seller to Buyer, or Buyer to Seller, upon the issuance of a final and non-appealable Order by a Governmental Authority to restrain, enjoin, or otherwise prohibit the transfer of the Property contemplated hereby; it being agreed that the Parties shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence); provided, that the right to terminate this Agreement under this Section 24(b) shall not be available to a Party if such Order was primarily due to the failure of such Party to perform any of its obligations under this Agreement;

(c)   by Buyer, pursuant to written notice to Seller:

(i)   if the Bid Procedures Order or Sale Order entered by the Bankruptcy Court shall have been vacated, or modified or supplemented in a manner, without Buyer's prior written consent, that is material and adverse to Buyer;

(ii)   if prior to the Closing, (A) the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed, or (C) if a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Case;

(iii)   if, at the end of the Auction contemplated by the bidding procedures provided for in the Bid Procedures Order, an Alternative Transaction is approved by Seller and Buyer is not selected to be the Prevailing Bidder or the Backup Bidder;

(iv)   if (A) Buyer is (1) not in material breach of this Agreement, and (2) ready and willing to close, (B) the conditions precedent to Closing set forth in Sections 10 and 11 have been satisfied or waived in writing by Seller, and (C) there has been a violation or breach by Seller of any representation, warranty, or covenant contained in this Agreement that (x) would cause any of the conditions set forth in Section 12 to not be satisfied by the Outside Termination Date, (y) has not been waived by Buyer, and (z) Seller have failed to cure within ten (10) Business Days following receipt of notification thereof by Buyer;

(v)   if Closing has not occurred by the Outside Termination Date; provided that the right to terminate this Agreement under this Section 24(c)(v) shall not be available to Buyer if the failure to so close was primarily due to the failure of Buyer to perform any of its obligations under this Agreement; or

(vi)   if an Alternative Transaction has been consummated.

(d)   by Seller pursuant to written notice to Buyer:

(i)   if the Bid Procedures Order entered by the Bankruptcy Court shall have been stayed or vacated, or modified or supplemented in a manner, without Seller's prior written consent, that is material and adverse to Seller;

(ii)   if, at the end of the Auction contemplated by the bidding procedures provided for in the Bid Procedures Order, Buyer is not determined by Seller to be the Prevailing Bidder or the Backup Bidder;

(iii)   if (A) Seller is (1) not in material breach of this Agreement, and (2) ready and willing to close, (B) the conditions precedent to Closing set forth in Sections 10 and 12 have been satisfied or waived in writing by Buyer, and (C) there has been a violation or breach by Buyer of any representation, warranty, or covenant contained in this Agreement that (x) would cause any of the conditions set forth in Section 11 to not be satisfied by the Outside Termination Date, (y) has not been waived by Seller, and (z) Buyer has failed to cure within ten (10) Business Days following receipt of notification thereof by Seller;

(iv)   if Closing has not occurred by the Outside Termination Date; provided that the right to terminate this Agreement under this Section 24(d)(v) shall not be available to Seller if the failure to so close was primarily due to the failure of Seller to perform any of its obligations under this Agreement;

(v)   if an Alternative Transaction has been consummated;

(vi)    unless Buyer has given prior written notice in accordance with Section 28 hereof to Seller specifying a proper basis for termination of this Agreement by Buyer and notice of termination of this Agreement, if Buyer fails to deliver the Performance Deposit to the Seller within three (3) Business Days after the Execution Date; or

(vii)    if the adjustments to the Base Purchase Price pursuant to Sections 8 and 13(b) exceed ten percent (10%) of the Base Purchase Price.

Each condition set forth in this Section 24 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 24 are applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

25.    **Effect of Termination.**  If this Agreement is validly terminated under Section 24, except for the provisions of Section 14(a), this Section 25, and Sections 34, 35, 36, 37, 38, and 42 which shall survive termination, this Agreement shall terminate and have no effect and, subject to this Section 25, each Party shall have no Liability to the other Party hereunder; provided, however, the Confidentiality Agreement shall not be affected by a termination of this Agreement. The Parties hereby agree that if this Agreement is terminated:

(a)    pursuant to Section 24(d)(iii), then, upon such termination, as Seller's sole and exclusive remedy, Seller shall be entitled to retain the Performance Deposit as liquidated damages free of any claims by Buyer thereto, and Buyer shall not be entitled to the Break-Up Fee or the Reimbursement;

(b)    pursuant to Section 24(a) (unless otherwise agreed by the Parties), Section 24(b), Section 24(c)(i), Section 24(c)(ii), Section 24(c)(iii), Section 24(c)(iv), Section 24(c)(v), Section 24(c)(vi) Section 24(d)(i), Section 24(d)(ii), Section 24(d)(iv), Section 24(d)(v), and Section 24(d)(vii), then Buyer shall be entitled to the delivery of the Performance Deposit, free of any claims by Seller with respect thereto, and Seller shall pay the Performance Deposit to Buyer within five (5) Business Days of such termination;

(c)    pursuant to Section 24(c)(i), Section 24(c)(iii), Section 24(c)(iv), Section 24(c)(vi), Section 24(d)(ii) or Section 24(d)(v), then Buyer shall be entitled to the Break-Up Fee and the Reimbursement, subject to and on the terms of the immediately following paragraph; and

(d)    pursuant to Section 24(d)(vi), then Seller may exercise any remedies they have to recover damages equal to the amount of the Performance Deposit.

(e)    With respect to any payments of the Break-Up Fee or Reimbursement if any, pursuant to this Section 25 to which Buyer is entitled, such payments shall be made (x) in the case of a termination pursuant to Section 24(c)(iii) or Section 24(d)(ii), within ten (10) Business Days after the later to occur of the termination of this Agreement and the consummation of the Alternative Transaction, as applicable; and (y) in the case of a termination pursuant to Section 24(c)(i), Section 24(c)(iv), Section 24(c)(vi) or Section

24(d)(v), within ten (10) Business Days after the termination of this Agreement, and in each case shall be allowed and paid as administrative expense claims of Buyer under Section 503(b)(1) of the Bankruptcy Code.

(f)   Return of Documentation and Confidentiality. Upon termination of this Agreement, Buyer shall return to Seller or shall destroy all title, engineering, environmental assessments and/or reports, maps and other information furnished by or on behalf of Seller to Buyer or its Representatives or prepared by or on behalf of Buyer or its Representative in connection with its due diligence investigation of the Property, in each case, in accordance with the Confidentiality Agreement (and subject to such retention rights as are provided in the Confidentiality Agreement)

26.   **Use of Seller's Name**.  Buyer agrees that, as soon as practicable after Closing, it will remove or cause to be removed the names and marks of Seller or any form or derivative thereof, where and if they exist, and all variations and derivatives thereof and logos relating thereto from the Property and will not thereafter make any use whatsoever of such names, marks, and logos.

27.   **Continuation of Operatorship**.  If Seller presently operates any Oil and Gas Interest, Seller makes no representation, warranty, or covenant that the Buyer will become operator of any or all of the Property.  Buyer acknowledges that operations will be governed by the applicable operating agreements or other related agreements affecting the Property.

28.   **Recording Documents Notices**.  Buyer shall pay all documentary, filing, and recording fees incurred in connection with the filing and recording of the instruments of conveyance.  Within sixty (60) days after Closing, Buyer shall provide Seller with recorded copies of all documents conveying the Oil and Gas Interests to Buyer.

All notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally, or to the extent receipt is confirmed by the party charged with notice, sent by documented overnight delivery service, by United States Mail, or email (with a copy to follow the next Business Day by overnight courier) to the appropriate address or number as set forth below.  Notices to Seller or Buyer shall be addressed to:

SELLER


Badlands Production Company
7979 E. Tufts Avenue, Suite 1150
Denver, CO  80237
Attn:  Richard S. Langdon
Email: rlangdon@badlandsenergy.com

With a copy to:

Hall, Estill, Hardwick, Gable, Golden &
Nelson, P.C.

*Purchase and Sale Agreement*
*Page 33*

Attn: Steven W. Soulé
320 South Boston Ave. Suite 200
Tulsa, Oklahoma 74103
Phone: 918-594-0466
E-mail: ssoule@hallestill.com

BUYER

Wapiti Newco, L.L.C.
800 Gessner, Suite 1100
Houston, Texas 77024
Attn:  Bart Agee
Email:  bagee@wapitienergy.com

With a copy to:

Diamond McCarthy LLP
Attn.: Kyung S. Lee and Charles M. Rubio
909 Fannin Street, 37th Floor
Houston, Texas 77010
Email: klee@diamondmccarthy.com;
crubio@diamondmccarthy.com

29.     **Entire Agreement**.  This instrument states the entire agreement and supersedes all prior agreements (except the Confidentiality Agreement between the Buyer and Seller) between the Parties concerning the subject matter hereof.    This Agreement may be supplemented, altered, amended, modified, or revoked by writing only, signed by both Parties.

30.     **Counterparts**.  This Agreement may be executed by Buyer and Seller in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Agreement may be executed and delivered by facsimile transmission or other electronic copy, and a facsimile or electronic copy of this Agreement or of a signature of a party will be effective as an original.

31.     **Time of Essence**.  Time is of the essence in this Agreement.

32.     **Announcements; Disclosures**.  Except as may be required or contemplated by applicable laws, rules, regulations and orders (including those of any Governmental Authority having jurisdiction over Seller or Buyer, as the case may be) or the applicable rules and regulations of any Governmental Authority or stock exchange, neither Buyer nor Seller shall issue any such press release or other publicity at any time without the prior written consent of the other Party, which consent, may be withheld in the sole discretion of the other Party.   The opinion of counsel of either Party shall be conclusive evidence of such requirement or contemplation of applicable laws, rules, regulations, and orders.   Without limitation of the

foregoing Buyer shall not disclose the terms or existence of this Agreement to any person or entity without the prior written consent of Seller.

33.     **Waiver**.  Any of the terms, provisions, covenants, representations, warranties, or conditions hereof may be waived only by a written instrument executed by the Party waiving compliance.  The failure of any Party at any time or times to require performance of any provisions hereof shall in no manner affect such Party's right to enforce the same.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

34.     **Governing Law.**  THIS AGREEMENT SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF COLORADO, EXCLUDING ANY CONFLICTS-OF-LAW RULE OR PRINCIPLE THAT MIGHT APPLY THE LAW OF ANOTHER JURISDICTION. THE ASSIGNMENT DOCUMENTS, AND ANY OTHER INSTRUMENTS OF CONVEYANCE EXECUTED UNDER THIS AGREEMENT, WILL BE GOVERNED BY AND MUST BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE WHERE THE PROPERTY TO WHICH THEY PERTAIN IS LOCATED, EXCLUDING ANY CONFLICTS-OF-LAW RULE OR PRINCIPLE THAT MIGHT APPLY THE LAW OF ANOTHER JURISDICTION.

35.     **Venue and Jurisdiction.**

(a)     Without limiting any party's right to appeal any Order of the Bankruptcy Court, the Parties expressly consent to (a) exclusive jurisdiction of the Bankruptcy Court over any dispute (i) arising out of or relating to this Agreement, or (ii) in connection with the Sale Transaction, and (b) the authority of the Bankruptcy Court to adjudicate any dispute (i) arising out of or relating to this Agreement, or (ii) in connection with the Sale Transaction.  In the event the Bankruptcy Court does not have jurisdiction over a dispute that arises under this Agreement, or for whatever reason fails or refuses to take jurisdiction over any other dispute arising hereunder or in connection with the Sale Transaction then, except as otherwise expressly set forth in this Agreement and to the fullest extent permitted by applicable law, the Parties hereby agree to submit all Actions arising hereunder and not otherwise resolved by the Parties in writing to the exclusive jurisdiction of the appropriate State of Colorado court located in the City and County of Denver, Colorado or, to the extent permitted by law, the federal courts in the District of Colorado (to whose jurisdiction the Parties hereby irrevocably, unqualifiedly and unconditionally submit), and to any appellate court from any therefrom, in any dispute arising out of or relating to this Agreement, and each Party hereby irrevocably, unqualifiedly and unconditionally agrees that all Actions in respect of any such dispute may be heard and determined in such State of Colorado court, or to the extent permitted by law, in such federal court. Each of the Parties hereby irrevocably, unqualifiedly and unconditionally waives, to the fullest extent it may effectively do so, any defense of any inconvenient forum or improper venue to the maintenance of any such dispute in any such court and any right of jurisdiction on account of its place of residence or domicile. Each of the Parties irrevocably, unqualifiedly and unconditionally consents to the service

of any and all process in any such dispute in such State of Colorado or federal court by the sending of such process to each of the applicable Parties at the addresses and in the manner specified in Section 28, or as otherwise may be permitted or required by law. The Parties shall be bound by a Final Order in any such dispute, following exhaustion of all remedies by appeal, which Final Order shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

(b)     EACH OF THE PARTIES HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING HEREUNDER AND CONSENTS TO TRIAL WITHOUT A JURY, AS EVIDENCED BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT.

36.     **Legal Fees**.  The prevailing Party in any legal proceeding brought under or to enforce this Agreement shall be additionally entitled to recover court costs and reasonable attorneys' fees from the non-prevailing Party.

37.     **Interpretation of Agreement**.  In construing this Agreement, the following principles shall be followed:

(i)     no consideration shall be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement;

(ii)    examples shall not be construed to limit, expressly or by implication, the matter they illustrate;

(iii)   the word "includes" and its syntactical variants mean "includes, but is not limited to" and corresponding syntactical variant expressions;

(iv)    a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined;

(v)     unless otherwise specified, the plural shall be deemed to include the singular, and vice versa; and

(vi)    each gender shall be deemed to include the other genders.

38.     **Agreement for the Parties' Benefit Only**.  This Agreement is not intended to confer upon any person not a party hereto any rights or remedies hereunder, and no person other than the Parties hereto is entitled to rely on any representation, covenant, or agreement contained herein.

39.     **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify

*Purchase and Sale Agreement*
*Page 36*

this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

     **40.**   <u>Assignment and Binding Effect</u>.  This Agreement or any portion thereof and the rights and obligations hereunder shall not be assignable or delegable by either Party without the prior written consent of the other Party.  Except as provided in the preceding sentence, the terms, provisions, covenants, representations, and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties hereto and their successors.

     **41.**   <u>Bonds</u>.  Prior to Closing, Buyer shall take such actions as may be necessary or appropriate so that all surety bonds, guaranties, and cash collateral listed on Schedule 41 will be released and replaced immediately after Closing with comparable surety bonds, guaranties, and cash collateral from Buyer or an Affiliate of Buyer.  Buyer shall promptly reimburse Seller for any losses or costs incurred by Seller in connection with such surety bonds, guaranties, or cash collateral after Closing.

     **42.**   <u>Exclusive Remedy</u>.  THE PARTIES HAVE VOLUNTARILY AGREED TO DEFINE THEIR RIGHTS, LIABILITIES AND OBLIGATIONS RESPECTING THE SUBJECT MATTER OF THIS AGREEMENT EXCLUSIVELY IN CONTRACT PURSUANT TO THE EXPRESS TERMS AND PROVISIONS OF THIS AGREEMENT, AND, WITHOUT LIMITING THE RIGHT OF ANY PARTY TO RELY ON THE REPRESENTATIONS AND WARRANTIES MADE TO SUCH PARTY IN SECTION 5 OR SECTION 6, AS APPLICABLE, (SUBJECT TO THE EXPRESS TERMS OF THIS AGREEMENT AS TO THE SURVIVAL THEREOF), THE PARTIES EXPRESSLY DISCLAIM THAT THEY ARE OWED ANY DUTIES OR ARE ENTITLED TO ANY REMEDIES NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. FURTHERMORE, THE PARTIES EACH HEREBY ACKNOWLEDGE THAT THIS AGREEMENT EMBODIES THE JUSTIFIABLE EXPECTATION OF SOPHISTICATED PARTIES DERIVED FROM ARM'S LENGTH NEGOTIATIONS, AND ALL PARTIES TO THIS AGREEMENT SPECIFICALLY ACKNOWLEDGE THAT NO PARTY HAS ANY SPECIAL RELATIONSHIP WITH ANOTHER PARTY THAT WOULD JUSTIFY ANY EXPECTATION BEYOND THAT OF AN ORDINARY BUYER AND AN ORDINARY SELLER IN AN ARM'S LENGTH TRANSACTION. THE SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF THE TERMS AND PROVISIONS OF THIS AGREEMENT (INCLUDING ANY REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN SUBJECT TO THE EXPRESS TERMS OF THIS AGREEMENT AS TO THE SURVIVAL THEREOF) SHALL BE THOSE RIGHTS TO INDEMNIFICATION AND THOSE REMEDIES PROVIDED IN THIS AGREEMENT (AS SUCH RIGHTS TO INDEMNIFICATION AND REMEDIES MAY BE FURTHER LIMITED OR EXCLUDED PURSUANT TO THE EXPRESS TERMS OF THIS AGREEMENT), AND, WITHOUT LIMITING THE RIGHT OF ANY PARTY TO RELY ON THE REPRESENTATIONS AND WARRANTIES MADE TO SUCH PARTY IN SECTION 5 OR SECTION 6 HEREIN (SUBJECT TO THE EXPRESS TERMS OF THIS AGREEMENT AS TO THE SURVIVAL THEREOF), THE PARTIES HEREBY WAIVE AND RELEASE ANY AND ALL TORT CLAIMS AND CAUSES OF ACTION THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT, OR

THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY TORT CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT). WITHOUT LIMITATION OF THE FOREGOING, FROM AND AFTER THE CLOSING, THE SOLE AND EXCLUSIVE REMEDY OF BUYER FOR ANY AND ALL (A) CLAIMS RELATING TO ANY REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS CONTAINED IN THIS AGREEMENT (SUBJECT TO THE EXPRESS TERMS OF THIS AGREEMENT AS TO THE SURVIVAL THEREOF), (B) OTHER CLAIMS PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT AND (C) OTHER CLAIMS RELATING TO THE PROPERTY AND THE PURCHASE AND SALE THEREOF SHALL BE (1) ANY RIGHT TO INDEMNIFICATION FROM SUCH CLAIMS OR REMEDIES THAT ARE EXPRESSLY PROVIDED IN THIS AGREEMENT (AS SUCH RIGHT TO INDEMNIFICATION OR REMEDIES MAY BE FURTHER LIMITED OR EXCLUDED PURSUANT TO THE EXPRESS TERMS OF THIS AGREEMENT), AND IF NO SUCH RIGHT TO INDEMNIFICATION OR REMEDY IS EXPRESSLY PROVIDED HEREIN, THEN SUBJECT TO THE FOLLOWING SUB-CLAUSE (2), SUCH CLAIMS ARE HEREBY WAIVED TO TE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND (2) THE RIGHT TO SEEK AN INJUNCTION OR INJUNCTIONS TO PREVENT BREACHES OF THE TERMS OF THIS AGREEMENT OR SPECIFIC PERFORMANCE OF THE TERMS HEREOF, IN EACH CASE, FROM A COURT OF COMPETENT JURISDICTION.

43.   <u>Survival of Representations and Warranties.</u>   The representations and warranties of Seller in this Agreement, other than Sections 5(b) and 5(c) of this Agreement, shall survive for a period of 30 days following Closing.

44.   <u>Employee Matters.</u>

(a)   Seller shall provide a list of available Business Employees to Buyer at least fifteen (15) days prior to the Closing Date and shall update such list on and through the Closing Date to reflect any new hires or departures. Buyer may, but is not obligated to, make an offer of employment to such Business Employees as it chooses in its sole and absolute discretion, and shall use commercially reasonable efforts to deliver such offers no later than five (5) days prior to the Closing Date. Such offers shall be effective as of the Closing Date or such later date as any Business Employee who is on short or long term disability may be ready to return to work. All offers of employment shall comply with the standard hiring practices of Buyer. The term "<u>Business Employees</u>" shall mean those full time and part time employees of Seller (hourly and salaried) working in or based in Seller's Myton, Utah field office or Denver, Colorado office, as identified by Seller, whose primary employment is related to the Property.

(b)   Buyer shall take such actions as are necessary to provide continuation health care coverage to employees hired by Buyer pursuant to Section 44(a) above and their qualified beneficiaries who incur qualifying events on or after the Closing Date in

accordance with the continuation health care coverage requirements of Section 4980B of the Code or any state analogue (collectively "COBRA").

(c)    This Section 44 shall not constitute an amendment to any employee benefit plan maintained by the Seller and its Affiliates, or the Buyer and its Affiliates, create any third party beneficiary rights or inure to the benefit of or be enforceable by any employee or any person representing the interests of employees.

(d)    Nothing herein shall be construed to alter in any way the status of the Business Employees as employees at will of any of the Seller, not shall it operate to guarantee any employment for any period of time to any such Business Employees. Further, nothing herein shall confer on any such Business Employees any rights as third party beneficiaries.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

"Seller"

BADLANDS PRODUCTION COMPANY

By: _____
Name: Richard S. Langdon
Title:  President & CEO


"Buyer"

WAPITI NEWCO, L.L.C.


By: _____
Name: Bart Agee
Title:  President

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

"Seller"

BADLANDS PRODUCTION COMPANY

By: _____
Name: _____
Title: _____


"Buyer"

WAPITI NEWCO, L.L.C.

By: _____
Name: Bart Agee
Title:  President

## LIST OF SCHEDULES AND EXHIBITS

**Schedules:**

| | |
|---|---|
| Schedule 2(a) | Executory Contract List |
| Schedule 5(d) | Scheduled Consents |
| Schedule 5(h) | Taxes and Tax Partnerships |
| Schedule 5(i) | Description of Claims |
| Schedule 5(j) | Production Matters |
| Schedule 5(l) | Consents |
| Schedule 5(l)(A) | Preferential Rights to Purchase |
| Schedule 6(i) | Letter from Buyer's Lender or Financing Entity |
| Schedule 9 | Pre-Closing Operations |
| Schedule 41 | Bonds |

**Exhibits:**

| | |
|---|---|
| A | Definitions |
| B | Oil and Gas Interests – Leases |
| C | Oil and Gas Interests - Wells |
| D | Oil and Gas Permits - Rights of Way |
| E | Excluded Rights and Interests |
| F | Allocated Values |
| G | Assignment, Assumption Agreement, and Bill of Sale |
| H | Form of Closing Statement |
| I | Non-Foreign Person Affidavit |
| J | List of Material Contracts |

## Exhibit A

**Section 1.1    Definitions**. The following terms, when used in this Agreement and the attached schedules and exhibits, shall have the meanings given below.

"Access Party" and "Access Parties" is defined in Section 7(c).

"Action" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"AFE" means any authorization for expenditure with respect to Property.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such specified Person. For the purposes of this definition, the term "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings.

"Aggregate Defect Deductible" means ten percent (10%) of the Base Purchase Price.

"Allocated Value" is defined in Section 4(e).

"Alternative Transaction" means the sale, transfer, lease or other disposition of, directly or indirectly, including through an asset sale, stock sale, merger, foreclosure, reorganization or other similar transaction, including pursuant to a stand-alone plan of reorganization or refinancing, directly or indirectly, all or a portion of the Property (or agreement to do any of the foregoing) to a Person or Persons other than Buyer or to effect any other transaction the consummation of which would be substantially inconsistent with the terms of this Agreement.

"Assignment" means the Assignment, Assumption Agreement, and Bill of Sale attached hereto as Exhibit G.

"Assumed Contract" is defined in Section 2(a).

"Auction" is defined in Section 14(d).

"Avoidance Actions" means any and all claims, rights or causes of action of Seller arising under the Bankruptcy Code or similar state law claims, including under Chapter 5 of the Bankruptcy Code or similar state laws, except for any such actions against Buyer.

"Backup Bidder" has the meaning set forth in the Bid Procedures.

"Base Purchase Price" is defined in Section 4(a).

"Bid Procedures" means bidding procedures approved by the Bid Procedures Order.

"Bid Procedures Order" means a Bankruptcy Court Order that, among other things, (a) establishes a date by which competing bids must be submitted by bidders and establishes procedures for the Sale Process, and (b) approves the payment of the Break-Up Fee and Reimbursement on the terms and conditions set forth herein.

"Break-up Fee" is defined in Section 14(a).

"Business Day" means any day other than a Saturday, a Sunday or other day on which commercial banks in Denver, Colorado are authorized or required by Law to close.

"Business Employees" is defined in Section 44(a).

"Buyer" is defined in the preamble.

"Buyer's Assumed Obligations" is defined in Section 20(a).

"Buyer's Knowledge" is defined in Section 6(m).

"Cash Consideration" is defined in Section 4(a).

"Casualty Loss" is defined in Section 13(a).

"Claims" means a claim as such term is defined in section 101(5) of the Bankruptcy Code, and any and all demands, losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for: (a) breaches of Contract; (b) loss or damage to property, injury to or death of persons (including illness and disease), and other tortious injury; or (c) violations of applicable Laws, Orders or any other legal right or duty actionable at law or equity. The term "Claims" also includes reasonable attorneys' fees, court costs, and other reasonable costs resulting from the investigation or defense of any Claim.

"Closing" and "Closing Date" are defined in Section 15.

"COBRA" is defined in Section 44(b).

"Code" is defined in Section 5(h).

"Confidentiality Agreement" means that certain confidentiality agreement between Seller and Buyer, dated May 5, 2017.

"Contract" means any contract, agreement, indenture, note, bond, loan, lease, sublease, conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment or other binding arrangement (in each case, whether written or oral), but expressly excluding the Leases.

"Contract and Cure Schedule" is defined in Section 2(a).

"Cure Costs" means to pay or otherwise satisfy all liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure, pursuant to section 365 of the Bankruptcy Code, all of Seller's monetary and non-monetary defaults under each

Assumed Contract at the time of the assumption thereof, in each case as determined by the Bankruptcy Court or as agreed by Seller and the non-debtor party to any such Assumed Contract.

"Cure Period" is defined in Section 8(j).

"Current Tax Period" is defined in Section 18(a).

"Defect Notice Date" means five (5) Business Days after the Sale Order is entered by the Bankruptcy Court.

"Defensible Title" is defined in Section 8(a).

"Dispute" means any dispute, claim or controversy of any kind or nature related to, arising under, or connected with this Agreement or the transactions contemplated hereby (including disputes as to the creation, validity, interpretation, breach or termination of this Agreement).

"Effective Date" is defined as 12:01 a.m. Mountain Time where the Property is located on the first day of the month in which Closing occurs.

"Environmental Law" means any Law relating to the control of any pollutant or protection of the air, water, land or environment or the release or disposal of hazardous materials, hazardous substances or waste materials.

"Excluded Assets" means: (i) all of Seller's corporate minute books and corporate financial records that relate to Seller's business generally; (ii) all trade credits, all accounts, receivables and all other proceeds, income or revenues attributable to the Oil and Gas Interests with respect to any period of time prior to the Effective Date; (iii) all claims and causes of action of Seller arising under or with respect to any contracts included in the Oil and Gas Interests that are attributable to periods of time prior to the Effective Date (including claims for adjustments or refunds); (iv) all rights and interests of Seller under any policy or agreement of insurance, under any bond, or to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of property, except as provided in Section 13; (v) all claims of Seller for refunds of, credits attributable to, or loss carry forwards with respect to taxes attributable to any period (or portion thereof) prior to the Effective Date; (vi) all documents and instruments of Seller that are protected by legal privilege (except for title opinions); (vii) all data and contracts that cannot be disclosed to Buyer as a result of confidentiality arrangements under agreements with third parties; (viii) the right to audit any third party arising under any of the contracts or otherwise with respect to any period prior to the Effective Date related to any contract that is not assumed by the Buyer; (ix) all geophysical and other seismic and related technical data and information relating to the Oil and Gas Interests that is not owned by Seller or conveyance of which would cause an additional fee or penalty to be incurred; (x) all causes of action under Chapter 5 of the Bankruptcy Code; (xi) any assets described in Exhibit E; and (xii) the Field Office and inventory located thereon.

"Executory Contracts"" means any executory Contract or unexpired lease that is subject to assumption and assignment under Section 365 of the Bankruptcy Code.

"Executory Contracts List" is defined in Section 2(a).

"Excluded Contracts" is defined in Section 2(a).

"Field Office" means those structures, buildings and lands located at 10569 Pariette Road, Myton, Utah, 84052 including all personal computer equipment, vehicles, communication equipment, improvements, fixtures, inventory, spare parts, tools, abandoned property and junk and other personal property located thereon and including all of Sellers' right, title and interest in the lands described in the following deeds: (1) Warranty Deed dated August 22, 2011 and filed in the county records of Duchesne County, Utah at Entry 437748, Book A625, Page 624; (2) Warranty Deed dated August 26, 2010 and filed in the county records of Duchesne County, Utah at Entry 427590, Book A602, Page 708; and (3) Warranty Deed dated June 13, 2007 and filed in the county records of Duchesne County, Utah at Entry 396116, Book A507, Page 261.

"Final Closing Date" is defined in Section 17(a).

"Final Closing Statement" is defined in Section 17(a).

"Final Closing Statement Due Date" is defined in Section 17(a).

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any appeal, petition for *certiorari*, reargue, or rehear shall have been waived in writing in form and substance reasonably satisfactory to Seller and Buyer, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Final Purchase Price" is defined in Section 17(a).

"Free and Clear" means free and clear of all liens, Claims, causes of action, encumbrances, interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, rights asserted in adversary proceedings in the Chapter 11 Cases, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Seller (and all created expenses and charges) of any type under, among other things, any document, instrument, Contract, affidavit, matter filed of record, cause, or Law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges,

obligations, or claims granted, allowed or directed in any Order, to the fullest extent provided by applicable Law.

"Governmental Authority" and "Governmental Authorities" means (a) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private); (b) any self-regulatory organization; (c) any political subdivision of any of the foregoing; (d) or any applicable tribal authority whose consent or approval to a transaction hereunder is required.

"Government Taking" is defined in Section 13(a).

"Hard Consent" is defined in Section 13(f).

"Hydrocarbons" means oil, gas, casinghead gas, coal bed methane, condensate and other gaseous and liquid hydrocarbons or any combination thereof.

"Individual Title Threshold" is defined in Section 8(g).

"Law" means any law, statute, ordinance, code, regulation, rule or other requirement of any Governmental Authority.

"Leases" means all oil, gas and mineral leases in which Seller holds any right, title or interest of any kind, including those described in Exhibit B.

"Lien" means any of the following: mortgage, lien (statutory or other), other security agreement or interest, hypothecation, pledge or other deposit arrangement, charge, levy, executory seizure, attachment, garnishment, encumbrance (including any easement, exception, reservation or limitation), conditional sale, title retention or other similar agreement, preemptive or similar right, or any option; provided, however, that the term "Lien" shall not include any of the foregoing to the extent created by this Agreement.

"Material Adverse Effect" means any adverse effect on the ownership, operation or value of the Property, as currently operated, which is material to the ownership, operation or value of the Property, taken as a whole; provided, however, that the following shall be deemed not to constitute, create, or cause a Material Adverse Effect: any changes, circumstances or effects that (a) affect generally the oil and gas industry, such as fluctuations in the price of commodities, industry inputs, or hydrocarbons, (b) result from international, national, regional, state, or local economic conditions, (c) result from general developments or conditions in the oil and gas industry, (d) result from changes in Laws (including regulatory or enforcement policy) applicable to Seller, (e) result from any of the transactions contemplated by this Agreement and any public announcement thereof, (f) result from the failure of a Governmental Authority to act or omit to act pursuant to Law, (g) result from acts of God or natural disasters, (h) result from an outbreak or escalation of hostilities (whether nationally or internationally), or the occurrence of any other calamity or crisis (whether nationally or internationally), including terrorist attacks, (i) result from a condition that is cured or eliminated on or before Closing, or (j) result from the Bankruptcy Case.

"Material Contracts" is defined in Section 5(f).

"Net Revenue Interest" means, with respect to any Person, the interest of such Person in and to the Hydrocarbons produced and saved from, or otherwise attributable to, a Lease or Well, as applicable, after satisfaction of all royalties, overriding royalties, net profits interests and other similar burdens on or measured by production of Hydrocarbons therefrom.

"Notice of Defective Interests" is defined in Section 8(d).

"Oil and Gas Interests" means all of Seller's right, title, and interest in and to the following rights, interests, and assets, but excluding the Excluded Assets:

(i)     The Leases;

(ii)     All rights, obligations and interests in any unit or pooled area in which the Leases or lands are included, including all rights and obligations derived from any unitization, pooling, operating, communitization or other Assumed Contract or from any Order (the "Units")

(iii)     All oil, gas and condensate wells (whether producing, not producing or abandoned), water source, water injection and other injection or disposal wells and systems in which Seller holds any right, title or interest of any kind (wherever located) (the "Wells") as set forth on Exhibit C or located on the Leases or on the lands covered by the Leases or Units, other than leased equipment located on the Leases or Units;

(iv)     (i) All flow lines, oil, gas, water and other pipelines, gathering systems and related equipment located on the Leases, the Units, or the Permits, Easements and Surface Rights or otherwise associated with the production or the transportation of production from the Leases, the Wells or the Units, and (ii) all facilities, equipment, compressors, booster stations, plants, meters, well pads, tank batteries, radio towers, remote terminal units, supervisory control and data acquisition (SCADA) equipment and other similar equipment, personal computer equipment, vehicles, communication equipment, improvements, fixtures, inventory, spare parts, tools, abandoned property and junk and other personal property located on the Leases, the Units, or the Permits, Easements and Surface Rights or otherwise associated with (A) operations on the Leases, the Units or the Permits, Easements and Surface Rights or (B) the sale, processing or transportation of production from Leases, the Wells and the Units, including all off-Lease facilities and other personal property (collectively referred to as the "Equipment");

(v)     All easements, rights-of-way, licenses, permits, servitudes, surface leases, surface use agreements, surface fee tracts, and similar rights, obligations and interests, whether located on the Leases or on other property, applicable to or used in operating the Leases, Units, Wells, or Equipment (the "Permits, Easements and Surface Rights"), including those described on Exhibit D;

(vi)     All lease files, right-of-way files, well files (including well logs), production records, division order files, abstracts, title opinions, and Contract files and reservoir and field studies related to any or all of the Leases, Units, Wells, Equipment,

Permits, Easements and Surface Rights, royalty interests and Assumed Contracts (the "Property Records"), and all other tangibles, movables, immovables, miscellaneous interests or other assets on the Leases or Units; and

(vii)   To the extent transferrable without payment (unless Buyer makes such payment), all (i) seismic, geological, geochemical, or geophysical data (including cores and other physical samples or materials from wells or tests) belonging to Seller or licensed from third parties, and (ii) interpretations of seismic, geological, geochemical or geophysical data belonging to Seller or licensed from third parties (to the extent that the transfer of such third party licenses may be made without the payment of an additional fee or penalty.

"Omitted Contract Order" is defined in Section 2(b)(i).

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of the Bankruptcy Court or Governmental Authority (in each such case whether preliminary or final).

"Outside Termination Date" means the first to occur: (i) forty-five (45) days after the Sale Order is entered by the Bankruptcy Court and (ii) October 31, 2017.

"Performance Deposit" is defined in Section 4(d).

"Permitted Encumbrances" means:

(i)   lessors' royalties, overriding royalties, net profits interests, production payments, reversionary interests and similar burdens on or measured by production if the net cumulative effect of such burdens does not operate to: (A) reduce the Net Revenue Interest with respect to any Lease or Well below the Net Revenue Interest set forth on Exhibit B or Exhibit C, as applicable, with respect to such Lease or Well; or (B) obligate a Seller to bear a Working Interest with respect to the currently producing intervals for any Well greater than the Working Interest set forth on Exhibit C with respect to the currently producing intervals for such Well (unless the Net Revenue Interest with respect to the currently producing intervals for such Well is greater than the Net Revenue Interest with respect to the currently producing intervals set forth in on Exhibit B or Exhibit C in the same or greater proportion as any increase in such Working Interest);

(ii)   preferential rights to purchase the Property or similar rights described on Schedule 5(l)(A);

(iii)   Liens for Taxes that are not yet due and payable or that are being contested in good faith in the normal course of business;

(iv)   all rights to consent by, required notices to, filings with, or other actions by Governmental Authorities or other Persons in connection with the transfer of the Property or the transactions contemplated hereby listed on Schedule 5(l);

(v)     excepting circumstances where such rights have already been triggered, rights of reassignment upon final intention to surrender or abandon any Property;

(vi)    easements, rights of way, servitudes, permits, surface leases and other rights with respect to surface operations, pipelines, grazing, logging, canals, ditches, reservoirs or the like, and easements for streets, alleys, highways, pipelines, telephone lines, power lines, distribution lines, railways and other easements and rights-of-way, on, over or in respect of any of the Property or any restriction on access thereto described in this Agreement or filed or referenced in the records of the counties in which the Property is located, in each case, that do not materially interfere with operations currently conducted on the affected Property;

(vii)   the terms and conditions of the Leases, Material Contracts or of any compulsory pooling or other order of any Governmental Authority; provided, however, that the net cumulative effect of such items does not: (A) reduce the Net Revenue Interest with respect to any Lease or Well below the Net Revenue Interest set forth on Exhibit B or Exhibit C, as applicable, with respect to such Lease or Well; or (B) obligate a Seller to bear a Working Interest with respect to the currently producing intervals for any Well greater than the Working Interest set forth on Exhibit C with respect to the currently producing intervals for such Well (unless the Net Revenue Interest with respect to such Well is greater than the Net Revenue Interest with respect to the currently producing intervals set forth in on Exhibit C in the same or greater proportion as any increase in such Working Interest);

(viii)  materialmen's, mechanics', operators' or other similar Liens arising (A) in the ordinary course of business or (B) incident to the construction or improvement of any property in the ordinary course of business, in each case for amounts not yet due and payable (including any amounts being withheld as provided by Law);

(ix)    such Title Defects that Buyer has waived in writing (or has been deemed to have waived pursuant to Section 8(d));

(x)     Liens burdening the Property that will be discharged or released at or before Closing;

(xi)    calls on production under existing Contracts listed on Schedule 5(f);

(xii)   gas balancing and other production balancing obligations and obligations to balance or furnish make-up Hydrocarbons under Hydrocarbon sales, gathering, processing or transportation Contracts;

(xiii)  all rights reserved to or vested in any Governmental Authorities to control or regulate any of the Property in any manner or to assess Tax with

respect to the Property, the ownership, use or operation thereof, or revenue, income or capital gains with respect thereto, and all obligations and duties under all applicable Laws of any such Governmental Authority or under any franchise, grant, license or Permit issued by any Governmental Authority;

> (xiv)   zoning and planning ordinances and municipal regulations;

> (xv)   Liens against landowners (or lessors or mineral owners under the Leases) that (A) do not materially interfere with the use or ownership of the Property subject thereto or affected thereby (as currently used or owned); and (B) secure amounts not yet due and payable; and

> (xvi)   following Closing, any matter of which Buyer was aware prior to the Defect Notice Date that could have been claimed as a Title Defect pursuant to Section 8(d) but for which Buyer failed to deliver a Notice of Defective Interests with respect thereto in accordance with Section 8(d) prior to the Defect Notice Date.

"Person" means any natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust or other legal entity, including any Governmental Authority.

"Preferential Purchase Right" means any option, right of first refusal, or similar preferential purchase right burdening any of the Oil and Gas Interests.

"Prepetition Lenders" means the senior lender, Garrison Loan Agency Services, LLC, as administrative agent for the following lenders: Garrison Funding 2013-2 Ltd., GMMF Loan Holdings LLC, Garrison GMM Loan Holdco LLC and Garrison Capital Inc.; and junior lender, Dorrier Equities, Ltd.

"Prevailing Bidder" has the meaning set forth in the Bid Procedures Order.

"Previously Omitted Contract" is defined in Section 2(b)(i).

"Property" is defined in Section 1.

"Purchase Price" is defined in Section 4(c).

"Records" is defined in Section 7(a).

"Reimbursement" is defined in Section 14(a).

"Royalty Owners" is defined in Section 19(b).

"Sale Order" means an order of the Bankruptcy Court approving the transaction contemplated by this Agreement, which order must be reasonably acceptable in form and substance to the Parties, the Prepetition Lenders, and the DIP Secured Parties and not inconsistent with the terms of this Agreement and which (i) approves the Sale Transaction

contemplated hereby and the terms and conditions of this Agreement, (ii) finds that notice of the hearing concerning approval of this Agreement and of the Sale Transaction was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (iii) finds that Buyer is a "good faith" purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code, (iv) provides that the Sale Transaction is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code, and (iii) provides for the vesting of the Property in Buyer, in each case, Free and Clear (except for Permitted Encumbrances and Buyer's Assumed Obligations).

"Sale Process" means the procedures for Seller's marketing of the Property to Persons who may make higher and better offers to acquire such Property, all as outlined in the Bid Procedures Order.

"Scheduled Consents" is defined in Section 5(d).

"Seller" is defined in the preamble.

"Seller-Operated" means operations by Seller or an Affiliate of Seller.

"Seller Parties" is defined in Section 20(b).

"Seller's Knowledge" is defined in Section 5(m).

"Suspended Funds" is defined in Section 18(c).

"Transfer Taxes" is defined in Section 18(b).

"Taxes" means any income taxes or similar assessments or any sales, excise, occupation, use, ad valorem, property, production, severance, transportation, employment, payroll, franchise, or other tax imposed by any federal, state, or local taxing authority, including any interest, penalties, or additions attributable thereto.

"Title Adjustment Amount" is defined in Section 8(i).

"Title Benefit" is defined in Section 8(c).

"Title Benefit Amount" is defined in Section 8(h).

"Title Benefit Notice" is defined in Section 8(e).

"Title Benefit Property" is defined in Section 8(e).

"Title Defect" is defined in Section 8(b).

"Title Defect Amount" is defined in Section 8(f).

"Title Defect Expert" is defined in Section 8(l)(i).

"Title Defect Property" is defined in Section 8(d).

"Title Dispute Matter" is defined in Section 8(l).

"Title Dispute Notice" is defined in Section 8(l).

"Transfer Taxes" is defined in Section 18(b).

"Working Interest" means, with respect to any Person, the percentage of the costs and expenses to be borne by such Person for the maintenance, development and operation of a Lease or Well without regard to the effect of any and all royalties, overriding royalties, net profits interests and other similar burdens on or measured by production.