# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>BADLANDS PRODUCTION COMPANY<br>EIN: 84-1461816,<br><br>      Debtor. | )<br>)<br>)   Case No.  17-17467-KHT<br>)   Chapter 11<br>)<br>) |

**DEBTOR'S MOTION FOR ENTRY OF
AN ORDER (A) APPROVING BID PROCEDURES
AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF ITS ASSETS, (B) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING
RELATED RELIEF**

Badlands Production Company, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), respectfully states the following in support of this motion:

## I. Jurisdiction and Venue

1. This Court (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and D.C. COLO. LCivR 84.1(a) of the United States District Court for the District of Colorado. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Court's Local Bankruptcy Rules, Forms and Appendix (the "Local Rules").

## II. Background

4. On August 11, 2017 (the "Petition Date"), Debtor and its affiliates Badlands Energy, Inc., Badlands Energy-Utah, LLC, and Myton Oilfield Rentals, LLC (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Debtors have filed a motion requesting procedural consolidation and joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in the Debtors' cases, and no committees have been appointed or designated.

5. As set forth in the Affidavit of Richard S. Langdon in Support of the Debtors' Motion Seeking Expedited Entry of Order(s) and Notice of Impending Hearing Thereon, Debtors are an onshore oil and gas exploration and production company with headquarters in Denver, Colorado, and operations located primarily in Utah's Uinta Basin.

6. Badlands Energy, Inc., is the 100% member of its subsidiary debtor affiliates. Debtor is an approximate 35% working interest owner and operator of Debtors' Riverbend Project.

7. Driven by current market conditions, the Debtors' liquidity constraints have prevented them from increasing their oil and gas production and proved productive reserves. Continuation of the Debtors' business without new capital would diminish the value of their assets. Accordingly, a sale or sales of substantially all of the Debtors' assets to the highest or best bidder(s) is in the best interests of their estates and creditors.

8. Earlier this year, the Debtors retained Parkman Whaling, LLC ("PW") as investment bankers in connection with restructuring, and a potential sale, merger, or other disposition of all or a portion of the Debtors and their assets. The Debtors and PW canvassed

interested parties, solicited bids, and assisted interested buyers in completing initial due diligence toward a sale.

9. The Debtors' marketing efforts have borne fruit. Specifically, the Debtor, Badlands Production Company, and Wapiti Newco, L.L.C. (the "Stalking Horse Bidder"), have entered into a Purchase and Sale Agreement, dated as of August 7, 2017 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtor's assets for a base purchase price of $5 million and the assumption of specified liabilities and obligations of the Debtor (the "Purchase Price").

10. The Debtor now seeks authority to market-test the transactions contemplated by the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid") to ensure that it obtains the highest or otherwise best offer or combination of offers for its assets. Pursuant to the Debtors' pending Motion for Expedited Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing the Debtors to Use Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing Motion"), the Debtors are required to expeditiously move toward a number of sale milestones. The sale milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed by October 5, 2017.

11. As set forth in further detail below, the sale, the Stalking Horse Purchase Agreement, the proposed bid procedures (the "Bid Procedures"), and the related relief requested

in this Motion are in the best interests of the Debtor's estate, its stakeholders, and all other parties in interest. Accordingly, the Debtor respectfully requests that the Court grant this Motion.

### III. Relief Requested

12. The Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

    (a) authorizing and approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Debtor's assets (the "Property");

    (b) approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Property free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Exhibit 2** to the Bid Procedures Order (the "Sale Notice");

    (c) scheduling the Auction and Sale Hearing;

    (d) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"); and

    (e) granting related relief.

### IV. Notice

13. The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"); (b) the administrative agent under the Debtors' prepetition credit facility; (c) all creditors on its list of creditors with the 20 largest unsecured claims; (d) the United States Attorney's Office for the District of Utah; (e) the Internal Revenue Service; (f) the Environmental Protection Agency; (g) the office of the Attorney General for the State of Utah; (h) counsel to the Stalking Horse Bidder; (i) the United States Bureau of Land Management; (j) the Utah Department of Environmental Quality; (k) all parties identified as secured creditors in Debtor's Schedule D filed as required by Section

521(a)(1)(A) of the Bankruptcy Code; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### V. The Proposed Sale

A.  **The Proposed Stalking Horse Purchase Agreement and Contemplated Section 363 Sale.**

14. The Debtor entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the Property. The Debtor believes a prompt Sale of the Property represents the best alternative available for all stakeholders in this chapter 11 case. Moreover, it is critical for the Debtor to execute on its proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement and DIP Financing Motion. Under the DIP Financing Motion and its Proposed Interim Order ("DIP Financing Order"), a sale transaction is to be consummated by October 5, 2017; otherwise, the Debtor will trigger an event of default under the DIP Financing Order.

15. The Debtor respectfully requests that the Court approve the following general timeline:

- *Contract Cure Objection Deadline*: 5:00 p.m. (prevailing Mountain Time) ten calendar days from service of the Assumption and Assignment Notice (as defined herein), as the deadline to object to the Cure Amounts listed in the Assumption and Assignment Notice;

- *Bid Deadline*: 11:59 p.m. (prevailing Mountain Time), on or before September 15, 2017, as the deadline by which bids for the Property (as well as the deposit and all other documentation required under the Bid Procedures for Qualified Bidders (as defined in the Bid Procedures)) must be actually received (the "Bid Deadline");

- *Auction*: September 20, 2017 at 10:00 a.m. (prevailing Mountain Time), as the date and time the Auction, if needed, will be held at the offices of Lindquist & Vennum LLP, located at 600 17th Street, Suite 1800 South, Denver, Colorado 80202;

- *Sale Objection Deadline*: 12:00 noon (prevailing Mountain Time), on or before September 22, 2017, as the deadline to object to the Sale;

- *Sale Hearing*: on or before September 25, 2017, at 10:00 a.m. (prevailing Mountain Time), or otherwise as the Court's calendar permits, as the date and time for the Sale Hearing.

16. The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing its estate. To further ensure that the Debtor's proposed Auction and Sale process maximizes value to the benefit of its estate, the Debtor will use the time following entry of the Bid Procedures Order to actively market the Property in an attempt to solicit higher or otherwise better bids.

## VI. The Bid Procedures Order

**A.     The Bid Procedures.**

17. To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor, in concert with the Stalking Horse Bidder, has developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The following are the salient points of the Bid Procedures.[1]

  (a) **Bid Requirements**. Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtor, in its reasonable business judgment and in consultation with the DIP Agent, to have satisfied the following requirements:

  (i) *Property and Bid Value*: Each Bid must be a bulk bid to purchase all or substantially all of the Property, and must clearly state which liabilities of the Debtor the Acceptable Bidder is agreeing to assume. Each Bid must clearly set forth the form and amount of the total consideration to be provided to the Debtor in cash and in the form of Assumed Obligations (the "Bid Value").

---

[1] This summary is qualified in its entirety by the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order. All capitalized terms used in this summary but not otherwise defined herein shall have the meanings in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

6

(ii) *Deposit*: Each Bid, other than a bid by a Garrison Credit Bid Party, must be accompanied by a cash deposit in the amount of ten percent (10%) of its aggregate cash consideration, to be held in a segregated deposit account to be identified and established by the Debtor (the "Deposit").

(iii) *Minimum Bid*: The aggregate cash consideration proposed by each Bid must equal or exceed the sum of (i) the Purchase Price set forth in the Stalking Horse Bid; (ii) the Breakup Fee and the Expense Reimbursement; plus (iii) $100,000 (the "Overbid Increment").

(iv) *The Same or Better Terms*: Except as otherwise provided herein, each Bid must, in the Debtor's business judgment and in consultation with the DIP Agent, be on terms the same as or better than the terms of the Stalking Horse Purchase Agreement. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include a schedule of Assigned Contracts (pursuant to the Stalking Horse Purchase Agreement) to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price, the Assumed Liabilities, and the Property), as well as all other material documents integral to such Bid.

(v) *Sources of Financing*: The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies.

(vi) *Assumed Obligations*: The Bid must specify which, if any, of the obligations of the Debtor the Acceptable Bidder proposes to assume.

(b) **Bid Deadline**. Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be actually received on or before **September 15, 2017 at 11:59 p.m. (prevailing Mountain Time)** (the "Bid Deadline").

(c) **The Auction**. If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtor will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid.

(d) **Bidding Increments**. Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $100,000.

7

(e) **Backup Bidder**. Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Property, as determined by the Debtors in the exercise of their reasonable business judgment and in consultation with the DIP Agent, shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors (the "Backup Bid").

(f) **Highest or Otherwise Best Bid**. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor, in consultation with the DIP Agent, may consider the following factors in addition to any other factors that the Debtor deems appropriate: (i) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Property sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid.

(g) **Reservation of Rights**. The Debtor reserves its rights, in consultation with the DIP Agent, to modify the Bid Procedures in its reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Property.

18. Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize sale value, do not impair the Debtor's ability to consider all qualified bid proposals, and, as noted, preserve the right to modify the Bid Procedures as necessary or appropriate to maximize value for the Debtor's estate.

**B.     Form and Manner of Sale Notice.**

19.     On or within three business days after entry of the Bid Procedures Order, the Debtor will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) counterparties to the Assigned Contracts (the "Contract Counterparties"); (d) all parties who have expressed a written interest in some or all of the Property; (e) all parties who are known or

reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Property; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) all the Debtors' other creditors; (i) the United States Bureau of Land Management; (j) the Utah Department of Environmental Quality; (k) any other governmental agency that is known to the Debtors to be an interested party with respect to the Sale and transactions proposed thereunder; (m) all other parties who are served with notice of this Motion; and (n) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

20. The Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Property; (e) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).

21. Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), the proposed Cure Amounts relating thereto, and the rights, procedures, and deadlines for

objecting thereto, will be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice") and **Exhibit 4** (the "Auction Notice") to be sent to the applicable Contract Counterparties.

22. The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Assumption and Assignment Notice, and the Auction Notice as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rules 2002-1, 6004-1, and 9013-1. The Debtor proposes that no other or further notice of the Sale shall be required. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

## VII. Basis for Relief

### A. The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.

23. A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

24. The paramount goal in any proposed sale of property of the estate is to maximize proceeds. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

25. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

26. The Debtor believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Property. The proposed Bid Procedures will allow the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Property and who can demonstrate the ability to close a transaction. Specifically, the Bid Procedures contemplate an open auction process with minimum

barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

27. At the same time, the Bid Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtor obtains fair market value by setting a minimum purchase price for the Property that will be tested in the marketplace. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above market.

28. The Debtor submits that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

**B. The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

29. The Debtor is also seeking authority to offer customary bid protections. The Debtor has agreed to pay the Breakup Fee of $200,000 and an Expense Reimbursement up to $100,000 to the Stalking Horse Bidder as an allowed administrative expense priority claim. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access

to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

30. Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Res*., 147 B.R. at 659–60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

31. As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Debtor believes that the allowance of the Bid Protections is in the best interests of the Debtor's estate and its creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Property for the benefit of the Debtor's estate.

13

32. Here, the Bid Protections are, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend significant time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Breakup Fee and the Expense Reimbursement in good faith and at arm's length. As a result, by agreeing to the Bid Protections, the Debtor ensured that its estate would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

33. If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtor's estate. Further, if the Bid Protections were to be paid, it will be because the Debtor has received higher or otherwise superior offers for the Property. In short, the proposed Breakup Fee is fair and reasonable under the circumstances because it constitutes, at not more than 4% of the Base Purchase Price, a "fair and reasonable percentage of the proposed purchase price," and the Expense Reimbursement is directly and "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

**C. The Form and Manner of the Sale Notice Should Be Approved.**

34. Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

35. The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Assumption and Assignment Notice, and the Assumption Notice as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

### D. The Assumption Procedures Are Appropriate and Should Be Approved.

36. As set forth above, the Sale contemplates the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any. In connection with this process, the Debtor believes it is necessary to establish a process by which: (a) the Debtor and Contract Counterparties can reconcile Cure Amounts, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such Counterparties can object to the assumption and assignment of the Assigned Contracts and/or related Cure Amounts (the "Assumption Procedures").

37. As set forth in the Bid Procedures Order, the Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

38. The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in

15

interest regarding their obligations and rights in respect thereof. Accordingly, the Debtor requests the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

WHEREFORE, the Debtor respectfully requests that the Court enter the Bid Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: August 14, 2017.

**LINDQUIST & VENNUM LLP**

By: /s/Theodore J. Hartl
    Theodore J. Hartl, #32409
    Harold G. Morris, Jr., #8409
600 17th Street, Suite 1800 South
Denver, CO, 80202-5441
Telephone: (303) 573-5900
Facsimile: (303) 573-1956
Email: thartl@lindquist.com
Email: hmorris@lindquist.com

*Proposed Counsel for Badlands Production Company*