### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | |
| BADLANDS ENERGY, INC. ) | Case No. 17-17465 KHT |
| EIN: 98-0204105, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | |
| ) | |
| BADLANDS PRODUCTION COMPANY ) | Case No.  17-17467 KHT |
| EIN: 84-1461816, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | |
| ) | |
| BADLANDS ENERGY-UTAH, LLC ) | Case No.  17-17469 KHT |
| EIN: 47-2023934, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | |
| ) | |
| MYTON OILFIELD RENTALS, LLC ) | Case No.  17-17471 KHT |
| EIN: 20-1202389, ) | Chapter 11 |
| ) | |
| Debtor. ) | **Jointly Administered Under** |
| ) | **Case No.** 17-17465 KHT |
| ) | |

---

**OBJECTION OF WAPITI OIL & GAS II, LLC TO DEBTORS' MOTION FOR
EXPEDITED ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO
SECTION 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III)
AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (IV) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V)
SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

*[Relates to Dkt. Nos. 13 and 16]*

Wapiti Oil & Gas II, LLC ("Wapiti II")[1] respectfully submits this objection (the

"Objection") to the *Debtors' Motion Seeking Expedited Entry of Order(s) and Notice of*

---

[1] The stalking horse bidder, Wapiti Newco, LLC ("Newco" or the "Stalking Horse Bidder"), is not an affiliate of
Wapiti II, although they do have some common ownership.  Newco is represented by separate counsel.

*Impending Hearings Thereon* [Dkt. No. 13] (the "First Day Motion") and the *Debtors' Motion For Expedited Entry Of Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Granting Liens And Providing Superpriority Administrative Expense Status, (III) Authorizing The Debtors To Use Cash Collateral, (IV) Granting Adequate Protection To The Prepetition Secured Parties, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief* [Dkt. No. 16] (the "DIP Motion"), filed by Badlands Production Company ("BPC"), Badlands Energy, Inc. ("BEI"), Badlands Energy Utah ("BEU"), and Myton Oilfield Rentals, LLC ("Myton," and together with BPC, BEI, and BEU, the "Debtors").[2]

## I.
## INTRODUCTION

1.      While the DIP Motion purports *not* to grant Garrison Loan Agency Services, LLC ("Garrison" or the "DIP Agent") a lien that primes higher priority prepetition liens,[3] the DIP Motion effectively accomplishes the same by requiring that all sale proceeds from the sale of substantially all of BPC's assets be paid to Garrison.  However, Wapiti II has a first priority senior secured claim that would attach to the proceeds of any sale in relation to an operator's lien on BPC's assets.  This backdoor attempt to roll-up prepetition debt and obtain a priming lien, without offering Wapiti II any adequate protection whatsoever, is a violation of the bankruptcy

---

[2] All capitalized terms not herein defined shall have the meanings ascribed to them in the DIP Motion.

[3] The DIP Motion is actually unclear as to whether priming liens are, or are not, granted.  *See* DIP Motion at p. 6 ("The DIP Facility shall be secured by first priority, perfected senior and priming liens (subject and junior only to: (i) the Carve-Out and (ii) any valid, enforceable, properly perfected and unavoidable prepetition liens to the extent such liens are senior (after giving effect to any subordination agreement) to the liens of the Pre-Petition Agent and Pre-Petition Lenders….") (emphasis added); *but see id.* at ¶34 ("Debtors propose to provide to the DIP Lenders perfected first priority claims, priming liens, and security interests in the DIP Collateral and Pre-Petition Collateral.").  Regardless of the intent of the DIP Motion, the language that purports to preserve any valid prepetition liens would be rendered nugatory by the provision requiring that all sale proceeds be paid to Garrison.  Thus, language preserving prepetition liens must be coupled with the deletion of the requirement to pay all sale proceeds to Garrison.

code, which allows the sale free and clear of Wapiti II's interests only if, among other things, Wapiti II's interests are adequately protected by a lien on the sale proceeds.[4]

2.      Furthermore, while the proposed Interim Order does not expressly address the payment of sale proceeds to Garrison, the Interim Order would create Events of Default that would substantially impair Wapiti II's rights. For example, it is an Event of Default if the Court were to order that any liens, security interests, or claims are senior to those of the Agent or DIP Lender.[5] This would arguably be breached if the Court finds, as it will, that Wapiti II has first priority pursuant to its operator's lien. Another Event of Default would be triggered if any payment were to be made to Wapiti II without the prior written consent of the Agent.[6] And it would be an Event of Default if any of the sale proceeds from the sale of Wapiti II's collateral were paid to anyone other than Garrison.[7] These Events of Default must be changed to protect Wapiti II's interests.

3.      Finally, the DIP Motion claims that "[n]o other party claims an interest in the Cash Collateral to the knowledge of the Debtors."[8] However, Wapiti II has an interest in the Cash Collateral pursuant to its operator's lien. Accordingly, Wapiti II is entitled to adequate protection to protect its interests in the use of such Cash Collateral, including, but not limited to, superpriority claims and replacement liens with the same priority as Wapiti II's prepetition liens.

---

[4] The Debtors may dispute the amount of Wapiti II's interests. As explained below, however, such a dispute must be adjudicated in an adversary proceeding. Wapiti II intends to file an adversary proceeding to assert its rights in the near future and will seek expedited discovery relating to same. In the meantime, the Court should order that any sale proceeds be held by the Debtors pending resolution of such dispute.
[5] DIP Motion at p. 8.
[6] DIP Motion at p. 9.
[7] DIP Motion at p. 9.
[8] DIP Motion at ¶ 17.

## II.
## BACKGROUND

### A.  General Background

4.      On August 11, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Debtors have filed a motion requesting procedural consolidation and joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in the Debtors' cases, and no committees have been appointed or designated.

### B.  The Sale Proceeds

5.      Following a marketing period, BPC and Newco, entered into a Purchase and Sale Agreement, dated as of August 7, 2017 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the BPC's assets for a base purchase price of $5 million and the assumption of specified liabilities and obligations of BPC (the "Purchase Price").[9]

6.      Pursuant to section XVIII of the proposed Bid Procedures:

> Subject to entry of the final order approving the Debtor's proposed postpetition financing, the proceeds from the sale shall be used to (i) if the Stalking Horse Bid is not the Successful Bid, pay the Break-Up Fee and Expense Reimbursement, and then (ii) indefeasibly repay, in cash, in the manner set forth in the order approving such postpetition financing, the Debtor's postpetition financing obligations to the DIP Agent and the Debtor's prepetition obligations to the First Lien Agent.[10]

---

[9] *See Debtor's Motion For Entry Of An Order (A) Approving Bid Procedures And Bid Protections In Connection With The Sale Of Substantially All Of Its Assets, (B) Approving The Form And Manner Of Notice Thereof, (C) Scheduling An Auction And Sale Hearing, (D) Approving Procedures For The Assumption And Assignment Of Contracts, And (E) Granting Related Relief* [Dkt. No. 21 (the "Bid Procedures Motion") at ¶ 9.  Exhibit 1 of the Bid Procedures Motion lists the bid procedures that Debtors intend to use (the "Bid Procedures").

[10] *See* Bid Procedures at § XVIII.

7.      Notably, the payment of proceeds to Garrison is referenced only in the attached Bid Procedures, not the motion itself.

8.      Furthermore, the DIP Motion states the following:

**Application of 363 Sale Proceeds**: Proceeds from the 363 Sale shall be paid, conditioned upon entry of Bankruptcy Court order authorizing the same, directly to Agent upon the closing of the 363 Sale and shall be applied: (i) first, to reduce outstanding DIP Facility obligations (including all fees and professional fees payable or reimbursable to Agent pursuant to the DIP Financing Documents); **(ii) second, to outstanding Obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents, in the manner set forth in the Pre-Petition Credit Agreement**, with any surplus remaining (if any) following satisfaction of the Obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents to be disbursed in the manner set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents (or to whomever shall be lawfully entitled thereto), provided however, that the Debtors shall reserve proceeds from the 363 Sale sufficient to pay expenses of the Debtors' severance, retention plan and post-petition wage obligations, as agreed to by Agent and approved and authorized by the Bankruptcy Court.[11]

9.      Notably, this provision is not referenced anywhere in the DIP Motion itself; it appears only in Exhibit A to same.

10.     The failure to pay the sale proceeds (the "363 Sale Proceeds" or the "Sale Proceeds") to the Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of the sale (the "363 Sale") constitutes an event of default, which effectively invalidates any operator lien.[12]

**C.  Other Notable Protections Provided to Garrison**

11.     Besides the payment of the Sale Proceeds, the Debtors propose to give Garrison virtually every other type of adequate protection (other than a lien on avoidance actions), including, among other things:

---

[11] DIP Motion, Exhibit A at p. 10.
[12] DIP Motion at p. 9.

a. **High Interest Rates** - Payment of very high interest rates (LIBO plus 21.5% absent default; LIBO plus 23.5% during default), which apply both to the post-petition <u>and</u> prepetition loan balances;[13]

b. **Commitment Fee** – Payment of a 1% Commitment Fee;[14]

c. **Strict Budget Terms** – Allowing only a 10% line-item variance and a 5% cumulative variance;[15]

d. **Payment of Garrison's Professional Fees** – Payment of Garrison's pre- and post-petition professional fees with <u>no</u> cap;[16]

e. **Surcharge, Equities of the Case, and Marshalling Waivers** – The waiver of the Debtor's rights to seek surcharge, equities of the case, and/or marshalling;[17]

f. **Stipulations** – Stipulations as to the amount, validity, and priority of Garrison's claims and liens, which stipulations are binding on all parties in interest, including a committee if one is appointed, following a 75 day challenge period (the "<u>Challenge Period</u>" or "<u>Review Period</u>");[18]

g. **Superpriority Claim and Replacement Liens** – Garrison shall receive a Superpriority lien, as well as valid, binding, enforceable, and perfected replacement liens on prepetition collateral;[19] and

h. **Restrictive Events of Default** – The Debtors will be bound by restrictive events of default that will limit their options to, among other things, seek additional DIP financing, fail to adhere to strict deadlines relating to the Sale, *etc.*[20]

## D. Wapiti II's Interest

12.      Wapiti II is operator of record of certain of BPC's leases and/or oil and gas interests pursuant to that certain A.A.P.L. Form 610-1989 model form operating agreement dated March 22, 2012 between Wapiti II and Gasco Production Company[21] (the "<u>Wapiti II Operating</u>

---

[13] DIP Motion at p. 4.
[14] DIP Motion at p. 5.
[15] DIP Motion at p. 6.
[16] DIP Motion, Exhibit A at p. 8.
[17] DIP Motion at p. 7.
[18] DIP Motion at p. 7.
[19] DIP Motion at p. 8.
[20] DIP Motion at pp. 8-9.
[21] Gasco Production Company changed its name to Badlands Production Company.

Agreement"). Wapiti II and BPC are also parties to that certain contract operating agreement dated March 22, 2012 (the "Contract Operating Agreement").

13.    A memorandum of the Wapiti II Operating Agreement and the Contract Operating Agreement was recorded in the real property records of each applicable county on May 21-23, 2012, including: Uintah County, Utah; Duchesne County, Utah; and Carbon County, Utah.[22]

14.    Wapiti II also filed financing statements against BPC with the Secretary of State of Delaware on June 26, 2013.[23]

15.    Pursuant to article VII(B) of the Wapiti II Operating Agreement:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.[24]

16.    Pursuant to section 6.1 of the Contract Operating Agreement:

In addition to any liens that may arise for the benefit of any Party hereto in connection with the Subject Operating Agreements, each Party grants to the other

---

[22] *See* JOA Memorandums attached hereto as **Exhibit A**.
[23] *See* UCC Searches attached hereto as **Exhibit B**.
[24] Wapiti II Operating Agreement at Art. VII(B).

Party a lien upon any and all of its interests now owned or hereafter acquired in the Subject Interests owned by that Party in the Wapiti Contract Area and in lands pooled or unitized therewith, including its leasehold interests, working interests, operating rights and royalty and overriding royalty interests, and security interests in (i) its share of Hydrocarbons when extracted, (ii) its interest in all materials and equipment, and (iii) its accounts (including accounts arising from imbalances) to secure payment of all amounts to be paid by that Party hereunder in accordance with the provisions of this Agreement, together with interest thereon at the Agreed Rate. To the extent that a Party has a security interest under the Uniform Commercial Code of the State in which such Subject Interests are located (the "UCC"), upon default, that Party shall be entitled to exercise the rights and remedies of a secured party under the UCC. The bringing of a suit and the obtaining of a judgment by a Party for the secured indebtedness shall not be deemed an election of remedies or otherwise effect the lien rights or security interest as security for the payment thereof In addition, upon default by any Party in the payment of any amounts to be paid by that Party pursuant to the terms hereof, that Party shall have the right, without prejudice to other rights or remedies, to collect from the purchaser or purchasers of production proceeds from the sale of the defaulting Party's proportionate share of Hydrocarbons until the amount owed by the defaulting Party, plus interest at the Agreed Rate, has been paid. Each purchaser shall be entitled to rely upon the written statement of the Party that is owed the funds concerning the amount of any default. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of this Agreement, to the extent allowed by governing Law, the defaulting Party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available light to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable Law, each Party hereby grants to the other Party a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable Law or otherwise in a commercially reasonable manner and upon reasonable notice.[25]

17.     Pursuant to the Wapiti II Operating Agreement, BPC owes various obligations to Wapiti II in an amount not less than $2.5 million,[26] and, accordingly, Wapiti II has an operator's lien on BPC's property to secure the payment of such obligations.  BPC admits in its filing of 20

---

[25] Wapati II Operating Agreement at § 6.1.
[26] BPC has failed to provide sufficient information on revenues, costs, expenses and payments for Wapiti to compute the exact amount due despite numerous requests, filing a State court lawsuit and accompanying requests for production.

largest creditors that it owes substantial amounts for operations on the properties including vendors and royalty owners, taxes, and gathering fees.[27]

18.     Wapiti II filed and perfected its operating liens on May 21-23, 2012 and security interests on June 26, 2013. Garrison's predecessor in interest, Orogen Energy, Inc. ("Orogen"), subsequently filed a mortgage on October 22, 2013.  Orogen did not obtain its interest through assignment of a previously filed mortgage.

19.     Orogen subsequently assigned its mortgage to Garrison on September 4, 2014.

**E.  The Royalty Motion and the Budget**

20.     On August 14, 2017, the Debtors filed the *Motion for Order Authorizing Ordinary Course Payments to Prepetition Royalty Interest Holders and Non-Operating Working Interest Holders* [Dkt. No. 13] (the "Royalty Motion").

21.     Pursuant to the Royalty Motion:

The Debtors' operating wells are also subject to joint operating agreements ("JOAs") where the Debtors serve as operator but share the costs and proceeds with other non-operating parties who own interests in those wells (the "Non-Operating Interest Owners").  Under the JOAs, the Debtors pay Non-Operating Interest Owners undisputed proportional shares of net proceeds from net proceeds of production from the wells subject to the JOAs ("Working Interest Payments"). The failure to remit Working Interest Payments to Non-Operating Interest Owners may give rise to **lien claims** or efforts to terminate the Debtors' operatorship under the JOAs.[28]

22.     Furthermore:

The Debtors thus seek the authority to pay, in the ordinary course of business and subject in all respects to their approved Cash Collateral and debtor in possession financing budget, Royalty Owners, and to make Working Interest Payments to Non-Operating Interest Holders, whether arising before or after the Petition Date to maintain their assets and operations.  The Debtors anticipate a total amount of approximately $658,000.00 in Working Interest Payments and payments to Royalty Owners as reflected in the budget. These funds may not be property of

---

[27] *See* List of 20 Largest Creditors [Dkt. No. 3].
[28] Royalty Motion at ¶ 29.

the Debtors' bankruptcy estates, but they seek entry of any order in an abundance of caution.[29]

23.     In the Budget attached to the DIP Motion, however, there is no line item that uses the term "Working Interest" and no line item that matches up with the $685,000 number.

**III.**
**REQUESTED RELIEF**

24.     Wapiti II requests the following relief:

a.   Ordering that the sale proceeds be held by the Debtors pending adjudication of Wapiti II's interests in such proceeds *vis a vis* Garrison and other parties;

b.   Ordering that Wapiti II's interests attach to the sale proceeds to the same extent and with the same priority as Wapiti's liens attached to the assets being sold prior to the petition date;

c.   Ordering that the interim and final DIP orders do <u>not</u> grant liens that prime Wapiti II's interests other than for the new money advanced;[30]

d.   Ordering that the Event of Default relating to "an order granting liens, security interests, or claims that are senior or pari passu to the liens, security interests, or claims granted in favor of Agent or DIP Lender" be amended to make an exception for any valid prepetition liens, security interests, or claims of Wapiti II;

e.   Ordering that the Event of Default relating to "[a]ny payment on, or application for authority to pay, any pre-petition claim without the prior written consent of Agent" be amended to make an exception for any payments made to Wapiti on account of its prepetition claims;

f.   Ordering that the Event of Default relating to any Debtor taking "any action inconsistent with the disbursement of the 363 Sale Proceeds to the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre- Petition Lender contemporaneously with the closing of the 363 Sale" be amended to make an exception for any payments made to Wapiti on account of its prepetition secured claims;

g.   Ordering that the Event of Default relating to the "failure to disburse the 363 Sale proceeds to Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of the 363 Sale" be amended to make

---

[29] Royalty Motion at ¶ 30.
[30] To be clear, Wapiti II objects to the imposition of priming liens to secure the *prepetition* amounts owed to Garrison, but not to priming liens to secure the *postpetition new money* being advanced by Garrison.

an exception for any payments made to Wapiti on account of its prepetition secured claims;

h.  Ordering that Wapiti II's interest in the cash collateral be recognized; and

i.  Ordering that Wapiti II be granted adequate protection for the use of its cash collateral, including, but not limited to:

  i.  The right to receive the Variance Reports and other reasonable reporting requirements;

  ii.  The same budget and use restrictions granted to Garrison;

  iii.  The same default remedies as granted to Garrison;

  iv.  Superpriority claims that are senior to those granted to Garrison to secure any diminution in value of Wapiti II's collateral;

  v.  Replacement liens that are senior to those granted to Garrison to secure any diminution in value of Wapiti II's collateral;

  vi.  Liens on postpetition collateral that are senior to those granted to Garrison to secure any diminution in value of Wapiti II's collateral; and/or

  vii.  Payment of Wapiti II's professional fees pursuant to the same restrictions as the payment of Garrison's professional fees.

j.  Ordering that the Debtors clarify whether the payments to working interest owners in the Budget include payments to Wapiti II and budgeted amounts for same.

## IV.
## ARGUMENT

**A. Garrison is Not Entitled to the Payment of All Sale Proceeds.**

25.  Pursuant to Bankruptcy Code section 363(d)(2):

The Trustee may use, sell, or lease property…only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.[31]

26.  Furthermore, pursuant to Bankruptcy Code section 363(e):

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used,

---

[31] 11 U.S.C. § 363(d)(2).

sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.[32]

27.     Here, Wapiti II has a first priority, senior secured lien on the Property pursuant to a perfected operator's lien.  And while the Debtors purport *not* to grant liens that prime "valid, enforceable, properly perfected and unavoidable prepetition liens to the extent such liens are senior…to the liens of the Pre-Petition Agent and Pre-Petition Lenders," the Debtors accomplish essentially the same thing with an end-run that requires the payment of all proceeds of the Sale to Garrison to satisfy, among other things, Garrison's junior priority prepetition obligations. This essentially rolls up Garrison's prepetition debts and effectively grants Garrison a first-priority priming lien, despite the express language that their liens are subject to valid and perfected prepetition liens.

28.     While the Debtor disputes the amount owed to Wapiti II, such a dispute must be adjudicated in an adversary proceeding rather than a sale hearing.  Bankruptcy Rule 7001(2) defines adversary proceedings to include a proceeding "to determine the validity, priority, or extent of a lien or other interest in property…"  Applying Rule 7001(2), courts have held that proceedings to determine an interest in property must be resolved through an adversary proceeding (absent a waiver by the non-moving parties).  *See, e.g., Feld v. Zale Corp. (In Re Zale Corp*.), 62 F.3d 746, (5th Cir. 1995) (reversing bankruptcy and district court because a third-party injunction could not be granted without conducting a full adversary proceeding under Rule 7001 absent a waiver); *In re Village Mobile Homes, Inc*., 947 F.2d 1282, 1283 (5th Cir. 1991) (reversing bankruptcy and district court in granting conversion damages, because it was an action "to recover money or property" that could only be determined in an adversary proceeding absent a waiver by the non-movant under Bankruptcy Rule 7001); *Lyons v. Lyons (In re Lyons*),

---

[32] 11 U.S.C. § 363(e).

995 F.2d 923, 924 (9th Cir. 1993) (holding that, when a Rule 7001 category was at issue, the movant "may obtain the authority he seeks only through an adversary proceeding").[33]

29.     Because the respective validity and priorities of liens requires adjudication in an adversary proceeding, while a court can approve a sale prior to such adjudication, it is inappropriate to distribute the proceeds until the dispute is resolved.  *See, e.g., In re Railyard Co., LLC,* 15-12386 T11, 2017 WL 2589304, at *6 (Bankr. D.N.M. June 14, 2017) (holding that asserted liens shall attach to the proceeds to the same extent they attached pre-sale, pending the determination of the validity and priority of such liens in an adversary proceeding); *In re Burd*, 202 B.R. 590, 594 (Bankr. N.D. Ohio 1996) (holding that absent the filing of an adversary proceeding to determine the extent and priority of claimed liens, courts shall not execute any orders approving the distribution of the sale proceeds) (citing Fed. R. Bankr. P. 7001(2)); *In re Collins,* 180 B.R. 447, 449 (Bankr. E.D. Va. 1995) (stating that issues concerning the propriety and validity of liens on property were not properly before the court on motion to sell free and clear); *In re K–Fabricators, Inc.,* 135 B.R. 654, 658 (Bankr. W.D. Wash. 1992) (stating that "[a] sale pursuant to 11 U.S.C. § 363(f) does not establish the validity of a claimed lien, which requires an adversary proceeding"); *cf In re Bryan*, 857 F.3d 1078, 1088 (10th Cir. 2017) (describing how bankruptcy court required sale proceeds to be held pending an adversary proceeding to determine the validity and priority of liens).

30.     Wapiti II's interest in the proceeds would not be adequately protected if the Court allows the junior lender to sweep the sale proceeds before an adjudication of Wapiti II's interests.  *See, e.g., In re Aneco Elec. Const., Inc.,* 377 B.R. 338, 343 (Bankr. M.D. Fla. 2006) (finding that the commonly accepted method for adequate protection of a secured creditor when

---

[33] Wapiti II intends to file an adversary proceeding to assert its rights in the near future and will seek expedited discovery relating to same.

a sale is authorized under § 363(f) is to order the liens to attach to the proceeds of the sale with the same priority as they existed pre-sale) (*citing  In re Collins,* 180 B.R. 447, 452 (Bankr. E.D. Va. 1995).  Thus, the Court should order the Debtors to hold the sale proceeds pending an adjudication of Wapiti II and Garrison's respective interests and priority, and Wapiti II's liens, claims, interests, and other encumbrances, whatever such liens, claims, interests, or other encumbrances may be, should attach with the same validity and priority to the Sale proceeds as they did to the underlying property prepetition.  *Id.*

**B.  The Events of Default Must Be Changed to Protect Wapiti II's Interests.**

31.    The provision requiring the payment of the sale proceeds to Garrison is not included in the proposed interim order, so the Debtors may not be asking for that relief to be granted on an interim basis.  On the other hand, other parts of the proposed interim order would accomplish a similar result and must be amended to adequately protect Wapiti II's interests.

32.    For example, it is an Event of Default if the Court were to order that any liens, security interests, or claims are senior to those of the Agent or DIP Lender.[34]  This would arguably be breached if the Court finds, as it will, that Wapiti II has first priority pursuant to its operator's lien.  This Event of Default should be amended to to make an exception for any valid prepetition liens, security interests, or claims Wapiti II establishes.

33.    Another Event of Default would be triggered if any payment were to be made to Wapiti II without the prior written consent of the Agent.[35]

34.    This could be triggered by the Court ordering the payment of the sale proceeds to Wapiti II.  Accordingly, this Event of Default should be amended to make an exception for any

---

[34] DIP Motion at p. 8 (Event of Default relating to "an order granting liens, security interests, or claims that are senior or pari passu to the liens, security interests, or claims granted in favor of Agent or DIP Lender")
[35] DIP Motion at p. 9 (Event of Default relating to "[a]ny payment on, or application for authority to pay, any pre-petition claim without the prior written consent of Agent").

payments made to Wapiti on account of its prepetition secured claims. And it would be an Event of Default if any of the sale proceeds from the sale of Wapiti II's collateral were paid to anyone other than Garrison.[36]  To the extent that Wapiti II's interests attach to the sale proceeds, which they will, it should not be an Event of Default to pay such proceeds to Wapiti II.  Accordingly, these Events of Default should be amended to make an exception for the payment of sale proceeds to Wapiti II.

35.     Unless these exceptions are made, the Debtors will effectively cut off Wapiti II's interests in the sale proceeds in violation of the bankruptcy code.

**C. Wapiti II has an Interest in the Debtors' Cash Collateral and is Entitled to Adequate Protection.**

36.     Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines,* 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See* 3 Collier on Bankruptcy ¶ 361.03 at 361-10 (16th ed. 2017); *see also* Local Bankruptcy Rule 4001-3 APP (providing a list of types of adequate protections that are and are not generally permitted).

37.     Here, Wapiti II has an interest in the cash collateral pursuant to its operator's lien. Wapiti II has <u>not</u> consented to the use of its cash collateral.  Accordingly, Wapiti II is entitled to

---

[36] DIP Motion at p. 9 (Events of Default relating to (i) any Debtor taking "any action inconsistent with the disbursement of the 363 Sale Proceeds to the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre- Petition Lender contemporaneously with the closing of the 363 Sale" and (ii) the "failure to disburse the 363 Sale proceeds to Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of the 363 Sale").

adequate protection to secure the diminution of value of the use of the cash collateral.  As the secured party with first priority to the cash collateral, Wapiti II should be granted adequate protection that is senior to, or at least *pari passu* with, the adequate protections granted to Garrison.

**V.**
**RESERVATION OF RIGHTS**

38.    The DIP Motion was filed on August 14, 2017.  The hearing on the DIP Motion was set on an emergency basis on August 17, 2017.  Accordingly, Wapiti II reserves all rights to supplement or amend this Objection, or to join any other objections.

**VI.**
**CONCLUSION**

WHEREFORE, Wapiti II respectfully requests that this Court enter an order (i) requiring that the sale proceeds be held by the Debtors pending an adjudication of Wapiti II's interests in such proceeds; (ii) requiring that Wapiti's liens, claims, interests, and other encumbrances attach to the sale proceeds with the same validity and priority as they did to the assets being sold prior to the petition date, (iii) clarifying that the Debtors are not granting any liens that prime Wapiti's prepetition interests, (iv) amending the Events of Default as requested herein, (v) recognizing Wapiti II's interest in the cash collateral, and (vi) granting Wapiti II such adequate protection as is necessary to secure the diminution in value of the cash collateral.  Wapiti II further requests that the Court grant it such other and further relief as the Court deems proper, both at law and in equity.

DATED: August 16, 2017.                    Respectfully submitted,

                                           **THOMPSON & KNIGHT LLP**


                                           By:____/s/ Mitchell E. Ayer_____
                                           Mitchell E. Ayer
                                           Texas State Bar No. 01465500
                                           811 Main St., Suite 2500
                                           Houston, Texas 77002
                                           Telephone: 713.654.8111
                                           Facsimile: 713.654.1871
                                           E-mail: mitchell.ayer@tklaw.com

                                           Steven J. Levitt
                                           Texas State Bar No. 24092690
                                           One Arts Plaza
                                           1722 Routh Street, Suite 1500
                                           Dallas, TX 75201
                                           Telephone: 214.969.1700
                                           Facsimile: 214.969.1751
                                           E-mail: steven.levitt@tklaw.com

                                           **ATTORNEYS FOR WAPITI OIL & GAS II LLC**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served on the Debtors, through counsel, and the parties listed below via email.  I further certify that the foregoing was served on all parties entitled to notice via the Court's electronic notification system on this <u>16</u><sup>th</sup> day of August, 2017.


Theodore J. Hartl
Lindquist & Vennum LLP
600 17th St., Suite 1800
Denver, CO 80202-5441
Via E-mail: thartl@lindquist.com

Garrison Loan Agency Services, LLC
c/o Brent R. McIlwain, Esq., Eric W. Kimball and Brian J. Smith, Esq.
Holland & Knight LLP
200 Crescent Court, Suite 1600
Dallas, Texas 75201
Via E-mail: brent.mcilwain@hklaw.com; eric.kimball@hklaw.com; brian.smith@hklaw.com

Alan K. Motes
Office of the United States Trustee
Byron G. Rogers Federal Building
1961 Stout St. , Ste. 12-200
Denver, CO 80294
Via E-mail: Alan.Motes@usdoj.gov


                                        */s/ Mitchell E. Ayer*_____
                                        Mitchell E. Ayer