UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BADLANDS PRODUCTION COMPANY, | ) | Case No. 17-17465 KHT |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| BADLANDS ENERGY, INC., | ) | Case No. 17-17467 KHT |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| BADLANDS ENERGY-UTAH, LLC, | ) | Case No. 17-17469 KHT |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| MYTON OILFIELD RENTALS, LLC, | ) | Case No. 17-17471 KHT |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | **Jointly Administered Under** |
| | ) | **Case No. 17-17465 KHT** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING ON A SECURED, SUPERPRIORITY BASIS AND (B) USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION,
(III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the Debtors for interim and final orders, under

sections 105, 361, 362, 363, and 364, of chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002 and 4001 of Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Colorado (the "Local Bankruptcy Rules") seeking, among other things:

(1) authority pursuant to Bankruptcy Code sections 363 and 364(c) and (d) to obtain debtor-in-possession secured financing (the "DIP Facility") pursuant to the following terms    and agreements (collectively, the "DIP Financing Documents"):  (a) this Order approving the Motion and DIP Facility (this "Final Order"), and (b) the Badlands Production Company, *et al.* Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility Term Sheet, attached to this Final Order as Exhibit A (the "DIP Financing Term Sheet"),[1] with Garrison Loan Agency Services LLC (the "DIP Agent"), as agent and the lenders designated pursuant thereto (the "DIP Lenders");

(2) the grant to the DIP Agent, for the benefit of itself and the DIP Lenders, of superpriority administrative claim status pursuant to Bankruptcy Code sections 364(c)(1) and 507(b) in accordance with the terms of this Order;

(3) authorization for the Debtors' use of cash collateral whenever or wherever acquired, and the proceeds of all collateral pledged to the Pre-Petition Lenders (defined below), as contemplated by Bankruptcy Code section 363 in accordance with the terms set forth herein;

(4) a grant of adequate protection to the Pre-Petition Agent and Pre-Petition Lenders under and in connection with the Pre-Petition Credit Agreement and Pre-Petition Loan Documents (as defined below) in accordance with the terms set forth herein; and

(5) modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h).

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Financing Term Sheet or the Motion, as applicable.

DOCS-#5995886-v5

Notice of the Motion, the relief requested therein, and the Final Hearing (as defined below) (the "Notice") having been served by the Debtors in accordance with Bankruptcy Rule 4001 on: (i) the counsel for the DIP Agent and the DIP Lenders and counsel for the Pre-Petition Agent and Pre-Petition Lenders; (ii) the United States Trustee for the District of Colorado (the "U.S. Trustee"); (iii) the holders of the twenty (20) largest unsecured claims against each Debtor's estate; (iv) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have properly filed UCC-1 financing statements against any of the Debtors, or who, to any Debtor's knowledge, have asserted any liens on any of such Debtor's assets; (vi) the Internal Revenue Service and all taxing authorities of states in which the Debtors are doing business; and (vii) all other parties as identified in the Debtors' certificates of service filed with this Court.

Pursuant to Bankruptcy Rule 4001, this Court held an interim hearing with respect to the Motion on August 17, 2017 (the "Interim Hearing"). The Court set this matter for a final hearing on September 13, 2017, as continued from time to time (the "Final Hearing").

After the Motion and the proceedings before this Court at the Interim Hearing; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by this Court as reflected on the record established by the Debtors in open Court;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[2]

A.   Petition Date.   On August 11, 2017 (the "Petition Date"), the Debtors each commenced a case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;[3]

---

[2]   To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

[3]   Unless otherwise noted, all statutory references are to the Bankruptcy Code.

B.   <u>Debtor in Possession</u>.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108, and no trustee or examiner has been appointed;

C.   <u>Notice</u>.  The Debtors gave due and sufficient notice of the Motion    and the Final Hearing pursuant to the Bankruptcy Rules and Local Bankruptcy Rules;

D.   <u>Jurisdiction and Venue</u>.  This Court has core jurisdiction over the Debtors' bankruptcy cases, the Motion, and the parties and property affected by this Order pursuant to  28 U.S.C. §§ 157(b) and 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

E.   <u>Statutory Committee Formation</u>.  As of the date hereof, the United States  Trustee has not appointed an official committee of unsecured creditors in this matter pursuant to Bankruptcy Code section 1102 (a "<u>Statutory Committee</u>");

F.   <u>Debtors' Stipulations</u>.   The Debtors have admitted, represented and    stipulated, without prejudice to the rights of third parties or any Statutory Committee set forth in this Order, the following (collectively, the "<u>Stipulations</u>"):

(1)   *Pre-Petition Loan Documents and Obligations*. As of the Petition Date, the Debtors and the Guarantors were parties to that certain Amended and Restated Credit Agreement, dated as of August 19, 2014 (such agreement, as amended, the   "<u>Pre-Petition Credit Agreement</u>", and together with all other documents, instruments, and   agreements delivered in connection with the Pre-Petition Credit Agreement, the "<u>Pre-Petition Loan Documents</u>") with Garrison Loan Agency Services LLC as agent (in such capacity, the "<u>Pre-Petition Agent</u>")  and  the lenders  party thereto  (in such capacity, the  "<u>Pre-Petition Lenders</u>"),  pursuant  to  which  (a) Badlands  Production  Company  ("<u>Badlands</u>")    was

4

indebted to the Pre-Petition Agent and Pre-Petition Lenders, without defense, counterclaim, recoupment, or offset of any kind, in the approximate non-contingent liquidated amount of no less than $33,401,224.84 as of the Petition Date, which obligations were subject to valid, binding, and irrevocable guaranties of payment by Badlands Energy, Inc., Badlands Energy-California, LLC, Badlands Energy-Utah, LLC, and Myton Oilfield Rentals, LLC (such entities, the "Guarantors" and the obligations of the and Guarantors under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents, collectively, the "Pre-Petition Obligations"), for which Badlands and the Guarantors have no defenses, counterclaims, recoupments, or offsets of any kind, and (b) such Pre-Petition Obligations were secured by valid, enforceable, properly perfected, first priority, and unavoidable liens on and security interests (the "Pre-Petition Liens")  encumbering substantially all assets of the Debtors and Guarantors (such collateral, the "Pre-Petition Collateral"), as set forth in the Pre-Petition Credit Agreement and Pre-Petition Loan Documents;

(2)      *DIP Lenders' Terms of Financing*. The DIP Agent and DIP Lenders are willing to provide post-petition financing to the Debtors through the DIP Facility as set forth in the DIP Financing Term Sheet, as amended and subject to this Final Order;

(3)      *Cash Collateral*. The Pre-Petition Agent and Pre-Petition Lenders and Wapiti II (as defined herein), Wyatt Energy, LLC ("Wyatt"), Multi-Chem/Halliburton Energy Services, Inc. ("Halliburton"), and RIG II, LLC ("Rig II"), consent to the Debtors' use of the Pre-Petition Collateral and cash collateral (as such term is defined in Bankruptcy Code section 363(a)) only upon the terms and conditions contained in this Order and the DIP Financing Term Sheet, and subject to a reservation of rights;

5

(4)     *No Claims Against Pre-Petition Agent and Lenders*. The Debtors and any non-debtor Guarantors possess no claims, offsets, or other rights, or causes of action against the Pre-Petition Agent and/or Pre-Petition Lenders that would in any manner impair, reduce, or otherwise modify the Pre-Petition Obligations or the validly perfected Pre-Petition Liens upon the Pre-Petition Collateral;

(5)     *Validity and Non-Disturbance of Pre-Petition Obligations*. The Pre-Petition Obligations constitute valid, binding obligations of the Debtors and any non-debtor Guarantors, enforceable in accordance with their terms, and the Debtors and/or any non-debtor Guarantors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity or enforceability of any of the Pre-Petition Obligations and/or the Pre-Petition Liens of the Pre-Petition Agent and Pre-Petition Lenders upon the Pre-Petition Collateral, or which would in any way reduce the obligation of Badlands or Guarantors to pay in full, in cash all of the Pre-Petition Obligations;

(6)     *Costs of Estate Administration*. The Debtors reasonably and in good faith believe that the use of the Cash Collateral and the loans, advances, and other financial accommodations to be obtained pursuant to the DIP Credit Facility are sufficient to fund all projected legitimate and allowable expenses of their Chapter 11 Cases from the Petition Date through the period to which the Budget pertains; and

(7)     *Authorization*. Each Debtor is a duly organized, validly existing limited liability company or corporation and has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral. Each of the Debtors has the requisite power and authority to enter into, execute, deliver, and  perform

6

its obligations under the DIP Financing Term Sheet and this Order and to incur the obligations provided for thereon. Except as may be explicitly required in the DIP Financing Term Sheet, no consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state, or other governmental authority or regulatory body or any other person (other than the DIP Agent), which has not already been obtained or done, is required in connection with the execution, delivery, and performance by the Debtors of any of the documents required as a condition to the validity or enforceability of the DIP Financing Term Sheet, other than entry by this Court of this Order.

G.      <u>Inability to Obtain Unsecured Credit</u>. The Debtors are unable to obtain  sufficient levels of unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense necessary to maintain and conduct their businesses;

H.      <u>Inability to  Obtain  Alternate Secured Credit</u>.  The Debtors  are unable to  obtain secured credit on more favorable terms than under the terms and conditions provided in this Order and  the other DIP Financing Documents;

I.      <u>Cash Collateral</u>. The Debtors assert that all cash of the Debtors, wherever  located on the Petition Date, represents (i) proceeds of loans or other financial accommodations provided to Debtors by the Pre-Petition Lenders under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents; or (ii) proceeds of Pre-Petition Collateral. The Debtors assert that such funds (the "<u>Cash Collateral</u>") constitute cash collateral within the meaning of Bankruptcy Code section 363; provided however, that for the avoidance of doubt, revenue held by the Debtors for royalty and non-operating working interest owners, unless subject to netting or offset by the Debtors in the ordinary course of business, is not Cash Collateral or property of the Debtors' estates.

J.      <u>Best Interests of Estates</u>.  It is in the best interest of Debtors' estates that the Debtors be allowed to enter into the DIP Facility in order to use the Pre-Petition Collateral and Cash Collateral subject to and in accordance with the terms of this Order and the DIP Financing Term Sheet, to obtain post-petition secured financing from the DIP Agent and DIP Lenders, and to grant adequate protection to the Pre-Petition Agent and Pre-Petition Lenders on account of the Pre-Petition Obligations, on the terms and conditions set forth herein and in the DIP Financing Term Sheet, as such is necessary to avoid immediate and irreparable harm and to administer the Debtors' estates;

K.      <u>Good Faith</u>.  The extension of credit and financial accommodations under the DIP Financing Term Sheet are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e);

L.      <u>Immediate Need for DIP Facility</u>.   The Debtors assert that they require access   to Cash Collateral and, upon entry of this Order the funding available, under the DIP Facility and the DIP Financing Term Sheet in order to satisfy administrative expenses associated with the operation of their businesses as going concerns and other costs relating to the administration of the Chapter 11 Cases;

M.      <u>Necessity of DIP Facility Terms</u>. The Pre-Petition Agent and Pre-Petition Lenders are unwilling to consent to use of the Pre-Petition Collateral by the Debtors, except as provided under the terms of the DIP Financing Term Sheet and this Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Order will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in

8

Bankruptcy Code section 364(e), which is applicable to the post-petition financing arrangement contemplated in the DIP Financing Term Sheet and the use of Cash Collateral contemplated by this Order; and

N.      <u>Good Cause for Entry of Order</u>.      Good and sufficient cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Entry of this Order, consummation of the financing under the DIP Facility, and the use of Pre-Petition Collateral, including Cash Collateral, in accordance with this Order and the DIP Financing Term Sheet are in the best interests of the Debtors, their estates and their creditors.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

DOCS-#5995886-v5

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:**

1.  <u>DIP Facility Approval</u>.  The Motion is granted. The Debtors are authorized, pursuant to Bankruptcy Code sections 363 and 364, to enter into the DIP Facility pursuant to the DIP Financing Term Sheet, to execute such other and additional documents necessary or desired to implement the DIP Facility or the DIP Financing Term Sheet, to use the Pre-Petition Collateral, Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the DIP Financing Term Sheet and this Order (with such changes, if any, as were made as a result of the Final Hearing or are otherwise authorized to be made as amendments to the DIP Financing Term Sheet in accordance with this Order). The Debtors shall use Cash Collateral and any advances obtained under the DIP Facility and the DIP Collateral only for the purposes and in the amounts set forth in the DIP Financing Term Sheet, the Budget attached hereto, and any subsequent Budgets approved by the DIP Agent, in writing, at the DIP Agent's sole discretion. The DIP Agent and DIP Lenders shall have no obligation to make DIP Facility advances in excess of the amounts and times set forth in the DIP Financing Term Sheet.

2.  <u>DIP Facility Obligations</u>.  The DIP Financing Documents shall constitute  and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, which DIP Facility obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing. The Debtors shall be jointly and severally liable for repayment of any DIP Facility funds advanced pursuant to the DIP Financing Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Financing Documents.

DOCS-#5995886-v5

3.      <u>DIP Facility Budget</u>.  With respect to the Budget:

(a)  (i) actual cash receipts for each line item within the Budget for any weekly period shall not be less than 90% of the budgeted cash receipts for such line item during such weekly period and (ii) each Budget line item for cash disbursements from operations (other than Professional Fees) during any weekly period shall not be more than 110% of the budgeted disbursements during such weekly period for such Budget line item;

(b)  (i) actual cash receipts for each line item within the Budget for the cumulative period from the Petition Date to the end of the current weekly Budget period shall not be less than 95% of the budgeted total cash receipts for such line item during such cumulative period and (ii) each Budget line item for cash disbursements from operations (other than Professional Fees) during the cumulative period from the Petition Date to the end of the current weekly period for such Budget line item shall not be more than 105% of the budgeted cash disbursements from operations for such Budget line item during such cumulative period; and

(c)  for all Professional Fees for each Professional (as such terms are defined in the DIP Financing Term Sheet) within the Budget, the Debtors shall not allow actual disbursements for each Professional Fee line item (and each Professional receiving Professional Fees shall be reflected on its own line item) to be more than the budgeted disbursements for such Professional Fee line item during the cumulative period from the Petition Date to the end of the current weekly Budget period; and

(d)  the Debtors shall separately account for revenue and expenses of Badlands Production Company and Badlands Energy-Utah, LLC, related to the Riverbend and South Altamont properties, respectively.

DOCS-#5995886-v5

4.  <u>Limitation on Use of DIP Facility Proceeds and Cash Collateral</u>.  No proceeds  of the DIP Facility or Cash Collateral shall be used to (a) permit the Debtors, or any other party-in-interest or their representatives to challenge, investigate, or otherwise contest or institute any proceeding to determine (or support, directly or indirectly, any other person or entity in contesting or challenging) (i) the validity, perfection, or priority of any security interests in favor of the Pre-Petition Lenders, Pre-Petition Agent, DIP Agent, or the DIP Lenders, or (ii) the enforceability of the obligations of any of the Debtors or any Guarantor under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, the DIP Facility, the DIP Financing Term Sheet, or any other DIP Financing Documents, (b) investigate, commence, prosecute, or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding, or cause of action against the Pre-Petition Lenders, Pre-Petition Agent, the DIP Agent and/or the DIP Lenders and their respective agents, employees, attorneys, advisors, or representatives including, without limitation, any lender liability claims or subordination  claims, (c) directly or indirectly investigate, commence, prosecute, or defend (or support, directly or indirectly, any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, or the DIP Financing Documents, (d) fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Agent, or (e) for any other purpose for which the Carve-Out cannot be used; <u>provided</u>, <u>however</u>, that a Statutory Committee (if any) shall be allowed to use proceeds of the DIP Facility in an amount not to exceed ten thousand dollars ($10,000) to investigate the validity of the claims and liens of the Pre-Petition Agent and Pre-Petition Lenders (the "<u>Committee Budget</u>").

12

5.       DIP Facility Advances. Pursuant to Bankruptcy Code sections 363 and 364(c) and (d), the DIP Facility funds to be advanced pursuant to the terms of this Order and the DIP Financing Term Sheet (collectively, the "DIP Facility Advances") shall be allowed administrative expenses of the Debtors' estates, which shall, subject to the Carve-Out, have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges against property arising in the Chapter 11 Cases as provided under the Bankruptcy Code (such claim, the "DIP Superpriority Claim"). Notwithstanding the foregoing, the DIP Superpriority Claim shall not be payable from the proceeds of or recoveries upon Avoidance Actions (as such term is defined below). The time of payment of the DIP Facility Advances shall not be altered, extended, or impaired by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of this Court which hereafter may be entered.

6.       Interest and Fees.   To the extent fully secured, interest on the Pre-Petition Obligations shall accrue from and after the Petition Date at the Non-Default Rate (as defined in the DIP Financing Term Sheet). The reasonable fees and expenses of the DIP Agent (whether incurred before or after the Petition Date) shall be payable as set forth in the DIP Financing Term Sheet without further notice, motion, or application to, order of, or hearing before this Court.

7.       DIP Facility Liens. Pursuant to Bankruptcy Code sections 363, 364(c), and 364(d), as security for the DIP Facility Advances and other post-petition costs payable under the DIP Financing Term Sheet, the Debtors are hereby authorized to and are hereby deemed to grant to the DIP Agent a valid, binding, and enforceable lien, mortgage and/or security interest (a "Lien," and as so granted to the DIP Agent, the "DIP Lien") in all of the Debtors' presently owned or hereafter acquired property and assets (including the "DIP Collateral" as defined in the DIP Financing Term

13

Sheet), whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located (including, without limitation, first priority liens on any cash held in the Debtors' bank accounts), and the proceeds and products thereof (collectively, the "DIP Collateral"), but excluding: any causes of action that could be brought relating to prepetition transfers pursuant to sections 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes, and all proceeds of or recoveries thereon (the "Avoidance Actions").

8.      Priority of DIP Facility Liens. Pursuant to Bankruptcy Code sections 364(c) and 364(d), the DIP Lien shall be a first priority senior and priming lien on the DIP Collateral (including the Pre-Petition Collateral), subject and junior only to (i) the Carve-Out (defined below) and (ii) valid, enforceable, properly perfected, and unavoidable prepetition Liens in existence on the Petition Date (including any Liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) encumbering assets currently in existence of a Debtor but only to the extent such Liens are senior to the Liens held by Pre-Petition Lenders and/or Pre-Petition Agent in connection with the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents. The DIP Liens shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of any of the Debtors' estates under Bankruptcy Code section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the obligations under the Pre-Petition Credit Agreement or Pre-Petition Loan Documents be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or security interests granted to or in favor of, or conferred upon, the DIP Agent or DIP Lenders by the terms of the DIP Financing Documents until such time as

14

the obligations under the DIP Financing Documents and this Order are indefeasibly paid in full, in cash.  The DIP Liens shall not be subject or subordinate to Liens arising after the Petition Date.

9.      Cash Collateral Usage.  The Debtors, the DIP Agent, and the DIP Lenders   assert that all rents, income, profits, cash in accounts and deposits derived from the Pre-Petition Collateral constitute Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code). Provided that each of the conditions set forth in this Paragraph are satisfied, the Debtors shall be authorized to use the Cash Collateral only in accordance with the terms of the Budget, this Order, and the other DIP Financing Documents. The satisfaction of each of the following conditions shall constitute a condition to the Debtors' authorization to use any Cash Collateral:  (i) no Event of Default under shall exist or be continuing; and (ii) the Termination Date shall not have occurred. If, on any date, any of such conditions is not satisfied, then none of the Debtors shall be authorized to use any Cash Collateral unless and until such use is consented to by the DIP Agent in its sole and absolute discretion. Upon order of this Court, if the Termination Date occurs, then the Debtors shall remit to the DIP Agent any Cash Collateral then in the Debtors' possession for application to the outstanding obligations under the DIP Facility and Pre-Petition Loan Documents.

10.     Adequate Protection of Pre-Petition Obligations. Until the indefeasible payment in full, in cash of the Pre-Petition Obligations, the Pre-Petition Agent and Pre-Petition Lenders are entitled to adequate protection of their interests in the Pre-Petition Collateral (including Cash Collateral) as a result of (a) the provisions of this Order granting first priority and/or priming liens on such Pre-Petition Collateral to the DIP Agent for the benefit of itself and the DIP Lenders, (b) the Debtors' use of the Pre-Petition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to Bankruptcy Code section 362, or (d) otherwise, pursuant to

15

Bankruptcy Code sections 361(a), 363(c), and 364(d)(1).  The Pre-Petition Agent, on behalf of and for the benefit of itself and the Pre-Petition Lenders, is hereby granted, solely to the extent of diminution in value of the Pre-Petition Liens in the Pre-Petition Collateral from and after the Petition Date, the following:

A.      a Lien in all DIP Collateral (the "<u>Adequate Protection Lien</u>") junior only to: (i) the DIP Lien; (ii) the Carve-Out; and (iii) any valid, enforceable, properly perfected, and unavoidable prepetition Liens in existence on the Petition Date (including any Liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) encumbering assets currently in existence of a Debtor but only to the extent such Liens are senior to the Liens held by Pre-Petition Lenders and/or Pre-Petition Agent in connection with the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents; and

B.      a post-petition superpriority administrative expense claim (the "<u>Prepetition Adequate Protection Superpriority Claim</u>") against each of the Debtors, with recourse   to all pre-petition and post-petition property of the Debtors and all proceeds thereof, under Bankruptcy Code sections 503 and 507 against the Debtors' estates on a joint and several basis, in each case to the extent the Adequate Protection Lien does not adequately protect against the diminution in value of the Pre-Petition Liens, which shall have priority in payment as provided under the Bankruptcy Code, subject and junior to the Carve-Out, DIP Facility Advances and DIP Superpriority Claim.

11.      <u>No Waiver of Future Adequate Protection Requests</u>.  Nothing herein  shall be deemed to be a waiver by the Pre-Petition Agent, any Pre-Petition Lenders, Wapiti II (as defined herein), Wyatt, Halliburton, or RIG II of their respective rights to request additional or further

DOCS-#5995886-v5

protection of its interests in any property of the Debtors, to move for relief from the automatic stay (if such relief is required), to seek the appointment of a trustee or examiner or the dismissal of any of the Debtors' bankruptcy cases, or to request any other relief.

   12. <u>Modification of Automatic Stay</u>. The automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit (a) the Debtors, the DIP Agent and DIP Lenders to implement the DIP Facility and perform pursuant to the DIP Financing Documents, including without limitation the provisions thereof with respect to the collection of Proceeds, and the maintenance and implementation of the Collection Accounts and the Collection Procedures (as such terms are defined below), and (b) the creation and perfection of all Liens granted or permitted by this Order. The Debtors and the holders of any DIP Lien, Adequate Protection Lien, Wapiti II Adequate Protection Lien (as defined below), Wyatt Adequate Protection Lien (as defined below), Halliburton Adequate Protection Lien (as defined below), or RIG II Adequate Protection Lien (as defined below) shall not be required to enter into any additional security agreements or take any further action to create, memorialize, and/or perfect any such Liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be, and are hereby, deemed valid, binding, enforceable, and automatically perfected by the docket entry of this Order by the Clerk of the Court. If, however, the holder of any DIP Lien or Adequate Protection Lien in its sole and absolute discretion shall elect for any reason to enter into, file, record, or serve any such financing statements or other documents with respect to any such Lien, then the Debtors shall execute same upon request and the filing, recording, or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Order by the Clerk of the Court. The holders (including any agent therefor) of any DIP Lien, Pre-Petition Lien, or Adequate Protection Lien are

hereby relieved of any requirement to file proofs of claim in the Debtors' bankruptcy cases with respect to any such Liens and the claims secured thereby, but any such holder (or such agent) may in its sole and absolute discretion file any such proof of claim. For the avoidance of doubt, the automatic stay provided in Bankruptcy Code § 362 shall not apply to any adversary proceeding commenced in this Court by any party in interest to determine the extent, validity, or priority of any purported lien or interest in property (together with any contract or accounting issues related to such action that may be subject to entry of final orders and judgments in this Court), provided however, that any party in interest shall not collect any final judgment nor foreclose any lien granted by a final order or judgment without further relief or modification of the automatic stay.

13.    <u>Carve-Out</u>.    The DIP Liens, DIP Facility Superpriority Claims, Adequate Protection Liens, Wapiti II Adequate Protection Liens (as defined below), Wyatt Adequate Protection Liens (as defined below), Halliburton Adequate Protection Liens (as defined below), RIG II Adequate Protection Liens (as defined below), Prepetition Adequate Protection Superpriority Claims, Wapiti II Adequate Protection Superpriority Claims, Wyatt Adequate Protection Superpriority Claims, Halliburton Adequate Protection Superpriority Claims, or RIG II Adequate Protection Superpriority Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "<u>Carve-Out</u>," and all amounts payable in connection therewith, the "<u>Carve-Out Amounts</u>"):

A.    unpaid post-petition fees and expenses of the Clerk of the Court and statutory fees payable to the U.S. Trustee  pursuant to 28 U.S.C. § 1930; and

B.    unpaid post-petition fees and expenses of professionals of the Debtors and professionals of a Statutory Committee (if any), which are retained by an order of the Court pursuant  to Bankruptcy Code  sections 327, 328, 363, or  1103(a) (the "<u>Professionals</u>")

incurred prior to a Termination Event, but only to the extent such fees and expenses are (i) incurred prior to a Termination Event, (ii) within the amounts set forth in the Budget approved by the DIP Agent for such Professional through the date of the Termination Event, (iii) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (iv) not otherwise paid from retainers, or any professional expense escrow account established by the Debtors.

provided, however, that (x) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available, and (y) in no event shall the Carve-Out for each Professional exceed the amounts set forth for post-petition fees for such Professional set forth in the Budget as of any applicable date determination. Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Agent or the DIP Lenders with respect to the Carve-Out prior to the entry of the Final Order shall be DIP Facility Advances and such obligations shall be secured by the DIP Lien. Further, the payment of the fees or costs of any Professional and/or Statutory Committee (if any) shall be subject to Court approval, and the DIP Agent and the DIP Lenders reserve the right to object to any Professional's application for payment. As used in this Order, the term "Termination Event" shall mean the occurrence of the earliest of: (i) an Event of Default under the DIP Financing Documents; (ii) the Debtors' failure to comply with the terms of this Order or the Final Order; or (iii) the Debtors' failure to comply with any of the Milestones set forth in the DIP Financing Term Sheet.

14.    Carve-Out Limitations.   Neither the payment of any Professional Fees, nor the Carve-Out shall include payment for any fees and expenses, if any, of the Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.      the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders, or the validity of any Liens or security interests or claims granted, or purported to be granted, to any of such parties;

B.      preventing, hindering, or otherwise delaying (or supporting any other person or entity in preventing, hindering, or otherwise delaying), whether directly or indirectly, the exercise by the DIP Agent or Pre-Petition Agent of any of its rights and remedies under this Order, the Final Order, the DIP Financing Documents, the Pre-Petition Credit Agreement, or the Pre-Petition Loan Documents;

C.      the commencement, support, or prosecution of any action or proceeding of any claims, causes of action, or defenses against the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors, or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, or any of them;

D.      any request to borrow money other than pursuant to the terms of this Order or the Final Order and the other DIP Financing Documents;

E.      with respect to the Debtors, any of the Debtors' Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator, or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter to be released, waived, or specified as not subject to challenge by the  Debtors

DOCS-#5995886-v5

(or any of them) pursuant to this Order (including, without limitation Paragraphs 24, 25, and 26 herein); and

F.      for any other purpose for which proceeds of the DIP Facility may not be used pursuant to the DIP Financing Documents.

15.      <u>Collateral Matters</u>.  Effective as of the time of commencement of the Debtors' bankruptcy cases on the Petition Date:

A.      each Debtor waives irrevocably all claims and rights, if any, it or its estate might otherwise assert against the Pre-Petition Collateral or the DIP Collateral pursuant to Bankruptcy Code section 506(c) or 105(a), or any other applicable law;

B.      no entity in the course of the Debtors' bankruptcy cases shall be permitted to recover from the DIP Collateral (whether directly or through the grant of derivative or equitable standing in the name of the any Debtor or such Debtor's estate) any cost or expense of preservation or disposition of the Pre-Petition Collateral or the DIP Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code sections 506(c) or 105(a), or any other applicable law;

C.      no entity shall be permitted to recover from the DIP Collateral or the Pre-Petition Collateral, or assert against the DIP Agent, DIP Lenders, Pre-Petition Agent or any Pre-Petition Lenders, any claim with respect to any unpaid administrative expense of the Debtors' bankruptcy cases, whether or not the Debtors' payment of such administrative claim was contemplated by or included in the Budget; and

D.      the Pre-Petition Agent, Pre-Petition Lenders, DIP Agent, and the DIP Lenders shall not be subject to the "equities of the case" exception of Bankruptcy Code

DOCS-#5995886-v5

section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine, with respect to any DIP Collateral or the Pre-Petition Collateral.

16.    <u>No Additional Financing or Cash Collateral Usage</u>.    So long as the use of Cash Collateral and any DIP Facility obligations approved by a Final Order remain outstanding, unless consented to in writing by the DIP Agent, no Debtor shall seek entry of any further orders in its Chapter 11 Case which authorize (a) under Bankruptcy Code section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code sections 364(c) or 364(d) that does not repay any amounts due under the DIP Facility in full, in cash, (c) the return of goods pursuant to Bankruptcy Code section 546(h) to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any such return pursuant to Bankruptcy Code section 553 or otherwise, or (d) any other grant of rights against the Debtors and/or their respective estates that is secured by a Lien in the DIP Collateral or is entitled to superpriority administrative status that does not repay any amounts due under the DIP Facility in full, in cash.

17.    <u>Default Rights</u>. Subject to entry of a Final Order, an upon the occurrence of: (i) an Event of Default; (ii) the Termination Date; (iii) any Debtor's failure to comply with the terms of this Order or the Final Order (including, without limitation, its failure to comply with the Budget); or (iv) any Debtor's failure to comply with any of the Milestones set forth in the DIP Financing Term Sheet, and the giving of written notice thereof by the DIP Agent to counsel to the Debtors, the Statutory Committee (if any) and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "<u>Default Notice</u>"), or upon the Maturity Date, then (1) the DIP Agent shall be fully authorized, in its   sole discretion to cease making DIP Facility advances to the Debtors (as authorized by a Final Order),

(2) the DIP Agent shall be fully authorized to terminate the Debtors' use of the DIP Collateral (including, without limitation, Cash Collateral), and/or (3) the DIP Agent shall be fully authorized to immediately terminate the DIP Facility and demand repayment of the DIP Facility obligations then outstanding.

18.    <u>Exercise of Remedies Against DIP Collateral</u>.  Further, upon the occurrence of an Event of Default and transmission of a Default Notice, or upon the Maturity Date, the DIP Agent shall have the right, subject to Bankruptcy Code section 362 and Bankruptcy Rule 4001(a), to take immediate reasonable action to protect the DIP Collateral from harm, theft, and/or dissipation.

19.    <u>DIP Facility Reporting</u>. The Debtors shall provide the DIP Agent, and any party in interest who reasonably requests it, with (i) all financial statements, certificates, and reports required pursuant to the DIP Financing Term Sheet in accordance with the timeframes specified therein and (ii) such additional information as the DIP Agent or such party in interest shall reasonably request from the Debtors. The DIP Agent and its representatives shall have reasonable access to each Debtor's business premises and to the DIP Collateral in order to review and evaluate the physical condition of any of the DIP Collateral and/or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' businesses.

20.    [Reserved]

21.    [Reserved]

22.    [Reserved]

23.    <u>Credit Bidding</u>. The DIP Agent, DIP Lenders, Pre-Petition Agent, and Pre-Petition Lenders are hereby authorized to credit-bid all or any of the applicable obligations under the DIP Facility (subject to a Final Order) and the Pre-Petition Credit Agreement and Pre-Petition Loan Documents at any disposition of any Pre-Petition Collateral and/or DIP Collateral.

DOCS-#5995886-v5

24.  <u>Binding Nature of Stipulations and Other Matters</u>.  Subject to the right to bring   a Challenge Action as set forth in Paragraph 27 below, upon entry of this Order:

A.  the Stipulations shall be binding upon the Debtors and all other persons, entities, and/or parties in all circumstances;

B.  the validity, extent, priority, perfection, enforceability, and non-avoidability of the Pre-Petition Agent's and Pre-Petition Lenders' respective first priority, validly perfected prepetition claims and Liens against the Debtors and the Pre-Petition Collateral shall not be subject to challenge by the Debtors or any other person, entity, or party; and

C.  neither the Debtors, nor any other person, entity, or party shall seek to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Agent or the Pre-Petition Lenders prior to the Petition Date.

25.  <u>Debtor Release</u>.  In consideration of and as a condition to the DIP Agent and  DIP Lenders making the DIP Facility Advances and providing credit and other financial accommodations to the Debtors pursuant to the terms of this Order and the DIP Financing Term Sheet, each of the Debtors (each a "<u>Releasor</u>" and collectively, the "<u>Releasors</u>") and subject to Paragraph 27 herein, their respective bankruptcy estates absolutely releases, forever discharges and acquits each of the Pre-Petition Agent, the Pre-Petition Lenders, and their respective successors and assigns, affiliates, officers, directors, employees, attorneys, and other representatives (the "<u>Releasees</u>") of and from any and all claims, demands, causes of action, damages, choses in action, and all other claims, counterclaims, defenses, setoff rights, and other liabilities whatsoever (the "<u>Prepetition Released Claims</u>") of every kind, name, nature, and description, whether known or unknown, both at law and equity (including, without limitation, any

24

"lender liability" claims) that any Releasor may now or hereafter own, hold, have, or claim against each and every of the Releasees arising at any time prior to the entry of this Order (including, without limitation, claims relating to the Debtors, the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, and other documents executed in connection therewith, and the obligations thereunder); <u>provided</u>, <u>however</u>, that such release shall not be effective as to the Debtors' bankruptcy estates until the expiration of the Challenge Period. In addition, upon the indefeasible payment, in full, in cash, of all DIP Facility obligations owed to the DIP Agent and DIP Lenders arising under this Order and the DIP Financing Term Sheet, the DIP Agent and DIP Lenders shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the DIP Financing Term Sheet or the other DIP Financing Documents.

26. <u>Releasor Covenants</u>.  Each Releasor hereby absolutely, unconditionally,  and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, or in any other proceeding) any Releasee on the basis of any claims or causes of action released and discharged by such Releasor pursuant to this Order. If any Releasor violates this covenant, each Debtor agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable attorneys' fees and costs incurred by any Releasee as a result of such violation.

27. <u>Challenge Action and Challenge Period</u>.  Notwithstanding any other provisions of this Order, any interested party (other than the Debtors or their Professionals) in these cases (including, without limitation, the Statutory Committee (if any)) shall have until seventy-five (75) days after the Petition Date (the "<u>Challenge Period</u>"), to commence an adversary proceeding

against the Pre-Petition Agent and/or Pre-Petition Lenders for the purpose (collectively, a "Challenge Action") of:

       A.       contesting challenging the findings of fact, Stipulations, waivers or releases contained herein;

       B.       challenging the validity, extent, priority, perfection, enforceability, and non-avoidability of the Pre-Petition Obligations and/or Pre-Petition Liens (as applicable) against the Debtors;

       C.       seeking to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Pre-Petition Lenders or the Pre-Petition Agent (as applicable) prior to the Petition Date;

       D.       seeking damages or equitable relief against the Pre-Petition Lenders and/or the Pre-Petition Agent arising from or related to their prepetition business and lending relationships with the Debtors, including without limitation equitable subordination, recharacterization, lender liability, and deepening insolvency claims and causes of action; or

       E.       challenging any other matter to be waived or released pursuant to this Order (including, without limitation, pursuant to Paragraphs 24, 25 and 26).

28.     No Challenge Actions After Expiration of Challenge Period.  All parties in interest, including without limitation the Statutory Committee (if any), that fail to act in accordance with the time periods set forth in the preceding paragraph shall be, and hereby are, barred forever from commencing a Challenge Action or challenging in any manner the Liens or claims of the Pre-Petition Agent and/or Pre-Petition Lenders and shall be bound by the waivers, Stipulations,    and

terms set forth in this Order (including Paragraphs 24, 25 and 26 of this Order). Any Challenge Action filed shall prohibit application of this Paragraph only to the extent of the specific matters set forth in such Challenge Action on the date of filing.

29. <u>Retention of Challenge Action Defenses</u>. The legal and equitable claims, counterclaims, defenses, and/or rights of offset and setoff of the Pre-Petition Agent and Pre-Petition Lenders in response to any such Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew, or reinstate any applicable statute of limitations which may have expired prior to the date of commencement of such Challenge Action. Despite the commencement of a Challenge Action, the prepetition claims and Liens of the Pre-Petition Agent and Pre-Petition Lenders shall be deemed valid, binding, properly perfected, enforceable, non-avoidable, not subject to disallowance under Bankruptcy Code section 502(d) and not subject to subordination under Bankruptcy Code section 510 until such time as a final and non-appealable judgment and order is entered sustaining such Challenge Action in favor of the plaintiffs therein. Notwithstanding anything to the contrary contained in this Order, the Court expressly reserves the right to order other appropriate relief against Pre-Petition Agent and Pre-Petition Lenders (solely in their capacities as such) in the event there is a timely and successful Challenge Action by any party in interest to the validity, enforceability, extent, perfection or priority of the Pre-Petition Liens.

30. <u>No Control by DIP Agent and Lenders</u>. In making decisions to advance any extensions of credit to the Debtors pursuant to the DIP Facility or in taking any other actions reasonably related to this Order, or the DIP Financing Documents (including, without limitation, the exercise of its approval rights with respect to any Budget), the DIP Agent and the DIP Lenders shall have no liability to any third party and shall not be deemed to be in control of the operations

of the Debtors or to be acting as a "control person," "responsible person," or other "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute), and the DIP Agent's and the DIP Lenders' relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Lenders and the Debtors.

31.  <u>Successors and Assigns</u>.  This Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Debtors, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estate administrator, or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. Except as set forth herein with respect to a Challenge Action and except for the benefit of the DIP Agent, the DIP Lenders and the Releasees, no rights are created under this Order for the benefit of any creditor of the Debtors, any other party in interest in the Debtors' bankruptcy cases, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

32.  <u>Continuing Nature of DIP Facility Liens and Claims</u>.  Any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise shall be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that (a) the DIP Agent's and DIP Lenders' Liens in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Facility obligations are indefeasibly paid and satisfied in full, in cash; and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the  DIP Facility Superpriority

Claim, the DIP Liens, the Adequate Protection Liens, and the Prepetition Adequate Protection

Superpriority Claims.

       33.   <u>Order Controls</u>. To the extent that any of the provisions of this Order shall conflict

with any provisions of the DIP Financing Term Sheet, or with any order of this Court authorizing

the Debtors to continue the use of prepetition bank accounts, cash management systems, treasury

management systems, or business forms, or any similar orders, this Order is deemed to control and

supersede the conflicting provisions therein.

       34.   <u>Immediate Effect of Order</u>.  The terms and conditions of this Order shall be

effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding

any potential application of Bankruptcy Rule 6004(h) or otherwise. Furthermore, to the extent

applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3),

6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of

Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the

contents of the Motion.

       35.   <u>Continuing Nature of Adequate Protection and Other Benefits Under DIP Order</u>.

The DIP Agent, Pre-Petition Agent, DIP Lenders, the Pre-Petition Lenders, Wapiti II (as defined

below), Wyatt, Halliburton and RIG II shall be entitled to the benefits and protections of this Order,

including (a) the adequate protection afforded to the Pre-Petition Agent, the Pre-Petition Lenders,

Wapiti II (as defined below), Wyatt, Halliburton, and RIG II, as set forth in this Order, and (b) the

protections afforded pursuant to Bankruptcy Code section 364(e), with respect to all loans,

advances, and other financial, accommodations made by them pursuant to this Order. The DIP

Lien, the priority afforded the DIP Facility Advances, the adequate protection afforded to the Pre-

Petition Agent and Pre-Petition Lenders, and the adequate protection provided to Wapiti II (as

defined below), Wyatt, Halliburton and RIG II, as set forth in this Order, shall be binding on the Debtors and any successor trustee or trustees even if this Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Order. Except as provided herein, no Proceeds, or Cash Collateral may be used by any party in interest seeking to modify any of the rights granted to DIP Agent or DIP Lenders hereunder or in the DIP Financing Documents.

36.   DIP Facility Modifications.  The Debtors and the DIP Agent may implement  non-material modifications of the DIP Financing Term Sheet without the need for notice or further approval of this Court, provided, however, that copies of such amendments will be provided to the U.S. Trustee, Wapiti II (as defined below), Wyatt, Halliburton, RIG II, and the Statutory Committee (if any).  The Debtors and the DIP Agent may implement material modifications of the DIP Financing Term Sheet on at least seven (7) calendar days prior notice to the Statutory Committee (if any) and the U.S. Trustee, and Wapiti II, Wyatt, Halliburton and RIG II, with an opportunity to object to such material modifications.

37.   Further Assurances.  The Debtors are authorized to do and perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, deeds of trust, and financing statements), and to pay all fees and expenses that may be required or necessary for the Debtors' performance under this Order or the DIP Financing Documents, including, without limitation, (a) the execution of the DIP Financing Term Sheet, (b) the payment of the fees and other expenses described herein or in the DIP Financing Term Sheet as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees, and facility fees.

38.     _Retention of Jurisdiction_.  This Court shall retain jurisdiction to enforce the provisions of this Order, the DIP Facility (as approved by a Final Order) and the DIP Financing Term Sheet, and this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order, the DIP Facility (as approved by a Final Order) and the DIP Financing Term Sheet.

39.     _364(e) Protections_.  This Court has considered and determined the  matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on terms and conditions to which the Debtors and DIP Agent and DIP Lenders have agreed. Thus, each of the terms and conditions constitutes a part of the authorization under Bankruptcy Code section 364, and is, therefore, subject to the protections contained in Bankruptcy Code section 364(e), regardless of (i) any stay, modification, amendment, vacation, or reversal of this Order or the DIP Financing Term Sheet or any term hereunder or thereunder; (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2); or (iii) the dismissal or conversion of any of the Chapter 11 Cases.

40.     _Protection of Wapiti II Interests - Liens_.  Wapiti Oil & Gas II, LLC ("_Wapiti   II_") alleges that it is a secured creditor of one or more of the Debtors holding a validly perfected operator's lien against such Debtor(s) (such liens "_Purported Wapiti II Liens_"). The Debtors, DIP Agent, DIP Lenders, Pre-Petition Agent, and Pre-Petition Lenders reserve all rights with respect to the alleged claims or liens of Wapiti II (including, without limitation, the Purported Wapiti II Liens) and do not, through entry of this Order, admit that Wapiti II holds any validly perfected Liens against any of the Debtors' estates or property of the Debtors' estates. Nevertheless, in the event that a Purported Wapiti II Lien is determined to be a valid, binding, enforceable, perfected, non-avoidable Lien in existence on the Petition Date (including any Lien that is perfected after the

31

Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) against estate property, to the extent that the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order results in a diminution in the value of such Purported Wapiti II Lien (if any), Wapiti II shall be granted pursuant to Bankruptcy Code §§ 361 and 363, effective as of the Petition Date, valid and automatically perfected replacement Liens, solely to the extent of such diminution in value (such Liens, the "Wapiti II Adequate    Protection Liens"), in and upon the same property of the Debtors to which such valid, binding,  enforceable, perfected, and non-avoidable Purported Wapiti II Lien, would be senior to the Pre-Petition Liens, together with the proceeds, products, and offspring of such assets. Each such Wapiti II Adequate Protection Lien (if any) shall be afforded the same relative validity and priority as the applicable Purported Wapiti II Lien maintained as of the Petition Date.

41.     Protection of Wapiti II – Priority Claims.  To the extent that the value, if any, of  a Wapiti II Adequate Protection Lien proves to be inadequate to protect Wapiti II against any diminution in value (if any) of its Purported Wapiti II Liens as a result of the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order, Wapiti II shall receive, solely to the extent of diminution in value (if any) of Wapiti II's, valid, binding, enforceable, perfected, non-avoidable Purported Wapiti II Lien that is not redressed by a Wapiti II Adequate Protection Lien, a post-petition superpriority administrative  expense  claim  (the  "Wapiti  II  Adequate  Protection Superpriority Claim") against each of the Debtor(s) to which the Purported Wapiti II Liens applied, with recourse to all pre-petition and post-petition property of such applicable Debtor(s) and all proceeds thereof, under Bankruptcy Code sections 503 and 507, which Wapiti II Adequate Protection Superpriority

32

Claim (x) shall have priority in payment as provided under the Bankruptcy Code, subject and junior to the Carve-Out, DIP Facility Advances and DIP Superpriority Claim; and (y) shall be pari-passu with the Prepetition Adequate Protection Superpriority Claim, Halliburton Adequate Protection Superpriority Claim (as defined below), the Wyatt Adequate Protection Superpriority Claim (as defined below), and the RIG II Adequate Protection Superpriority Claim (as defined below).

42.     <u>Protection of Wyatt Interests - Liens</u>.  Wyatt alleges that it is a secured creditor of one or more of the Debtors holding a validly perfected lien against such Debtor(s) (such liens "<u>Purported Wyatt Liens</u>").  The Debtors, DIP Agent, DIP Lenders, Pre-Petition Agent, and  Pre-Petition Lenders reserve all rights with respect to the alleged claims or liens of Wyatt (including, without limitation, the Purported Wyatt Liens) and do not, through entry of this Order, admit that Wyatt holds any validly perfected Liens against any of the Debtors' estates or property of the Debtors' estates. Nevertheless, in the event that a Purported Wyatt Lien is determined to be a valid, binding, enforceable, perfected, non-avoidable Lien in existence on the Petition Date (including any Lien that is perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) against estate property, to the extent that the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order results in a diminution in the value of such Purported Wyatt Lien (if any), Wyatt shall be granted pursuant to Bankruptcy Code §§ 361 and 363, effective as of the Petition Date, valid and automatically perfected replacement Liens, solely to the extent of such diminution in value (such Liens, the "<u>Wyatt Adequate Protection Liens</u>"), in and upon the same property of the Debtors  to which such valid, binding, enforceable, perfected, and non-avoidable Purported Wyatt Liens

DOCS-#5995886-v5

would be senior to the Pre-Petition Liens, together with the proceeds, products, and offspring of such assets.  Each such Wyatt Adequate Protection Lien (if any) shall be afforded the same relative validity and priority as the applicable Purported Wyatt Lien maintained as of the Petition Date.

43.     <u>Protection of Wyatt Interests –Administrative Claims</u>. To the extent that the value, if any, of a Wyatt Adequate Protection Lien proves to be inadequate to protect Wyatt against any diminution in value (if any) of its Purported Wyatt Liens as a result of the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order, Wyatt shall receive, solely to the extent of diminution in value (if any) of Wyatt's valid, binding, enforceable, perfected, non-avoidable Purported Wyatt Liens that are not redressed by a Wyatt Adequate Protection Lien, a post-petition superpriority administrative expense claim (the "<u>Wyatt Adequate Protection Superpriority Claim</u>") against each of the Debtor(s) to which the Purported Wyatt Liens applied, with recourse to all pre-petition and post-petition property of such applicable Debtor(s) and all proceeds thereof, under Bankruptcy Code sections 503 and 507, which Wyatt Adequate Protection Superpriority Claim (x) shall have priority in payment as provided under the Bankruptcy Code, subject and junior to the Carve-Out, DIP Facility Advances and DIP Superpriority Claim; and (y) shall be pari-passu with the Prepetition Adequate Protection Superpriority Claim, Wapiti II Adequate Protection Superpriority Claim, the Halliburton Adequate Protection Superpriority Claim (as defined below), and the RIG II Adequate Protection Superpriority Claim (as defined below).

44.     <u>Protection of Halliburton Interests - Liens</u>.  Halliburton alleges that it is a  secured creditor of one or more of the Debtors holding a validly perfected lien against such Debtor(s) (such liens "<u>Purported Halliburton Liens</u>").  The Debtors, DIP Agent, DIP Lenders, Pre-Petition Agent, and Pre-Petition Lenders reserve all rights with respect to the alleged claims or liens of Halliburton

34

(including, without limitation, the Purported Halliburton Liens) and do not, through entry of this Order, admit that Halliburton holds any validly perfected Liens against any of the Debtors' estates or property of the Debtors' estates. Nevertheless, in the event that a Purported Halliburton Lien is determined to be a valid, binding, enforceable, perfected, non-avoidable Lien in existence on the Petition Date (including any Lien that is perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) against estate property, to the extent that the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order results in a diminution in the value of such Purported Halliburton Lien (if any), Halliburton shall be granted pursuant to Bankruptcy Code §§ 361 and 363, effective as of the Petition Date, valid and automatically perfected replacement Liens, solely to the extent of such diminution in value (such Liens, the "Halliburton Adequate Protection Liens"), in and upon the same   property of the Debtors to which such valid, binding, enforceable, perfected, and non-avoidable Purported Halliburton Liens would be senior to the Pre-Petition Liens, together with the proceeds, products, and offspring of such assets. Each such Halliburton Adequate Protection Lien (if any) shall be afforded the same relative validity and priority as the applicable Purported Halliburton Lien maintained as of the Petition Date.

45.    Protection of Halliburton Interests –Administrative Claims.  To the extent that  the value, if any, of a Halliburton Adequate Protection Lien proves to be inadequate to protect Halliburton against any diminution in value (if any) of its Purported Halliburton Liens as a result of the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order, Halliburton shall receive, solely to the extent of diminution in value (if any) of Halliburton's valid, binding, enforceable,

35

perfected, non-avoidable Purported Halliburton Liens that are not redressed by a Halliburton Adequate Protection Lien, a post-petition superpriority administrative expense claim (the "Halliburton Adequate Protection Superpriority Claim") against each of the Debtor(s) to   which the Purported Halliburton Liens applied, with recourse to all pre-petition and post-petition property of such applicable Debtor(s) and all proceeds thereof, under Bankruptcy Code sections 503 and 507, in each case to the extent the Halliburton Adequate Protection Lien does not adequately protect against the diminution in value of the Purported Halliburton Liens, which Halliburton Adequate Protection Superpriority Claim (x) shall have priority in payment as provided under the Bankruptcy Code, subject and junior to the Carve-Out, DIP Facility Advances and DIP Superpriority Claim; and (y) shall be pari-passu with the Prepetition Adequate Protection Superpriority Claim, Wapiti II Adequate Protection Superpriority Claim, the Wyatt Superpriority Claim, and the RIG II Adequate Protection Superpriority Claim (as defined below).

46.     Protection of RIG II Interests - Liens. RIG II alleges that it is a secured creditor of one or more of the Debtors holding a validly perfected lien against such Debtor(s) (such liens "Purported RIG II Liens").  The Debtors, DIP Agent, DIP Lenders, Pre-Petition Agent, and Pre-Petition Lenders reserve all rights with respect to the alleged claims or liens of RIG II (including, without limitation, the Purported RIG II Liens) and do not, through entry of this Order, admit that RIG II holds any validly perfected Liens against any of the Debtors' estates or property of the Debtors' estates. Nevertheless, in the event that a Purported RIG II Lien is determined to be a valid, binding, enforceable, perfected, non-avoidable Lien in existence on the Petition Date (including any Lien that is perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) against estate property, to the extent that the Debtors' use of Cash Collateral or the granting of first priority

36

and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order results in a diminution in the value of such Purported RIG II Lien (if any), RIG II shall be granted pursuant to Bankruptcy Code §§ 361 and 363, effective as of the Petition Date, valid and automatically perfected replacement Liens, solely to the extent of such diminution in value (such Liens, the "RIG II Adequate Protection Liens"), in and upon the same property of the Debtors to which such valid, binding, enforceable, perfected, and non-avoidable Purported RIG II Liens would be senior to the Pre-Petition Liens, together with the proceeds, products, and offspring of such assets. Each such RIG II Adequate Protection Lien (if any) shall be afforded the same relative validity and priority as the applicable Purported RIG II Lien maintained as of the Petition Date.

47.     Protection of RIG II Interests –Administrative Claims.  To the extent that the value, if any, of a RIG II Adequate Protection Lien proves to be inadequate to protect RIG II against any diminution in value (if any) of its Purported RIG II Liens as a result of the Debtors' use of Cash Collateral or the granting of first priority and/or priming Liens to the DIP Agent for the benefit of the DIP Lenders pursuant to this Order, RIG II shall receive, solely to the extent of diminution in value (if any) of RIG II's valid, binding, enforceable, perfected, non-avoidable Purported RIG II Liens that are not redressed by a RIG II Adequate Protection Lien, a post-petition superpriority administrative expense claim (the "RIG II Adequate Protection Superpriority Claim") against each of the Debtor(s) to which the Purported RIG II Liens applied, with recourse to all pre-petition and post-petition property of such applicable Debtor(s) and all proceeds thereof, under Bankruptcy Code sections 503 and 507, which RIG II Adequate Protection Superpriority Claim (x) shall have priority in payment as provided under the Bankruptcy Code, subject and junior to the Carve-Out, DIP Facility Advances and DIP Superpriority Claim; and (y) shall be pari-passu with the Prepetition Adequate Protection Superpriority Claim, Wapiti II Adequate Protection Superpriority

37

Claim, Wyatt Adequate Protection Superpriority Claim, and the Halliburton Adequate Protection Superpriority Claim.

48.     <u>Sale Proceeds Reservation</u>.   Any terms within the DIP Financing Term Sheet requiring direct payment of proceeds of the 363 Sale (as that term is defined in the DIP Financing Term Sheet) shall be conditioned upon entry of further Court orders, such as the 363 Sale Order, or other order making a determination of priority to the Sale Proceeds.

49.     <u>No Default Due to Wapiti II, Wyatt, Halliburton, or RIG II Adequate   Protection</u>. Notwithstanding anything to the contrary in the DIP Financing Term Sheet, the granting of any Wapiti II Adequate Protection Liens (if any), Wyatt Adequate Protection Liens (if any), Halliburton Adequate Protection Liens (if any), and RIG II Adequate Protection Liens (if any), and the award of the Wapiti II Adequate Protection Superpriority Claims (if any), Wyatt Adequate Protection Superpriority Claims (if any), Halliburton Adequate Protection Superpriority Claims (if any), and RIG II Adequate Protection Superpriority Claims (if any), shall not constitute an Event of Default under the DIP Financing Term Sheet.


Dated September 14, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

Exhibit A

**Badlands Production Company, *et al.***
**Terms and Conditions**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The terms outlined below in this Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (such post-petition credit facility, the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet and the Interim Order and Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (such documentation, the "**DIP Financing Documents**"), subject to approval by the Bankruptcy Court (as defined below). Capitalized terms not otherwise defined in this DIP Term Sheet shall have the meanings ascribed to them in that certain Amended and Restated Credit Agreement, dated as of August 19, 2014 by and among Garrison Loan Agency Services LLC ("Agent"), the Debtors, the guarantors party thereto and the lenders party thereto (such agreement, as amended, the "**Pre-Petition Credit Agreement**"), a copy of which is attached as Exhibit C to the Debtors' motion requesting approval of the DIP Facility.*

| | |
|---|---|
| **Debtors:** | (i) Badlands Production Company, a Delaware corporation; (ii) Badlands Energy, Inc., a Nevada corporation; (iii) Badlands Energy-Utah, LLC, a Delaware limited liability company; (iv) Myton Oilfield Rentals, LLC, a Nevada limited liability company; and (v) any other subsidiary of any of the foregoing who is a debtor pursuant to the Chapter 11 Cases (each a "**Debtor**", collectively, the "**Debtors**"). |
| **Guarantors:** | (i) Badlands Energy, Inc., a Nevada corporation; (ii) Badlands Energy-California, LLC, a Delaware limited liability company; (iii) Badlands Energy-Utah, LLC, a Delaware limited liability company; and (iv) Myton Oilfield Rentals, LLC, a Nevada limited liability company (each a **Guarantor**" and collectively, the "**Guarantors**"). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of: a credit line of up to one million five hundred thousand dollars ($1,500,000) (the "**Maximum DIP Advance Amount**"); provided that the amount and timing of any DIP Facility advances shall be limited by the DIP Advance Amounts and the Budget. The Maximum DIP Advance Amount, Budget, and DIP Advance Amounts may be further modified and amended from time to time only with the written consent of the Debtors and Agent. |
| **Agent:** | Garrison Loan Agency Services LLC ("**Agent**"). |

**DIP Lender:** Certain affiliates of Agent as may be designated by Agent (collectively, "**DIP Lender**"). Subject to the terms and conditions of the DIP Financing Documents, each DIP Lender shall be severally (and not jointly) obligated to fund its ratable share of the Availability up to its aggregate commitment for the DIP Facility.

**Borrowing Availability:** All borrowings under the DIP Facility shall be limited by the Budget (defined below) and borrowing Availability (as set forth below) and may be made from time to time on any Business Day (as defined in the Pre-Petition Credit Agreement) as designated by Debtors in a Borrowing Request, substantially similar to the form attached to the Pre-Petition Credit Agreement, properly delivered to Agent. The Budget shall be subject to the prior approval of Agent in its sole discretion and shall cover the time periods as more particularly described in the definition of such term below. The Budget may be further modified and amended from time to time only with the consent of Agent and the Debtors.

Availability shall be calculated as follows: all new advances under the DIP Facility shall not exceed, on a cumulative basis as of any date of determination, the lesser of (x) the Maximum DIP Advance Amount; or (y) the DIP Advance Amounts. The DIP Advance Amounts may be further modified and amended from time to time only with the written consent of the Debtors and Agent.

The availability under the DIP Facility shall be reduced by reserves as may be established by Agent in its reasonable discretion from time to time to reflect, among other things, contingencies or risks that may materially affect the DIP Collateral, the liens of Agent in such DIP Collateral or the business and operations of the Debtors, including, without limitation, a reserve for the Carve-Out.

**Budget and Variances:** Subject to the Budget Variances (as defined below): (i) the Debtors' Budget line items for actual cash receipts and cash disbursements from operations (excluding Professional Fees), shall each be adhered to, by line item, on a weekly period basis and a cumulative basis for the Budget period then ending as described below; and (ii) the disbursements for Professional Fees for the Debtors and Committee (if any) (which shall be reported in a manner so that Professional Fees for each retained Professional shall be reflected on its own line item) shall be adhered to, by line item, on a cumulative basis for that portion of the Budget period then ending, as described below. Any professional fees payable to Agent's counsel shall not be limited by the Budget.

Actual cash receipt and cash disbursement activity (which shall not include any Professional Fees) shall be tested on a line item

basis and each such line item may not vary unfavorably from the applicable Budget more than ten percent (10%) for each week during any Budget period or five percent (5%) on a cumulative basis for that portion of the Budget period then ended (collectively, the "**Budget Variances**").

Expenditures for Professional Fees shall be tested on a line item basis and may not vary unfavorably from the applicable Budget on a cumulative basis per Professional Fee line item for that portion of the Budget period then ending (and each Professional that may receive Professional Fees shall be reflected on its own Budget line item).

On or before the third (3rd) business day of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to Agent an Approved Budget Variance Report.

**Fees:**

The Debtors shall pay to Agent the fees and other charges payable in the amounts and at the times separately set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.

The Debtors also agree to pay Agent a DIP Commitment Fee of 1% of the Maximum DIP Advance Amount (the "**Commitment Fee**"), which Commitment Fee shall be fully earned upon entry of the Interim Order, and payable on the Maturity Date.

The Debtors also agree to pay the costs and expenses of Agent as set forth in the Section titled "Fees and Expenses" below.

**Termination Date:**

The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty-five (35) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to Agent at its sole option; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) any of the following occurrences (i) through (iv) in the Bankruptcy Court (as defined below) (i) entry of an order granting relief from the automatic stay permitting foreclosure of any assets of any Debtor having a value in excess of $100,000 in the aggregate, being secured by any DIP Lien or being secured by any asset the subject of a Third-Party Asset Purchase Agreement (unless consented to by Agent in writing), (ii) filing of any notice by Agent to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) filing of a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers,

3

or (iv) filing of a motion for the dismissal or conversion of any of the Chapter 11 Cases (as defined below); (g) entry of a Bankruptcy Court order granting liens or claims that are senior or *pari passu* to the liens granted in favor of Agent and/or DIP Lender under the DIP Financing Documents; and (h) such other date as is agreed to by Agent, in writing, in its sole discretion. The date on which the earliest of clauses (a) through (h) above occurs being referred to hereinafter as the "**Termination Date**." On the Termination Date, Debtors' ability to borrow pursuant to the DIP Facility shall be deemed terminated, and Agent and DIP Lender shall have no further obligation to provide financing pursuant to the DIP Facility, DIP Financing Documents or otherwise.

| | |
|---|---|
| **Non-Default Interest Rate and Payment Terms:** | Interest shall accrue on all outstanding advances under the DIP Facility at at the per annum rate (calculated by Agent on a calendar month basis) equal to the lesser of (x) the highest lawful rate and (y) the sum of 21.5% plus the LIBO Rate (determined by Agent on a calendar month basis and taking into account the minimum LIBO Rate floor set forth in the Pre-Petition Credit Agreement) and subject to the foregoing, as otherwise described in Section 2.5 of the Pre-Petition Credit Agreement (the "**Non-Default Interest Rate**"). The terms and provisions of Section 2.5 of the Pre-Petition Credit Agreement are hereby incorporated by reference into this DIP Term Sheet as if fully set forth herein. |

Interest with respect to any outstanding obligations under the Pre-Petition Credit Agreement shall, to the extent permitted by applicable bankruptcy law, accrue from and after the Petition Date at the Non-Default Interest Rate and be due and payable by the Debtors on the date that the full amount of the DIP Facility is immediately due and payable. Notwithstanding anything in this DIP Term Sheet to the contrary, in no event may maximum rate of interest charged, taken or received for the DIP Facility exceed 25% per annum.

| | |
|---|---|
| **Default Interest Rate:** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by Agent at its sole option, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is the lesser of (x) 2% per annum in excess of the Non-Default Interest Rate or (y) the highest lawful rate. |
| **Loan Payments:** | The Debtors jointly and severally promise and agree to pay to Agent and DIP Lender, all DIP Facility advances, together with interest thereon accruing pursuant to this DIP Term Sheet, in full, in cash, at the times set forth in this DIP Term Sheet, but in any event, no later than the Termination Date. |

All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full, in cash on the Termination Date, whether at maturity, upon acceleration or otherwise, and if such amounts are not paid in full in cash,

4

interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full, in cash.

**Use of Proceeds:**

Proceeds of the DIP Facility shall be used solely for the following lawful purposes (and to the extent identified in the Budget): (a) to fund post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to Agent in accordance with this DIP Term Sheet, the DIP Financing Documents, and/or the Pre-Petition Credit Agreement (to the extent required under the DIP Financing Documents) and other Pre-Petition Loan Documents (to the extent required under the DIP Financing Documents) (whether or not such amounts are reflected in the Budget); (c) to fund fees and expenses incurred in connection with the 363 Sale(s) (as defined below); (d) to pay permitted pre-petition claim payments and adequate protection payments approved by Agent in writing or set forth in the Budget, if any; (e) to pay Professional Fees and expenses provided for in the Budget; and (f) to pay certain other costs and expenses of administration of the Chapter 11 Cases, as set forth in the Budget.

Proceeds of the DIP Facility or cash collateral shall not be used (a) to directly or indirectly permit any of the Debtors, or any other party-in-interest or their representatives, to challenge or otherwise contest or institute any proceeding to determine (or directly or indirectly support any other person or entity in challenging or contesting) (i) the validity, perfection or priority of security interests in favor of the Pre-Petition Agent, Pre-Petition Lender, Agent or the DIP Lender, or (ii) the enforceability of the obligations of the Debtors or any guarantor under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, the DIP Financing Documents, or the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the Pre-Petition Agent, Pre-Petition Lender, Agent, or the DIP Lender and their respective agents, employees, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to directly or indirectly investigate, commence, prosecute or defend (or directly or indirectly support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the Obligations under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, or the DIP Financing Documents, (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure (other than capital expenditures specifically set forth in the Budget and approved by Agent), or (e) for any other purpose for which the Carve-Out may not be used, provided that a Committee (if appointed) and its professionals shall be permitted to

expend an amount not to exceed $10,000 in order to investigate the liens and claims of the Pre-Petition Agent and Pre-Petition Lenders in connection with the Pre-Petition Credit Agreement.

**Cash Management Collections and Remittances:**

The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to Agent at its sole option. The Final Order shall provide Agent with a valid and enforceable first priority, perfected lien/security interest on the cash held in the Debtors' bank accounts, subject to the terms of such Final Order.

For the purpose of crediting the Debtors' loan account and calculating interest, all items of payment shall be deemed applied by Agent one (1) business day following the business day of Agent's receipt thereof.

**Guarantor Reaffirmation:**

All obligations of each and every Guarantor under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents shall be, and upon the entry of the Interim Order, shall be deemed without any further action, reaffirmed and shall also extend, and upon the entry of the Interim Order, shall be deemed without any further action to extend, to the DIP Facility.

**Super-Priority Administrative Claim:**

Subject to the Carve-Out and the terms of the Final Order, amounts owed by any of the Debtors to Agent and DIP Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code. The foregoing superpriority claim in favor of Agent shall not be payable from any claims or causes of action arising under any Avoidance Actions.

**Collateral Security:**

The DIP Facility (including accrued interest, fees, costs and expenses relating thereto) shall be secured by first priority, perfected senior and priming liens (subject and junior only to: (i) the Carve-Out and (ii) any valid, enforceable, properly perfected and unavoidable prepetition liens in existence on the Petition Date (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Section 546(b) of the Bankruptcy Code) encumbering assets currently in existence of a Debtor but only to the extent such liens are senior (after giving effect to any subordination agreement) to the liens of the Pre-Petition Agent and Pre-Petition Lenders (collectively, the "**DIP Liens**"): in each Debtor's now owned or hereafter acquired right, title or interest in any property, including, without limitation, all of the Debtors'

6

existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, letter-of-credit rights, investment property, commercial tort claims, goods, inventory, rolling stock, machinery, equipment, fixtures, as-extracted collateral, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, securities accounts, commodity accounts, commodity contracts, contract rights, insurance policies, tax refunds, oil, gas and other minerals, leasehold estates and other real property interests and all proceeds thereof (collectively, the "**DIP Collateral**"); provided, however, the DIP Collateral shall not include any Avoidance Actions or the proceeds thereof.

**Lien Validation and Perfection:**

All liens and security interests authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected automatically as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

The Debtors shall stipulate and agree in the Interim Order and Final Order that (i) the Debtors have outstanding obligations to the Pre-Petition Agent and Pre-Petition Lenders in an amount not less than $33,401,224.84, which are secured by liens on substantially all of the Debtors' assets and which are not subject to any defenses or offsets of any kind; (ii) the Pre-Petition Agent's liens and security interests securing the Pre-Petition Credit Facility are valid, perfected and have first priority, and such liens and security interests encumber all assets of the Debtors, and (iii) the Debtors possess no claims, offsets or any other type of causes of action against the Pre-Petition Agent or any Pre-Petition Lender or any of their respective affiliates, officers, directors, employees, attorneys, and other representatives which would impair, in any manner, the liens or security interests, or both, of the Pre-Petition Agent or any Pre-Petition Lender against the Debtors' assets or the Obligations of the Debtors to the Pre-Petition Agent or Pre-Petition Lender under the Pre-Petition Credit Facility. The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Committee that is appointed, unless and to the extent (i) an adversary proceeding is filed prior to the expiration of seventy five (75) days after the Petition Date (the "**Review Period**") against the Pre-Petition Agent or Pre-Petition Lender challenging such party's liens and security interests or otherwise asserting estate claims against such party, and (ii) a final, non-appealable judgment is entered against the Pre-Petition Agent or such Pre-Petition Lender in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Agent

7

and/or Pre-Petition Lender, or challenging in any manner the liens, security interests and claims of the Pre-Petition Agent or any Pre-Petition Lender against any of the Debtors or their respective assets.

**506(c) Surcharge:**   Subject to entry of the Final Order and show of "cause":

(i) the Debtors shall waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code Section 506(c) or 105(a) or under any other applicable law; and

(ii) Agent, DIP Lender, Pre-Petition Agent, and Pre-Petition Lenders shall not be subject to the "equities of the case" exception of Bankruptcy Code Section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or any collateral securing the Pre-Petition Credit Facility.

**Adequate Protection:**   As adequate protection and in consideration for being primed by the Agent's and DIP Lender's claims, liens and security interests, the Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to allowed claims paid under the Carve-Out and super-priority administrative claims of Agent and DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected replacement liens and security interests in all of the DIP Collateral, subject only to the DIP Liens and the Carve-Out, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral (the "**Adequate Protection Liens**").

**Fees and Expenses:**   The Debtors shall promptly pay or reimburse Agent when invoiced for all reasonable costs and expenses of the counsel, financial advisors, and any other third parties engaged by Agent, or Agent's counsel, to assist such parties regarding the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility including, but not limited to, all due-diligence, duplication, processing, or printing costs, consultation, travel, and attendance at court hearings, and any other matters relating in any way to any of the DIP Financing Documents regardless of whether the DIP Facility is consummated. Agent shall have the right to charge the DIP Facility for any such fees and costs (whether such costs were incurred prior to the Petition Date or after the Petition Date). Failure to pay such fees and costs within ten (10) days after delivery of the applicable

8

invoice shall be an Event of Default under the DIP Facility.

**Conditions Precedent:**    The closing of the DIP Facility shall be subject to the following conditions: (a) approval of the Interim Budget and Budget by Agent, together with all financial information and projections regarding the Debtors requested by Agent, all in form and substance satisfactory to Agent in its sole discretion, (b) entry of an Interim Order and the Final Order (as applicable) approving the DIP Facility, its superpriority administrative claims and all first priority claims, security interests and other liens securing the DIP Facility, and containing such other orders and findings as Agent may require and which Interim Order or Final Order (as applicable) shall not have been modified or amended without approval of Agent, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to Agent, (c) the satisfaction of Agent with all adequate protection payments, critical vendor payments, and all other material motions and orders filed in the Chapter 11 Cases, (d) continuation of the Debtors' present cash management system, and (e) Agent shall have received, in form and substance satisfactory to it in its sole discretion, written reaffirmation from the Guarantors (including any non-debtor Guarantor) that their respective obligations under their respective guaranty agreements and security agreements (as applicable) shall apply with respect to the DIP Facility and DIP Financing Documents.

**Affirmative and Negative Covenants:**    To the extent not inconsistent with other covenants set forth herein, all covenants of the Debtors (including all indemnities and tax gross-up provisions) in the Pre-Petition Credit Agreement shall apply equally to the DIP Facility (as if the DIP Facility would constitute part of the "Obligations" outstanding thereunder), other than the covenants set forth in Sections 6.14 through 6.17 of the Pre-Petition Credit Agreement.

The Debtors shall also comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (including delivery of Approved Budget Variance Reports), (b) the Debtors shall, from and after the Petition Date, continue to take action and demonstrate progress, satisfactory to Agent in Agent's sole discretion, toward closing a sale or sales of substantially all of the Debtors' assets to the Stalking Horse Bidder(s) (or, as applicable, the Winning Bidder(s)) in accordance with the Milestones and shall demonstrate progress toward, and work to satisfy, all proposed sale conditions imposed in the Stalking Horse Bidders' (or Winning Bidders') asset purchase agreement(s); and (c) the Debtors shall, contemporaneously with closing a sale of their respective assets, and conditioned upon entry of Bankruptcy Court order authorizing the same, direct each of the 363 Sale purchaser(s) to remit the proceeds of such sale(s) to Agent for immediate application to the DIP Facility and Obligations under

9

#51991423_v9
DOCS-#5955070-v4

the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.

**Application of 363 Sale Proceeds:** Proceeds from the 363 Sale(s) shall be paid, conditioned upon entry of Bankruptcy Court order authorizing the same, and in accordance with the terms of the Final Order, directly to Agent upon the closing of the 363 Sale(s) and shall be applied: (i) first, to reduce outstanding DIP Facility obligations (including all fees and professional fees payable or reimbursable to Agent pursuant to the DIP Financing Documents); (ii) second, to outstanding Obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents, in the manner set forth in the Pre-Petition Credit Agreement, with any surplus remaining (if any) following satisfaction of the Obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents to be disbursed in the manner set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents (or to whomever shall be lawfully entitled thereto), provided however, that the Debtors shall reserve proceeds from the 363 Sale(s) sufficient to pay expenses of the Debtors' severance, retention plan and post-petition wage obligations, as agreed to by Agent and approved and authorized by the Bankruptcy Court.

**Bankruptcy Court Filings:** As soon as practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to Agent (i) the motion seeking approval of, and proposed forms of, the Interim Order and the Final Order, which motion and forms of order shall be in form and substance satisfactory to Agent in its sole discretion, (ii) the motions seeking approval of any Sale Procedure Order(s) and the 363 Sale(s), and the proposed forms of the orders related thereto, which shall be satisfactory to Agent in its sole discretion, (iii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to Agent in its sole discretion, (iv) any motion seeking approval of any sale of the Debtor's assets and any proposed form of a related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale(s)), and (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any material contract (each of the foregoing items (i) through (v) must be in form and substance satisfactory to Agent in its sole discretion).

**Sale Process:** The Debtors shall conduct a sale process for the sale of substantially all of their assets in one or more 363 Sale(s) accordance with the Milestones set forth below.

Current Management, together with Investment Banker, the Debtors' counsel, and the Debtors' other professionals, shall oversee the sale process on behalf of the Debtors, including all activities of any advisors retained by the Debtors in connection

with the sale process. Current Management shall at all times be entitled to take any action necessary or appropriate to conduct the sale process, and shall provide Agent with access to all potential bidders and other interested parties, and any information provided to the Debtors by such parties.

The Debtors shall provide or cause to be provided to Agent a written report from Current Management weekly (or more frequently as reasonably requested by Agent) in form and substance satisfactory to, and addressing such items as are requested by Agent, including addressing the status of the marketing and sale process of the Debtors. The Debtors shall also cause Current Management to be made available to provide periodic telephonic updates of such reports to Agent from time to time (but not less than weekly), as requested by Agent.

**Milestones:**                      The Debtors shall be required to comply with the following sale milestones (the "**Milestones**"):

(a)       On the Petition Date or such later date to which Agent consents in writing at its sole option, the Debtors shall have selected Stalking Horse Bidder(s) and filed a motion requesting entry of the Sale Procedure Order(s) (as defined below) and the sale of substantially all of one or more of the Debtors' assets to the Stalking Horse Bidder(s) (or Winning Bidder(s), as applicable) on terms and conditions acceptable to Agent in Agent's sole discretion.

(b)       On or before the date that is forty-two (42) days after the Petition Date, or such later date to which Agent consents in writing at its sole option, the Bankruptcy Court shall have entered one or more Sale Procedure Orders.

(c)       On or before the date that is fifty-six (56) days after the Petition Date, or such later date to which Agent consents in writing at its sole option, any and all bids for one or more 363 Sale(s) shall have been received.

(d)       On or before the date that is sixty-three (63) days after the Petition Date, or such later date to which Agent consents in writing at its sole option, the Debtors shall have held the Auction (as defined below) for one or more 363 Sale(s).

(e)       On or before the date that is seventy (70) days after the Petition Date, or such later date to which Agent consents in writing at its sole option, the Bankruptcy Court shall have entered one or more Sale Order(s) (as defined below) approving one or more 363 Sale(s), the results of the Auction and the winning bid received at the Auction.

(f)       On or before the date that is ten (10) days  after

entry of any Sale Order, _provided_ that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which Agent consents in writing at its sole option, the 363 Sale subject to such Sale Order shall be closed, with proceeds of the 363 Sale paid directly to Agent to be applied to the obligations under the DIP Facility and thereafter, as set forth herein.

(g)    Notwithstanding anything to the   contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

(h)    Agent and the Pre-Petition Agent shall have the right to "credit bid" any prepetition or post-petition secured obligations owed to it in any sale of the Debtors' assets.

| | |
|---|---|
| **Representations and Warranties:** | The representations and warranties of the Debtors set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents (other than those set forth in Section 4.24 [solvency] and subject only to Bankruptcy Court approval as to Sections 4.1 [due authorization] and 4.9 [authorizations; consents]) are hereby incorporated into this DIP Term Sheet as if made on the date hereof (except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date). |
| **Additional Conditions to Each Borrowing Under the Facility:** | There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties herein and therein shall be true and correct in all material respects (without duplication of any other materiality qualifier). |
| | There shall have occurred no material adverse change in the Debtors' (financial, environmental, or otherwise) operations, performance, or properties (other than the commencement of the Chapter 11 Cases), since the date of this DIP Term Sheet, that in the judgment of Agent, has or could be expected to have a material adverse effect on the rights and remedies of Agent or on the ability of the Debtors to perform their respective obligations or to provide the liens, security interests and other claims contemplated under or in connection with the DIP Facility. |
| | Agent shall be satisfied that Debtors are continuing to take action and demonstrating progress toward closing one or more sales of substantially all of the Debtors' assets in accordance with   the |

Milestones to the Stalking Horse Bidder(s) (or, as applicable, the Winning Bidder(s)) and are working toward satisfying all proposed sale conditions imposed in the Stalking Horse Bidders' (or Winning Bidders') asset purchase agreement(s).

**Remedies:**

Upon the occurrence of an Event of Default or the Termination Date, and the transmission (including by e-mail) of written notice thereof to counsel for the Debtors, any Committee, and the U.S. Trustee, then Agent shall be fully authorized, in its sole discretion to: (i) cease making DIP Facility advances to the Debtors; (ii) terminate the Debtors' use of the DIP Collateral (including, without limitation, cash collateral); and/or (iii) immediately terminate the DIP Facility and demand immediate repayment, in cash, of the DIP Facility obligations then outstanding.

Additionally, upon the occurrence of an Event of Default or the Termination Date, Agent will also have other remedies under applicable law or under the Pre-Petition Loan Documents, including, without limitation, the ability to foreclose upon and/or sell the DIP Collateral and the right to exercise any remedy available under applicable law.

**Additional Conditions to Financing:**

Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by Agent authorizing and approving the DIP Facility in form, substance and amount and providing for the DIP Collateral, all acceptable to Agent in its sole discretion.

Payment of all fees and expenses owing to Agent in connection with the DIP Facility.

The DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are required by, and are acceptable to, Agent in its sole discretion.

**Events of Default:**

Events of Default shall mean the occurrence of any of the following:

- Any of the Debtors shall, without Agent's prior written consent, take any action that (or fail to take any action that could reasonably be expected to) results in any of Current Management ceasing to be employed by the Debtors or incurring a material change in job duties.

- Any of the Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or the filing of a motion requesting such relief that the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization or other similar dispositive plan by any Debtor that does    not

13

provide for the indefeasible payment in full, in cash on the effective date of the plan effective of the Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by Agent at its sole option.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization or other similar dispositive plan that does not require the indefeasible repayment in full, in cash of the DIP Facility on the effective date of the plan, unless otherwise agreed in writing by Agent at its sole option.

- Appointment of a trustee for any of the Debtors under Section 1104 of the Bankruptcy Code without the express written consent of Agent, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code for any of the Debtors without the prior written consent of Agent, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, or any other DIP Financing Documents, without the prior written consent of Agent or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any Debtor shall request approval of any post-petition financing, other than the DIP Facility, which would not immediately repay all DIP Facility obligations in full, in cash and terminate all related commitments thereunder, on the date of the closing of such post-petition financing.

- Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Entry of an order granting liens, security interests or claims that are senior or *pari passu* to the liens, security interests or claims granted in favor of Agent or DIP Lender under the DIP Financing Documents.

- Any party in interest (including the Debtors) shall assert that any of the DIP Liens or DIP Facility obligations is invalid, or any DIP Liens granted to or DIP Facility obligations owed to Agent or DIP Lender shall be determined to be invalid.

- Any payment on, or application for authority to pay, any pre-petition claim without the prior written consent of Agent.

- At any time, Investment Banker ceases to be involved in the sale process or the sale process is halted.

- A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay, with a claim secured by any DIP Lien or with a claim secured by any asset the subject of a Third-Party Asset Purchase Agreement, unless otherwise agreed in writing by Agent at its sole option.

- Failure to make all payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness.

- Breach of any term or covenant of the DIP Facility or in any DIP Financing Document (including, without limitation, the Milestones).

- Any representation or warranty by any Debtor is incorrect in any material respect (without duplication of any other materiality qualifier) when made.

- Plan exclusivity shall have been terminated or any Debtor shall have agreed to any such termination.

- After entry thereof, any of the Sale Procedure Order(s) or any of the Sale Order(s) shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the express written consent of Agent.

- Unless consented to by Agent in writing, in its sole discretion, the Stalking Horse Bidder designated in the motion seeking approval of the applicable Sale Procedures Order shall drop out of the sale process or otherwise indicate that it is unable to close its related 363 Sale before the Maturity Date.

- Any Debtor shall take (or directly or indirectly support any other Person in taking) any action in order to restrict or prohibit Agent, the Pre-Petition Agent, the Pre-Petition Lender, or any DIP Lender from submitting a "credit bid" for any assets of the Debtors.

- Any Debtor shall take (or directly or indirectly support any other Person in taking) any action inconsistent with the disbursement of any 363 Sale proceeds to Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of a 363 Sale.

- The failure to disburse any of the 363 Sale proceeds to Agent, DIP Lender, and Pre-Petition Lender contemporaneously with the closing of a 363 Sale, as provided in the Final Order and as authorized by Bankruptcy

15

Court order.

- The commencement of an action or filing of a motion by the Debtors challenging the rights and remedies of Agent or DIP Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

- Any matters that give rise to the Termination Date.

**Governing Law:**   All documentation in connection with the DIP Facility shall be governed by the laws of the state of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:**   "**363 Asset Purchase Agreement**" means a Third-Party Asset Purchase Agreement for the sale of substantially all of the assets of one or more of the Debtors to the Stalking Horse Bidders (or Winning Bidders), which 363 Asset Purchase Agreement shall be satisfactory to Agent, in its sole discretion.

"**363 Sale**" means a sale of all or substantially all of the assets of one or more of the Debtors under Section 363 of the Bankruptcy Code.

"**Approved Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis); (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each line item set forth in the Budget for such period; and (iii) provides an explanation for all variances between budgeted amounts and actual amounts. Each Approved Budget Variance Report will be certified as true and correct by the Debtors' chief financial officer or chief executive officer.

"**Auction**" means an auction held in connection with a 363 Sale and in accordance with the provisions set forth in a Sale Procedure Order for all, or substantially all, of one or more of the Debtors' assets.

"**Avoidance Actions**" means any avoidance causes of action that could be brought relating to prepetition transfers pursuant to Sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Colorado, presiding over the Chapter 11 Cases.

16

"**Budget**" means the budget of the Debtors relative to the operations of the Debtors in the Chapter 11 Cases for any fiscal period, as delivered to Agent in form and substance satisfactory to Agent in its sole discretion. A Budget for the first 8 weeks of the Chapter 11 Case (the "**Interim Budget**") must be approved by Agent and must be attached to the Interim Order. A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Borrowers to Agent before any hearing related to final approval of the DIP Facility and must be attached to the Final Order.

"**Carve-Out**" means a carve-out for:

(i) unpaid post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930; and

(ii) unpaid post-petition fees and expenses of professionals of the Debtors and/or any Committee retained by an order of the Court pursuant to Section 327, 328, 363 or 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**") incurred prior to a Termination Event, but only to the extent that to the extent such fees and expenses satisfy all of the following: (a) were incurred before the Termination Event, (b) are within the amounts set forth in the Budget approved by Agent for such Professionals through the date of the Termination Event, (c) are subsequently allowed by the Bankruptcy Court under Section 330, 331, or 363 of the Bankruptcy Code, and (d) were not otherwise paid from retainers or any professional expense escrow account established by the Debtors; and

provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall the Carve-Out for each Professional exceed the amounts for post-petition fees set forth for such Professional in the Budget as of any applicable date of determination.

The Carve-Out shall not include payment for any fees and expenses, if any, of the Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the Pre-Petition Agent, Pre-Petition Lender, Agent, or DIP Lender, or the validity or priority of any liens, security interests or other claims granted or purported to be granted to any such parties;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by Agent or Pre-Petition Agent of any of its rights and remedies under the

17

Interim Order, Final Order, or documents comprising the DIP Facility, DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against Agent, the DIP Lender, the Pre-Petition Agent, the Pre-Petition Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders;

(iv) any request to borrow money other than pursuant to the terms of the Interim Order or the Final Order and the documents comprising the DIP Facility;

(v) with respect to the Debtors, any of the Debtors' Professionals, or any of their respective successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for any of the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge, by the Debtors (or any of them) pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Cases**" means the voluntary Chapter 11 cases commenced by Debtors, case nos. 17-17465-KHT; 17-17467-KHT; 17-17469-KHT and 17-17471-KHT in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Current Management**" means Richard Langdon and Michael Decker.

"**DIP Advance Amounts**" shall mean, the following amounts on the following dates, unless (a) Agent has agreed to a higher amount as determined by Agent in its sole discretion or (b) the Termination Date shall have occurred before any such date:

from the Petition Date and entry of the Interim Order through entry of the Final Order, the total amount of outstanding DIP Facility obligations shall not exceed $350,000; and

18

from entry of the Final Order through the Termination Date, the total amount of outstanding DIP Facility obligations shall not exceed an additional $1,150,000 for a total of $1,500,000. The DIP Advance Amounts shall be calculated net of available cash collateral held by the Debtors, which cash collateral, above a base $250,000 to be used for working capital purposes, shall be used first by the Debtors before obtaining any DIP Advance Amounts. In the event consummation of a 363 Sale extends past the Maturity Date, Agent will consider a limited extension of the Maturity Date and, if necessary, approval of a revised budget for such period.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens, security interests and other claims contained therein, on terms satisfactory to Agent.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing the Debtors to, among other things, obtain interim financing, provide the liens, security interests and other claims contemplated hereunder and incur post-petition indebtedness pursuant to the DIP Facility, on terms satisfactory to Agent.

"**Investment Banker**" means Parkman Whaling.

"**Maturity Date**" means the date that is ninety (90) days after the Petition Date or as otherwise extended by the Agent at its sole option.

"**Petition Date**" means the date on which the Chapter 11 Cases were filed with the Bankruptcy Court, August 11, 2017.

"**Pre-Petition Agent**" means Garrison Agency Loan Services LLC, in its capacity as agent under the Pre-Petition Credit Agreement.

"**Pre-Petition Credit Facility**" means the financial accommodations furnished to one or more of the Debtors pursuant to the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.

"**Pre-Petition Lender**" means each of the Lenders (as such term is defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement.

"**Pre-Petition Loan Documents**" means, collectively, (i) each of the agreements, instruments, and other documents executed in connection with the Pre-Petition Credit Agreement, including, without limitation, each of the Loan Documents (as such term is defined in the Pre-Petition Credit Agreement); and (ii) the Pre-

Petition Credit Agreement.

"**Professional Fees**" means fees and expenses incurred by, and/or payable to, any Professionals.

"**Sale**" means a sale of all or substantially all of one or more of the Debtors' assets.

"**Sale Order**" means an order entered by the Bankruptcy Court in form and substance satisfactory to Agent in its sole discretion that, among other things, approves a 363 Sale, the results of the Auction and the Winning Bidder(s)' bid received at the Auction or the Stalking Horse Bidder(s)' bid (if no Auction is held).

"**Sale Procedure Order**" means an order in form and substance satisfactory to Agent in its sole discretion approving (a) the bidding procedures to be applicable to a 363 Sale and (b) subject to higher and better bid, the proposed form of a 363 Asset Purchase Agreement.

"**Stalking Horse Bidder**" shall mean a proposed purchaser under one or more 363 Sale Asset Purchase Agreement(s) (which purchaser shall be satisfactory to Agent in its sole discretion) that has agreed to serve as the "stalking horse" for a 363 Sale and irrevocably committed, subject only to requisite Bankruptcy Court approval, to acquire substantially all of a Debtor's assets via a 363 Sale Asset Purchase Agreement.

"**Termination Event**" means the first occurrence of any of the following:

(i) an Event of Default under the DIP Facility;

(ii) the Debtors' failure to comply with the terms of the Interim Order or Final Order (including, without limitation, their failure to comply with the Budget, subject to any approved variances); or

(iii) the Debtors' failure to comply with any of the Milestones.

"**Third-Party Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and a third party purchaser that provides for the purchase and sale of substantially all of the assets of the Debtors, which third party purchaser and asset purchase agreement are satisfactory to Agent in its sole discretion.

"**Winning Bidder**" means the bidder that (a) agrees at the Auction to purchase all or substantially all of the assets of the Debtor pursuant to a Third-Party Asset Purchase Agreement, and (b) is acceptable to Agent in its sole discretion.

20

21

# Exhibit B

| 9/11/17 Update | Actual | Actual | Actual | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | 8/22/2017 | 8/29/2017 | 9/5/2017 | 9/12/2017 | 9/19/2017 | 9/26/2017 | 10/3/2017 | 10/10/2017 | 10/17/2017 | 10/24/2017 | 10/31/2017 | 11/7/2017 | 11/14/2017 | 11/21/2017 | 11/28/2017 | 12/5/2017 | |
| **Field - 8/8ths Production - Sales** [1] | | | | | | | | | | | | | | | | | |
| Gas (MMcf) | 498,926 | | | | | | 478,000 | | | | | 483,750 | | | | 466,900 | 1,927,576 |
| Oil (BBLs) | 13,848 | | | | | | 13,672 | | | | | 13,710 | | | | 13,508 | 54,738 |
| 8/8ths BOE's | 97,002 | | | | | | 93,339 | | | | | 94,335 | | | | 91,325 | 1,982,314 |
| | | | | | | | | | | | | | | | | | |
| Gas Prices - Net Realized [2] | $2.42 | | | | | | $2.46 | | | | | $2.46 | | | | $2.56 | |
| Oil Prices - Net Realized [3] | $41.77 | | | | | | $43.34 | | | | | $43.35 | | | | $44.00 | |
| | | | | | | | | | | | | | | | | | |
| **8/8ths Oil & Gas Revenues** [4][5][6] | $1,006.8 | $1,006.8 | | | | | $1,785.8 | | | | | $1,768.4 | | | | $1,784.4 | $6,874.0 |
| Revenue Disbursements [7] | $0.0 | $0.0 | | | | $580.6 | -$623.5 | | | | | $0.0 | | | | -$680.4 | -$2,564.9 |
| Suspense Reversal (Release) [8] | $0.0 | $0.0 | | | -$160.0 | -$76.6 | $0.0 | | | | | $0.0 | | | | $0.0 | -$76.6 |
| **Net Revenues** | $1,006.8 | $0.0 | | | | | $1,162.4 | | | | | $1,768.4 | | | | $1,784.4 | $4,232.5 |
| | | | | | | | | | | | | | | | | | |
| **LOE and Capital - 8/8ths** | | | | | | | | | | | | | | | | | |
| S. Altamont - LOE [9] | $0.0 | -$1.3 | -$10.5 | | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$10.0 | -$131.9 |
| S. Altamont - Capital [10] | $0.0 | $0.0 | $0.0 | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| S. Altamont - Payables [11] | $0.0 | $0.0 | $0.0 | -$93.3 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| | | | | | | | | | | | | | | | | | |
| Riverbend - LOE [12] | $0.0 | -$4.0 | $19.0 | | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$100.0 | -$1,278.2 |
| Riverbend - Capital [13] | $0.0 | $0.0 | $0.0 | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Riverbend - Payables [14] | $0.0 | $0.0 | $0.0 | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| | | | | | | | | | | | | | | | | | |
| Total Field - Salaries [15] | -$20.7 | -$20.5 | $0.0 | $0.0 | -$22.4 | $0.0 | -$22.0 | -$22.0 | $0.0 | $0.0 | -$22.0 | -$22.0 | $0.0 | $0.0 | -$22.0 | $0.0 | -$173.5 |
| Total Field - Land [16] | $0.0 | $0.0 | $0.0 | $0.0 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$7.5 | -$90.0 |
| | | | | | | | | | | | | | | | | | |
| Federal Royalties - OMRI [17] | $0.0 | $0.0 | $0.0 | $0.0 | -$335.0 | $0.0 | $0.0 | -$136.0 | $0.0 | $0.0 | -$136.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$607.0 |
| Utah State Royalties [18] | $0.0 | -$73.5 | $0.0 | $0.0 | -$192.6 | $0.0 | $0.0 | $0.0 | $0.0 | -$50.0 | $0.0 | -$50.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$292.6 |
| Utah State Withholding Taxes [19] | $0.0 | $0.0 | $0.0 | $0.0 | -$36.8 | $0.0 | $0.0 | $0.0 | $0.0 | -$57.0 | $0.0 | -$57.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$150.8 |
| Utah State Severance Taxes [20] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Application of 2010 Utah Severance Tax Refund [21] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Property Taxes [22] | $0.0 | $0.0 | $0.0 | $0.0 | -$111.3 | $0.0 | -$105.3 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$520.0 | $0.0 | $0.0 | -$1,801.0 |
| Total Field - Gas Transportation [23] | -$25.5 | $0.0 | $0.0 | -$15.4 | $21.1 | $21.1 | $0.0 | $7.3 | $0.0 | -$20.0 | $0.0 | $91.3 | $0.0 | $7.3 | $0.0 | -$14.0 | -$58.4 |
| Total Field - Insurance & Bond Fee Payments [24] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| **Total Field Costs - 8/8ths** | -$46.2 | -$5.3 | -$1.5 | -$119.2 | -$203.1 | $14.2 | $476.1 | $139.5 | -$380.5 | -$663.5 | $124.8 | -$220.8 | $360.5 | -$869.5 | -$138.8 | -$583.4 | -$4,583.4 |
| | | | | | | | | | | | | | | | | | |
| Total Field - JIB Receivables [25] | $268.9 | $0.0 | $36.8 | $50.0 | $25.1 | $313.7 | $0.0 | $0.0 | $60.0 | $57.5 | $57.5 | $60.0 | $60.0 | $73.4 | $225.0 | $225.0 | $1,222.0 |
| Less: COPAS [26] | -$73.5 | $0.0 | $0.0 | $0.0 | $0.0 | -$73.5 | $0.0 | $0.0 | $0.0 | $0.0 | -$73.5 | $0.0 | $0.0 | -$33.0 | $0.0 | -$73.5 | $294.0 |
| Total Field - BTR/LC Contract Op Payments [27] | $0.0 | $51.8 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $60.0 | $0.0 | $0.0 | $0.0 | $0.0 | $128.0 |
| **Total Field - Receivables** | $195.4 | $68.6 | $50.0 | $25.1 | $240.2 | $0.0 | $230.1 | $320.5 | $428.5 | $190.8 | $360.5 | $360.5 | $73.4 | $151.5 | $12.7 | $609.9 | $969.9 |
| | | | | | | | | | | | | | | | | | |
| **Field - Net Costs** | -$46.2 | $190.0 | $50.5 | -$177.9 | $814.2 | $235.9 | $230.1 | $206.5 | $1,309.9 | $190.8 | $190.8 | $360.5 | $1,124.9 | -$635.7 | | | -$3,623.6 |
| | | | | | | | | | | | | | | | | | |
| **Field - Total Field Level Net Cash Flow** | -$46.2 | $1,196.8 | -$30.1 | $367.9 | $880.8 | $926.5 | $73.4 | $129.5 | $320.5 | $839.2 | $160.8 | -$869.5 | -$869.5 | $1,124.9 | | $608.9 | $608.9 |
| | | | | | | | | | | | | | | | | | |
| G&A - Payroll - Denver Office [28] | $0.0 | $0.0 | -$73.8 | -$73.4 | -$73.4 | -$73.4 | -$73.4 | -$73.4 | -$33.0 | $0.0 | -$33.0 | $0.0 | -$73.4 | $0.0 | -$73.4 | $0.0 | -$514.3 |
| G&A - Payroll - Field Supervision [29] | $0.0 | $0.0 | -$33.2 | $0.0 | -$33.0 | -$33.0 | -$33.0 | -$33.0 | -$33.0 | $0.0 | -$33.0 | $0.0 | -$33.0 | $0.0 | -$33.0 | $0.0 | -$231.1 |
| G&A - Payroll [30] | $0.0 | $0.0 | -$107.0 | -$106.4 | -$106.4 | -$106.4 | -$106.4 | -$106.4 | -$106.4 | -$106.4 | -$106.4 | $0.0 | -$106.4 | $0.0 | -$106.4 | $0.0 | -$745.4 |
| G&A - Occupancy Rents [31] | $0.0 | $0.0 | -$27.4 | $0.0 | -$40.0 | $0.0 | $0.0 | $0.0 | -$15.0 | -$15.0 | $0.0 | $0.0 | -$60.0 | $0.0 | -$60.0 | $0.0 | -$69.0 |
| G&A - Bond Escrow [32] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| G&A - Accounting [33] | $0.0 | $0.0 | -$20.0 | $0.0 | -$20.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$30.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$80.0 |
| G&A - BOD Fees and Expenses [34] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| G&A - Consulting - WestRock [35] | $0.0 | $0.0 | $0.0 | -$55.0 | $0.0 | -$55.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$55.0 | $0.0 | -$55.0 | $0.0 | $0.0 | -$35.0 |
| **Total G&A Before 3rd Party Payments** | -$1.0 | -$4.2 | -$134.4 | $141.4 | $141.4 | -$126.4 | $0.0 | -$156.4 | $0.0 | -$151.4 | $0.0 | $0.0 | -$121.4 | -$45.0 | -$121.4 | $0.0 | -$1,162.9 |
| | | | | | | | | | | | | | | | | | |
| G&A - BTR/LC Contract Op Receivables [36] | $0.0 | $0.0 | $0.0 | $13.6 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $13.6 |
| G&A - COPAS Receivables [37] | $0.0 | $73.5 | $0.0 | $0.0 | $0.0 | $73.5 | $0.0 | $0.0 | $0.0 | $0.0 | $73.5 | $73.5 | $0.0 | $0.0 | $0.0 | $73.5 | $294.0 |
| **G&A - Total 3rd Party Payments** | $0.0 | $73.5 | $0.0 | $0.0 | $0.0 | $73.5 | $0.0 | $0.0 | $0.0 | $0.0 | $73.5 | $73.5 | $0.0 | $0.0 | $0.0 | $73.5 | $307.6 |
| | | | | | | | | | | | | | | | | | |
| G&A - Total Net G&A [38] | -$1.0 | $69.3 | -$134.4 | $13.6 | -$45.0 | -$52.9 | -$15.0 | -$156.4 | $15.0 | $151.4 | $58.5 | $0.0 | $121.4 | -$45.0 | $47.9 | $865.3 |
| G&A - Total Denver G&A [39] | -$1.0 | $69.3 | $101.2 | -$86.4 | $108.4 | -$19.9 | -$15.0 | -$123.4 | $15.0 | $118.4 | $58.5 | $0.0 | -$88.4 | $0.0 | -$14.9 | -$624.2 |
| | | | | | | | | | | | | | | | | | |
| Restructuring - Legal - Hall Estill [40] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$50.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$50.0 | $0.0 | $0.0 | $0.0 | -$50.0 | $0.0 | -$150.0 |
| Restructuring - Legal - Lindquist [41] | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$75.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$75.0 | $0.0 | $0.0 | $0.0 | -$75.0 | $0.0 | -$225.0 |
| Restructuring - Legal - Lender's Counsel [42] | $0.0 | $0.0 | $0.0 | $0.0 | -$75.0 | -$75.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$75.0 | $0.0 | $0.0 | -$75.0 | $0.0 | -$300.0 |
| Restructuring - Legal - Unsecured Creditors' Committee [43] | $0.0 | $0.0 | $0.0 | $0.0 | -$25.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$25.0 | $0.0 | $0.0 | $0.0 | -$25.0 | $0.0 | -$25.0 | -$100.0 |

| | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restructuring - Parkman Whaling (28) | -$50.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$550.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$550.0 | $0.0 | $0.0 | -$250.0 |
| Restructuring - R2 Advisors (28) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$100.0 | $0.0 | $0.0 | -$175.0 | $0.0 | $0.0 | -$275.0 |
| **Restructuring - Total (27)** | -$50.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$550.0 | $0.0 | $0.0 | -$100.0 | $0.0 | $0.0 | -$175.0 | $0.0 | $0.0 | -$1,025.0 |
| Severance and Retention Payments (28) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | -$600.0 |
| Contingency (28) | $0.0 | $0.0 | $0.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$25.0 | -$300.0 |
| **Total Net Cash Flow** | -$97.1 | $1,266.1 | -$135.8 | -$86.5 | -$524.3 | -$1,060.8 | $673.6 | $728.3 | $1,401.9 | $1,155.4 | -$310.9 | $844.5 | $1,163.5 | -$980.7 | $531.9 | $1,054.9 | -$1,583.6 | -$2,171.4 |
| Beginning Cash | $1,366.8 | $1,269.7 | $2,535.7 | $2,399.9 | $2,313.4 | $1,789.1 | $728.3 | $1,401.9 | $1,155.4 | $844.5 | $384.0 | $1,547.6 | $566.8 | $256.1 | $1,304.9 | $1,304.9 | | |
| **Change in Cash with Financing** | -$97.1 | $1,269.7 | -$135.8 | -$86.5 | -$524.3 | -$1,060.8 | $728.3 | $728.3 | $1,155.4 | $1,155.4 | -$469.5 | $384.0 | $1,163.5 | -$980.7 | $256.1 | -$56.1 | -$1,054.9 | $1,366.8 |
| **Ending Cash** | $1,269.7 | $2,535.7 | $2,399.9 | $2,313.4 | $1,789.1 | $728.3 | $1,401.9 | $2,313.4 | $1,155.4 | $844.5 | $384.0 | $1,547.6 | $566.8 | $256.1 | $1,304.9 | $1,304.9 | $250.0 | $250.0 |
| **DIP Loan** | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | $1,366.8 | $1,269.7 | $2,535.7 | $2,399.9 | $2,313.4 | $1,789.1 | $728.3 | $1,401.9 | $1,155.4 | $844.5 | $384.0 | $1,547.6 | $566.8 | $256.1 | $1,304.9 | $1,304.9 | $250.0 | $1,366.8 |
| DIP Beginning Balance | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $469.5 | $1,163.5 | $880.7 | $310.9 | $1,163.5 | $56.1 | $1,054.9 | -$1,116.8 |
| DIP Draws | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $469.5 | $384.0 | $880.7 | $310.9 | $384.0 | $825.8 | $825.8 | $250.0 |
| DIP Outstanding Balance | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $469.5 | $1,547.6 | $0.0 | $0.0 | $1,547.6 | $825.8 | $1,054.6 | $1,054.6 |

DIP Balance @ 12/1/17            $1,054.6
Cash Balance @ 12/1/17           $250.0
Net DIP Balance @ 12/1/17        $804.6

**Assumptions - Footnotes**

1  Current production forecast with no change in assets managed and without capital for additional drilling, recompletion or workover activity
2  Current price forecast - net wellhead realization
3  Estimate updated for actual August receipts and timing of the August revenue disbursements.
4  Forecast consistent with current LOE costs
5  No capital expenditures are forecast
6  Catch up on royalties. None planned.
7  Forecast consistent with current LOE costs.
8  Field salaries for Riverbend, South Altamont and BTR/Lake Canyon (contract operations)
9  Land budget required to maintain current leasehold
10  Catch up on past due royalty payments and withholding taxes to the extent they have priority in bankruptcy. Payment of pre-petition Production and Property Taxes are deferred until asset sale closing. Post petition royalties and taxes
10A  The state of Utah approved a $466,419.00 Severance Tax refund for the year ended 12/31/10. They applied the refund to the amounts we owe them for past due State Severance and Conservation taxes including penalties and interest
     through the end of 2016. We received an check totaling $172,088.54 on 7/5/17.
11  Primarily Questar transportation, purchase gas and South Altamont transportation costs. Eliminated Pre-Petition costs not paid. Post-petition costs are kept current based on actual usage. Starting September the Anadarko gas proces
     paying Monarch directly for its post petition gathering and water disposal costs.
12  Operations insurance and bond premiums.
13  Portion of the monthly contract operations fee from RIG II covering BTR/LC field operations personnel
14  Denver office personnel - assuming no change in current personnel until end of bankruptcy period unless assets under management change.
15  Field operations supervisory personnel. Does not assume any further layoffs until the assets under management change.
16  $150,000 collateral deposit in August eliminated post-petition.
17  External accounting support - primarily Pivot. No annual outside financial audit or third party reserve report for YE 2016 is planned at this time
18  Board payments eliminated June 30.
19  JT Thompson - our needs for his time will be dependent on bankruptcy requirements
20  Portion of the monthly contract operations fee from RIG II attributable to Badlands G&A costs
21  Estimated outside Counsel - litigation, contracts & bankruptcy counsel - assumes we start preparing mid July for an August bankruptcy filing. HE is doing the work on the PSA's and asset sale portion of the 363 transactions. $100k pa
     June billing ($70k) plus $30k Retainer was added to their earlier $25k Retainer for a total Retainer of $50k.
22  Denver bankruptcy counsel - assumes we start preparing in mid for an August 11 bankruptcy filing. Will provide ~90% of the day-to-day bankruptcy support. $120k week of 7/7 is their retainer.
23  Garrison counsel assumes $75k/month payment starting mid-September.
24  Unsecured Creditors Committee Expenses
25  Includes additional $50k retainer week prior to filing and $50k /month payment during bankruptcy period. Does not include success fee.
26  Assumes R2 Advisors $15K retainer paid in June covers their fees for for schedule and disclosure preparation.
27  Assumes bankruptcy filing August 11, 2017.
28  Estimate incorporating the greater of traditional severance policy of 2 weeks salary per year of service or proposed retention payments. To the extent Denver personnel are retained by the buyers, these costs could be lower.